# United States Court of Appeals
*for the*
# First Circuit

---

Case No. 25-1063

NORTH END CHAMBER OF COMMERCE, INC.; 119 SALEM ST., INC., d/b/a Ristorante Euno; ANTICO FORNO, INC., d/b/a Antico Forno; AQUA PAZZA, INC., d/b/a Aqua Pazza; ASSAGGIO, INC., d/b/a Assaggio; DOLCE, INC., d/b/a Dolce; FULL COMP, INC., d/b/a Mare Oyster Bar; IL PANINO EXPRESS, INC., d/b/a Quattro Ristorante; IL PANINO, INC., d/b/a Trattoria Il Panino [Parmenter St.];MARNICO, INC., d/b/a Nico Ristorante; MONICA'S TRATTORIA ON PRINCE, INC., d/b/a Monica's Trattoria; MONICA'S, INC., d/b/a Vinoteca di Monica, d/b/a Monica's Restaurant; NICOMAR, INC., d/b/a Strega; SCHIAFFO, INC., d/b/a Carmelina's; STREGA PIZZERIA & CAFE CORP., d/b/a Rina's; TERRAMIA, INC., d/b/a Terramia Ristorante; TRATTORIA IL PANINO HANOVER, INC., d/b/a Trattoria Il Panino [Hanover St.]; TRESCA RESTAURANT GROUP, LLC, d/b/a Tresca; UMBRIA NORTH END, INC., d/b/a Umbria; VADO PAZZO, INC., d/b/a Bricco Ristorante & Enoteca; VILLA FRANCESCA'S, INC., d/b/a Ristorante Villa Francesca,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE DISTRICT OF MASSACHUSETTS, BOSTON, IN CASE NO. 1:24-CV-10039-LTS, LEO T. SOROKIN, U.S. DISTRICT JUDGE

## BRIEF FOR PLAINTIFFS-APPELLANTS

KIERAN G. ALTIERI
ALTIERI LAW & CONSULTING, PLLC
*Attorneys for Plaintiffs-Appellants*
100 Cambridge Street, 14th Floor
Boston, MA 02114
(603) 413-5285

CP COUNSEL PRESS    (800) 4-APPEAL • (378456)

CASARECCE LLC, d/b/a Casarecce Restaurant,

*Plaintiff,*

v.

CITY OF BOSTON,

*Defendant-Appellee.*

- i -

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellants North End Chamber of Commerce, Inc., 119 Salem St., Inc., Antico Forno, Inc., Aqua Pazza, Inc., Assaggio, Inc., Dolce, Inc., Full Comp, Inc., Il Panino Express, Inc., Il Panino, Inc., Marnico, Inc., Monica's Trattoria On Prince, Inc., Monica's, Inc., Nicomar, Inc., Schiaffo, Inc., Strega Pizzeria & Café Corp., Terramia, Inc., Trattoria Il Panino Hanover, Inc., Tresca Restaurant Group, LLC, Umbria North End, Inc., Vado Pazzo, Inc., and Villa Francesca's, Inc., state that, as to each entity, there is no parent corporation or publicly held corporation owning 10% or more of its stock.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ......................................................iv

JURISDICTIONAL STATEMENT ........................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............. 2

STATEMENT OF THE CASE ................................................. 4

SUMMARY OF ARGUMENT .................................................. 6

STANDARD OF REVIEW....................................................... 12

ARGUMENT ..................................................................... 13

    I.    THE DISTRICT COURT ERRED BY FAILING TO WEIGH ALLEGATIONS WHICH WENT TO THE HEART OF THE DISMISSED CLAIMS ............................. 13

    II.    THE COURT ERRED BY DILUTING AND INVERTING THE UNLAWFUL TAX TEST ...................... 19

    III.    THE DISTRICT COURT ERRED BY APPLYING A LEGALLY ERRONEOUS "CLASS OF ONE" COMPARATOR TEST ....................................................... 27

        A.    The district court wrongly compared neighborhood to neighborhood.................................... 27

        B.    The district court failed to assess the similarly situated comparators alleged in the complaint........... 31

        C.    The district court failed to weigh the substantiated allegations of bad faith retaliation and animus ................................................ 40

    IV.    THE DISTRICT COURT FAILED TO ADDRESS THE CLAIMS ARISING FROM THE 2024 BAN ................ 41

V.    THE DISTRICT COURT FAILED TO WEIGH SUBSTANTIAL EVIDENCE OF DISCRIMINATORY INTENT ................................................................... 44

VI.   THE COMPLAINT STATED PLAUSIBLE PROCEDURAL AND SUBSTANTIVE DUE PROCESS CLAIMS ............................................................ 46

    A.    The Complaint's Procedural Due Process Claim ......... 47

        1.    The City had no authority to impose a North End ban under the statute ...................... 47

        2.    The Complaint adequately alleged a property interest based on the statutory scheme, the importance of outdoor dining, and the City's representations ............................ 50

        3.    The City provided the Plaintiffs with no process regarding the 2022 North End Plan and the 2023 and 2024 bans ...................... 54

    B.    The Complaint's Substantive Due Process Claim ............................................................................ 54

VII.  RULE 8 WAS NOT VIOLATED AND DISMISSAL OF THE COMPLAINT WAS NOT WARRANTED UNDER THE CIRCUMSTANCES ....................................... 57

CONCLUSION ..................................................................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Am. Trucking Ass'ns v. Alviti,*
944 F.3d 45 (1st Cir. 2019) ...............................................................22

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................... 6, 59

*Back Beach Neighbors Comm. v. Town of Rockport,*
535 F. Supp. 3d 57 (D. Mass. 2021) ....................................................29

*Back Beach Neighbors Committee v. Town of Rockport,*
63 F.4th 126 (1st Cir. 2023) ........................................................ *passim*

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .............................................................................6

*Berge v. Sch. Comm. of Gloucester,*
107 F.4th 33 (1st Cir. 2024) ...............................................................13

*Berry v. Danvers,*
34 Mass. App. Ct. 507 (Mass. App. Ct. 1993) ...............................24, 25

*Bertone v. Dep't of Pub. Utils.,*
583 N.E.2d 829 (Mass. 1992) .............................................................23

*Board of Regents v. Roth,*
408 U.S. 564 (1972) ...........................................................................51

*Brockton Power LLC v. City of Brockton,*
948 F. Supp. 2d 48 (D. Mass. 2013) ...............................................41, 57

*Buise v. Hudkins,*
584 F.2d 223 (1978) .......................................................................13-14

*Cerame v. Slack,*
123 F.4th 72 (2d Cir. 2024) ................................................................16

*Clark v. Boscher,*
514 F.3d 107 (1st Cir. 2008) ..............................................................54

*Cordi-Allen v. Conlon,*
  494 F.3d 245 ..............................................................................28

*Correia v. Fitzgerald,*
  354 F.3d 47 (2003) ......................................................................18

*Denver St. LLC v. Town of Saugus,*
  970 N.E.2d 273 (Mass. 2012)......................................................23

*Emerson College v. Boston,*
  391 Mass. 415 (1984) ...................................................... 19, 21, 23, 27

*Giragosian v. Ryan,*
  547 F.3d 59 (1st Cir. 2008) .........................................................12

*Greenbriar, Ltd. v. City of Alabaster,*
  881 F.2d 1570 (11th Cir. 1989)....................................................57

*Harrison v. Springdale Water Sewer Comm'n,*
  780 F.2d 1422 (8th Cir. 1986)......................................................14

*Macaulay v. Anas,*
  321 F.3d 45 (1st Cir. 2003) .........................................................18

*MacLaurin v. City of Holyoke,*
  475 Mass. 231 (2016) ..................................................................53

*Mad Room, LLC v. City of Miami,*
  2023 U.S. Dist. LEXIS 220762 (S.D. Fla. Dec. 12, 2023) ...................57

*Matzker v. Herr,*
  748 F.2d 1142 (7th Cir. 1984)......................................................13

*Nestor Colon Medina & Sucesores, Inc. v. Custodio,*
  964 F.2d 32 (1st Cir. 1992.) ........................................................54

*Perry v. Sindermann,*
  408 U.S. 593 (1972)......................................................................51

*PFZ Properties, Inc. v. Rodriguez,*
  928 F.2d 28 (1st Cir. 1991) .........................................................52

*Powell v. Alexander,*
  391 F.3d 1 (1st Cir. 2004) ...........................................................13

*Redondo-Borges v. United States HUD*,
421 F.3d 1 (1st Cir. 2005) ...................................................................51

*Rodríguez-Reyes v. Molina-Rodríguez*,
711 F.3d 49 (1st Cir. 2013) .................................................................15

*Roeder v. Alpha Industries, Inc.*,
814 F.2d 22 (1st Cir. 1987) .................................................................12

*Rubinovitz v. Rogato*,
60 F.3d 906 (1st Cir. 1995) .................................................................14

*Salahuddin v. Cuomo*,
861 F.2d 40 (2d Cir. 1988) ..................................................................59

*SDCO St. Martin, Inc. v. City of Marlborough*,
5 F. Supp. 3d 139 (D. Mass. 2014)................................................23, 25

*Silva v. City of Attleboro*,
908 N.E.2d 722 (Mass. 2009)...............................................................23

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
707 F.3d 95 (1st Cir. 2013) .................................................................59

*Soranno's Gasco, Inc. v. Morgan*,
874 F.2d 1310 (9th Cir. 1989)..............................................................54

*Stroman v. Bristol Cnty. Dist. Attorney's Office*,
2023 U.S. Dist. LEXIS 160008 (D. Mass. 2023) ................................59

*Village of Willowbrook v. Olech*,
528 U.S. 562 (2000)........................................................................31, 41

*Wadsworth v. Nguyen*,
2025 U.S. App. LEXIS 3782 (1st Cir., February 17, 2025).................61

*Wilson v. HSBC Mortg. Servs.*,
744 F.3d 1 (2014) ...............................................................................12

*Windsor Ct., LLC v. Lynnfield Water Dist.*,
18 N.E.3d 1138 (Mass. App. Ct. 2014) ..............................................23

*Yerardi's Moody Street v. Board of Selectmen*,
19 Mass. App. Ct. 296 (1985)..............................................................53

## Statutes & Other Authorities:

U.S. Const. amend. V ......................................................................... 1

U.S. Const. amend. XIV ..................................................................... 1

28 U.S.C. § 1291 ................................................................................. 1

28 U.S.C. § 1331 ................................................................................. 1

28 U.S.C. § 1343 ................................................................................. 1

28 U.S.C. § 1367 ................................................................................. 1

28 U.S.C. § 1391(b) ............................................................................ 1

28 U.S.C. § 1391(c) ............................................................................ 1

28 U.S.C. § 2201 ................................................................................. 1

28 U.S.C. § 2202 ................................................................................. 1

42 U.S.C. § 1983 ................................................................................. 1

Fed. R. Civ. P. 8 ........................................................................ *passim*

Fed. R. Civ. P. 12(b)(6) ............................................................ 5, 12, 16

M.G.L. c. 223A, § 3 ............................................................................ 1

Massachusetts Session Laws, Acts of 2021, Chapter 20, § 19 ............... 48

Massachusetts Session Laws, Acts of 2022, Chapter 42, § 27 .............. 49

Massachusetts Session Laws, Acts of 2023, Chapter 2, § 38 ................ 49

## JURISDICTIONAL STATEMENT

The matter before the district court arose under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Massachusetts state law.

The district court had subject matter jurisdiction over the federal law claims under 28 U.S.C. §§ 1331 and 1343, and subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367.

The district court had personal jurisdiction over Defendant-Appellee City of Boston under M.G.L. c. 223A, § 3. The exercise of personal jurisdiction over Defendant-Appellee City of Boston is consistent with the Due Process clauses of the Fifth and Fourteenth Amendments to the United States Constitution. Venue in the District of Massachusetts was proper under 28 U.S.C. §§ 1391(b)-(c).

The district court issued a final order and entered judgment on December 20, 2024. ADD1-34. A notice of appeal was filed on January 14, 2025. A472. This Court's appellate jurisdiction arises from 28 U.S.C. §1291.

- 1 -

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Whether the district court erred by concluding that Plaintiffs "adduced no direct evidence establishing retaliatory motive," notwithstanding the City's statement: "if they sue, can we just say 'fine, we are shutting down the North End program'"? (Point I, A.)

Whether the district court erred by resolving challenged factual issues against the Plaintiffs in ruling on the City's motion to dismiss? (Point I, B.)

Whether allegations that fees charged to the North End restaurants in 2022 were used to fund a $520,000 electric street sweeper and other purposes unrelated to North End outdoor dining should have required denial of the motion as to unlawful tax? (Point II)

Whether the district court erred by applying a legally erroneous "class-of-one" equal protection test, comparing neighborhood to neighborhood, instead of the Plaintiffs' restaurants to other alleged similarly situated restaurants? (Point III)

Whether the district court erred by failing to address in any way the allegations and claims regarding the 2024 North End ban? (Point IV)

Whether the COVID-19 emergency legislation precluded the City from imposing a North End-only outdoor dining ban while the North End restaurants' licenses were in place pursuant to that legislation? (Point V)

Whether the district court erred by not considering —in ruling that there was no plausible allegation of discriminatory intent— an allegation that the City deliberately excluded and uninvited whites from a government function? (Point VI)

Whether a district court may properly dismiss a complaint without leave to amend on the sole basis that the complaint is too long, even where (1) the complaint contained a short and plain statement of the claims, and (2) the defendant comprehended and responded to the claims and the court comprehended and ruled on them? (Point VII)

## STATEMENT OF THE CASE

This appeal arises from an order of dismissal for failure to state a claim in a case brought by twenty-one North End restaurants and the North End Chamber of Commerce against the City of Boston. Twenty of the restaurants and the Chamber bring this appeal.

The complaint asserted claims involving five years of outdoor dining history.[1] In three of those years (2022-2024), the City's rules for on-street dining were different for restaurants in the North End than they were for the rest of the City.

In the first year (2022), the City charged North End restaurants a $7,500 participation fee, plus $480 per parking spot per month, while restaurants in all other parts of the City participated in the on-street dining program for free. In the second and third years (2023-24), North End restaurants were prohibited from on-street dining, while restaurants everywhere else in the City continued to participate for free.

The district court determined that the complaint which asserted due process, equal protection, unlawful tax and related counts based on

---

[1]   A summary of the relevant facts and claims is provided at A12-25 (¶¶ 1-51 of the Second Amended Complaint).

- 4 -

the three years of Boston programs did not state any plausible claims for which the law afforded a remedy. The district court also ruled that the complaint violated Federal Rule of Civil Procedure 8, and dismissed the case in its entirety.

This appeal seeks the Court's de novo review of whether the Plaintiffs stated *any* viable claim for relief under the familiar 12(b)(6) standard, and seeks an order of reversal and remand on all of the claims, as explained below.

SUMMARY OF ARGUMENT

*First*, the district court erred by failing to consider foundational allegations of the complaint, contrary to the requirements of *Twombly* and *Iqbal*.[2] The allegations which went unacknowledged by the district court include: (1) a statement by the City contemplating a ban of the outdoor dining program in the North End *as retaliation for* the restaurants' protests and potential suit about the 2022 fees; (2) an allegation, supported by documentary evidence, that the 2022 fees charged only to the North End restaurants were for revenue raising purposes and were planned to be deposited into the general fund; (3) an allegation that the City repeatedly promised to the North End restaurants that it would reinvest the 2022 fee money into the North End with input from a community group, and failed to do so; and (4) an allegation that the City created a "North End outdoor dining task force" for 2024, and then proceeded to ignore the task force's recommendation that there should be outdoor dining in 2024, and banned the North End

---

[2]   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*") and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*").

restaurants again. In fact, the district court's order of dismissal did not address the 2024 claims at all.

Though these allegations and others were fundamental to the claims, each of them went unaddressed by the court in its dismissal order. Instead of accepting the truth of these allegations and reasonable inferences from them, the district court openly fretted about "unlock[ing] the doors of discovery in federal court." The City's "if they sue, can we just … shut[] down the North End program" comment, when coupled with the fact that the City did in fact shut it down, should have alone compelled denial of the retaliation-based claims. The district court also incorrectly decided factual issues in ruling on the motion. See Point I.

*Second*, the district court misconstrued Massachusetts law on unlawful tax. The caselaw is clear that a lawful fee —distinguished from an unlawful fee or tax— must have three characteristics. Thus, any well-pled allegation that one of these elements of lawfulness was *not* met should have resulted in denial of the motion. The district court instead looked for allegations in the complaint that supported a theoretically lawful basis for the fees, and found it, and dismissed the unlawful tax claim. This was a conflation of the rational basis test and the unlawful

tax test, and a misapplication of the motion to dismiss standard. See Point II.

*Third*, the district court erred by applying the incorrect legal standard to the class-of-one equal protection claim. The law of this Circuit requires a class-of-one claimant to present sufficiently similar comparators who were treated differently vis-à-vis the government. The complaint did so. In dismissing the class-of-one claims, the district court first erroneously determined that the most salient comparator was not other restaurants, but rather other neighborhoods in Boston. This use of neighborhoods as comparators was legal error. See Point III, A.

The district court then compounded its erroneous class-of-one test by determining that no restaurant outside the North End could be similarly situated because the North End was incomparably unique. North End restaurants, the court concluded, needed to be compared to North End restaurants.

In justifying this conclusion, the district court accepted the very reasons the City urged, which the Plaintiffs directly challenged in the complaint. The court cited "density" and "proximity" to two construction projects, and vague "residential quality of life issues" which were the

City's purported bases for the disparate treatment of the North End. The Plaintiffs, however, challenged these bases as "pretextual" justifications with detailed, specific factual allegations. In particular, the Plaintiffs alleged that the restaurants in other neighborhoods were in similarly "dense" areas in all relevant respects, that they shared the "quality of life issues," and alleged that the North End's proximity to construction projects basis was (1) pretextual, and (2) wholly irrelevant to the similarly situated analysis. In accepting the City's view of these issues, the Court impermissibly flipped the motion to dismiss standard on its head. This was reversible error. See Point III, B.

*Fourth*, the district court declined to address an entire class of claims relating to the 2024 ban. The thirty-three page order does not even acknowledge the claims made by the Plaintiffs regarding the 2024 ban, which included independent bases for many of the counts. Because those allegations raise separate legal issues, and also inform the allegations of improper motive vis-à-vis the 2022 and 2023 claims, this too was error and requires reversal. See Point IV.

*Fifth*, the district court failed to acknowledge or consider allegations of race-based exclusionary conduct which compelled denial of

the discriminatory intent-based claims. Specifically, the allegation of exclusion of whites from an "electeds of color" holiday party was highly relevant to the plausibility of the claims of discriminatory intent, and should not have been discarded or overlooked. The district court acknowledged the hosting of the party and concluded it was innocuous, but failed to acknowledge the exclusion, which is a fundamentally different allegation and which informs many other allegations in the case. See Point V.

*Sixth*, the complaint raised plausible claims that the Plaintiff-Appellants' procedural and substantive due process rights were violated. As to procedural due process, the Court of Appeals should determine that the statewide legislative scheme did not permit a North End-only ban by mayoral fiat, which operated as a revocation of the in-place North End licenses prior to their expiration under the state statutes. Regardless of the Court's assessment of that legal issue, there were adequate allegations to support the existence of a property interest and deprivation, the two core components of such a claim. See Point VI, A.

As to substantive due process, there were ample allegations of gross misuse of power, including the allegations that the city planned and

threatened to terminate a government program as a means of silencing dissent, that it —in fact— terminated the program as retaliation for the dissent, and that the City misrepresented the purpose of and misused the money it collected from the restaurants in 2022. These were enough to assert a plausible due process claim, even if the district court saw the allegations differently. See Point VI, B.

Finally, the district court erred by ruling that Rule 8 was violated and provided an independent basis for dismissal of the case. Contrary to the court's determination, the complaint included the short and plain statement required by the Federal Rules, and there is no "just too long" rule. Any discretion the district court had to dismiss a complaint it viewed as overly long was imprudently exercised in this case, which involved three years of the challenged programs, five years of outdoor dining history, necessary legislative and historical context involving many more years, and stringent pleading standards for the claims asserted in the case. See Point VII.

## STANDARD OF REVIEW

In reviewing the district court's grant of a 12(b)(6) motion, this Court's review is conducted de novo, and the Court, like the district court, must "construe all factual allegations in the light most favorable to the non-moving party to determine if there exists a plausible claim upon which relief may be granted." *Wilson v. HSBC Mortg. Servs.*, 744 F.3d 1, 7 (2014). Moreover, the Court is free to consider documents incorporated by reference in the complaint, matters of public record, and other matters "susceptible to judicial notice." Id. (citing *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008)). Additionally, and paramount to this appeal, a court considering or reviewing an order on a motion to dismiss "should not decide questions of fact. A complaint is to be construed in the light most favorable to the plaintiff; dismissal is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of" its claims. *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 25 (1st Cir. 1987). As explained below, the district court departed from this standard in several ways.

## ARGUMENT

I.    THE DISTRICT COURT ERRED BY FAILING TO WEIGH ALLEGATIONS WHICH WENT TO THE HEART OF THE DISMISSED CLAIMS.

"If they sue, can we just say, 'fine, we are shutting down the North End program.'" A high-ranking City official made this statement after the City learned of a potential suit by the restaurants challenging the $7,500 fee which the City planned to charge North End restaurants to participate in the citywide on-street outdoor dining program in 2022. A17, ¶18. And when the restaurants sued to challenge the fee, the City carried out exactly what it had internally considered: it banned outdoor dining in the North End. A21-22. This is unconstitutional conduct, as expressed by multiple federal courts of appeal, including this Court.[3]

---

[3] Cf. *Powell v. Alexander*, 391 F.3d 1, 16 (1st Cir. 2004)("[o]ur constitutional system gives every citizen the right to seek redress in the courts . . . without fear that recourse to the law will make that citizen a target for retaliation,"); *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 40-41 (1st Cir. 2024) ("[T]he First Amendment gives all of us — as players in the democratic process — space to ask public officials questions … without the threat of legal liability … [because]… in such discussions lies the security of the Republic, the very foundation of constitutional government.") (internal citations omitted); *Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir. 1984) ("An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper") (citing *Buise v. Hudkins*,

The statement amounts to unequivocal contemplation of retaliatory action by the City in response to a potential lawsuit challenging the 2022 outdoor dining fees. Specifically, the statement supports the claims that the City's North End-only bans in 2023 and 2024 were in response to the lawsuits challenging the City programs.

And yet, the district court wholly avoided the allegation. Its thirty-three page order, in which it fretted about "unlock[ing] the doors of discovery in federal court" (ADD2), did not touch the allegation. The court concluded that "Plaintiffs 'adduce **_no direct evidence_** establishing retaliatory motive. Instead, they rely entirely on circumstantial evidence: that is, [the complained of action] followed the plaintiffs' exercise of their constitutional rights." ADD20 (emphasis added) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 911 (1st Cir. 1995)).

This conclusion was wrong (after all, it was clear and direct evidence of retaliatory motive), and the district's court failure to

---

584 F.2d 223, 229 (1978); *Harrison v. Springdale Water Sewer Com'n*, 780 F.2d 1422, 1427-8 (8th Cir. 1986) (governmental officials may not retaliate against an individual to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right).

acknowledge the allegation and consider it conflicts with the requirement that a reviewing court accept *all* factual allegations in the complaint as true, and draw all reasonable inferences in the pleader's favor. *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 52-53 (1st Cir. 2013). The district court did not perform that function in this case.

Instead, the district court offered its own interpretation of an allegation that the mayor of Boston's March 2022 letter (A17, ¶21) amounted to a threat to the North End businesses. The plaintiffs alleged that, when read in its proper context, the statement in question ("if a critical mass of restaurant owners also believe this program is unworkable as proposed, then I am prepared to rescind North End outdoor dining before the start of the season") amounted to a retaliatory threat. A17, ¶21. The context was necessary to the claim, and was not mere surplus.

The "if they sue, can we just … shut[] down the North End program" statement from the City was a fundamental piece of this context. Instead of acknowledging that context or the days of events surrounding it (see A15-19, ¶¶12-28), never mind accepting it as true and "drawing all reasonable inferences in the pleader's favor," the district court concluded

- 15 -

that the letter amounted to the mayor saying "that she would only go so far." ADD20. This interpretative dance around the actual allegations was a substantial and unjustified departure from the deference that should be afforded a complaint under the 12(b)(6) standard.[4]

Similarly, the Court accepted as true the City's version — not the Plaintiffs' — of other challenged conduct which directly bears on the plausibility of the claims. First, Plaintiffs alleged that the exclusion of certain restaurant owners from a March 29, 2022 press conference was an attempt to "eliminate opposing views" (A169, ¶553) and "stifle vocal opposition" (A170, ¶559).

Instead of accepting the truth of these allegations, the Court accepted *as fact* the alleged pretextual basis for the City's decision, which was "exclusion for fire safety reasons." ADD19-20. But "fire safety" was what the movant City said was the reason for the exclusion, not the Plaintiffs. The Plaintiffs had asserted that the exclusion was an attempt

---

[4]  Cf. *Cerame v. Slack*, 123 F.4th 72, 80 (2d Cir. 2024) (reversing a dismissal order where, in a first amendment pre-enforcement challenge, the court "failed to credit Appellants' well-pleaded allegations regarding the speech in which they wish to engage and erroneously assessed not whether such speech is *arguably* proscribed but whether it is *in fact* proscribed").

to control the narrative and "eliminate public discussion of the issue by those with opposing views." A193, (¶667).

Second, Plaintiffs alleged that the 2022 fee was an attempt "to raise revenue" (A211, ¶740) for the general fund in furtherance of the Mayor's "Green New Deal" and campaign promises, and to "pay for standard city services" which the City had long provided. A210, ¶737. The district court disregarded these allegations entirely, accepting as fact the City's statements that the "impact fee the City received *paid for* services that were related to the program, including rat baiting, power washing of sidewalks, and painting of street lane lines." ADD32 (emphasis added).

This conclusion is contrary to the substantiated and specific allegations of the complaint that the money *did not pay for* services related to outdoor dining, but rather paid for traditional city services provided across the city, for many years, and which were *unrelated* to outdoor dining. A208, ¶¶725-27. Moreover, this conclusion is directly contrary to the allegation that the money was used in part to fund an unnecessary, fully electric street sweeper at a cost of $520,000, which the City of Boston used across the City, not just in the North End, and not just during the very short period during which it allowed outdoor dining

- 17 -

in the neighborhood.[5] The district court's order is a clear departure from the requirement that all well-pled allegations and reasonable inferences therefrom must be accepted as true, and should not be sustained for this reason alone.

---

[5]   Notably, the district court incorrectly concluded that the Plaintiffs had not "allege[d] any facts that the fees were deposited in the City's general fund, just like tax revenues." ADD33. In fact, the Plaintiffs had alleged that one "city official raised the prospect of depositing the funds from the fees in the City's general fund, to be allocated at an undefined future time based on the vote of a neighborhood advisory group," and that the City had a "plan to deposit the funds into a general account" (A211, ¶740) which was a "strong indicator that the payment was meant to raise revenue." Id.

Moreover, the City produced approximately 28,000 pages from its files just days before the hearing on the motion to dismiss, and only after the hearing was scheduled. The approximately 28,000 pages were provided in response to public records requests made almost 18 months prior, in June of 2023. The Plaintiff-Appellants requested a two-week continuance of the hearing in order to more closely review the 28,000 pages, which included other evidence directly bearing on the issues before the court (A426-434). The Court summarily denied the motion, despite having continued the original hearing date at the request of the City. ECF Nos. 32-35. The withholding of such documents severely prejudiced the plaintiffs-appellants in this case, and the district court's denial of the motion to continue was an abuse of discretion under the circumstances. Cf. *Correia v. Fitzgerald*, 354 F.3d 47, 52 (2003) ("We review a district court's denial of a motion to continue for abuse of discretion"), citing *Macaulay v. Anas*, 321 F.3d 45, 48 (1st Cir. 2003).

II.   THE COURT ERRED BY DILUTING AND INVERTING THE UNLAWFUL TAX TEST.

In ruling on the unlawful tax claim, the district court made two errors. First, the court diluted Massachusetts law by converting the requirement that a lawful fee must be charged "in exchange for a particular government service which benefits the party paying the fee *in a manner 'not shared by other members of society*,'" (emphasis added) into a mere requirement that it be charged "in exchange for a government service which benefits the party paying the fee," full stop. ADD30. The district court truncated the rest of the test, i.e., "… in a manner not shared by other members of society," which is essential to its meaning.

As stated by the Supreme Judicial Court in *Emerson College v. Boston*, 391 Mass. 415, 424-25 (1984), Massachusetts law imposes a requirement that a *lawful* fee meets three criteria:

> (1) it is charged "in exchange for a particular government service which benefits the party paying the fee in a manner 'not shared by other members of society,'"
>
> (2) it is "paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge," and
>
> (3) it is not collected to "raise revenues but to compensate the governmental entity providing the services for its expenses." *Id.*

- 19 -

With respect to the first requirement, the district court edited out the requirement that the fee is charged for a service which benefits the paying party "in a manner not shared by other members of society." The court determined that fees were charged in exchange for the "benefit" of on-street dining, and that was all that was required. ADD31. The court did not go on to analyze whether the "service" benefited the payer in a manner shared by other members of society, which would render the fee an unlawful tax.

The court did address, albeit briefly, the allegation that a significant part of the fee money was used to fund a street sweeper adorned with North End insignia, which was used outside the North End, but determined that this was "inconsequential." The court held that the correct "inquiry":

> does not involve an exact measuring or quantifying of the comparative economic benefits of the limited group and the general public. Instead, the inquiry is whether the limited group is receiving a benefit that is, in fact, sufficiently specific and special to its members. (ADD32)

But the court conducted no real analysis of whether there was a claim that the fee money was *not* used for a benefit specific and special to the

North End restaurants, for which there were ample well-pled allegations in the complaint.

In particular, the complaint alleged that the fees were collected for revenue raising purposes (A210, ¶737), were destined for the general fund (A211, ¶740), and were charged to fund the purchase of an unnecessary, fully electric street sweeper (A209, ¶729), which had nothing to do with services unique or specific to outdoor dining in the North End (A19, ¶27, A210, ¶733). These allegations precluded the district court's erroneous determination on the motion to dismiss that the "[t]he impact fee the City received paid for services that were related to the program."

The district court made a second, independent error in ruling on the unlawful tax claim. In addition to applying the wrong law (its watered-down version of the *Emerson College* test), the district court again gave no weight to important factual allegations bearing on the plausibility of the claim, and actually decided key factual issues against the pleader. As explained above, the court determined that: "[t]he impact fee the City received *paid for services that were related to the program*, including rat baiting, power washing of sidewalks, and painting of street lane lines."

ADD34 (emphasis added). These matters were directly challenged by the Plaintiffs in the complaint, and they go to the heart of the plausibility of the unlawful tax and substantive due process claims. Yet the district court rejected the factual allegations rather than accept them. This was also error.

Third, the district court order incorrectly required plaintiffs to meet a non-existent three-part 'unlawfulness' test. Each of the Emerson College criteria are requirements of a *lawfully* imposed fee. Thus, if any one of them were unsatisfied, the fee would be unlawful and would constitute an unlawful tax. Instead of considering whether the complaint stated a plausible claim that one of the criteria was not met, the district court inverted the test, requiring plaintiffs to "make out" the "requirement[s]" (ADD32) and ruling that they had "fail[ed] to make a showing" (ADD33) as to certain parts of the test.

The law of Massachusetts is that the "requirements" are requirements for a lawful fee. Even though a plaintiff has the burden of showing (at later stages of a case)[6] the unlawfulness of a fee, this burden

---

[6]   Notably, with the single exception of a case involving a Rhode Island toll tax decided on review of a motion to dismiss, *Am. Trucking Ass'ns v. Alviti*, 944 F.3d 45, 54 (1st Cir. 2019), each of the unlawful tax cases

- 22 -

of proof has no application on a motion to dismiss. The sole test is whether, accepting all the well-pled facts as true, the complaint gives rise to a plausible claim against the defendant.

The complaint alleged sufficient facts demonstrating that the City's $7,500 assessment to North End outdoor dining participants satisfies none of the three *Emerson College* criteria. But it need not have done so; plaintiffs need only have adequately pled that _one_ of the required characteristics was not met.

The complaint asserted that when the City developed a "special plan" for outdoor dining for North End Italian restaurants in late 2021 and early 2022, it determined that they would pay an "Impact Fee" to address the alleged impacts of the program on the North End

---

cited by the district court (ADD32-33) were opinions rendered on evidentiary records. *Silva v. City of Attleboro*, 908 N.E.2d 722, 725 (Mass. 2009) (on review of order after trial). *Emerson Coll. v. City of Boston*, 462 N.E.2d 1098, 1105 (Mass. 1984) (on review of order issued after an evidentiary hearing); *Bertone v. Dep't of Pub. Utils.*, 583 N.E.2d 829, 836 (Mass. 1992) (on review of summary judgment upon joint fact stipulation and evidentiary record); *Windsor Ct., LLC v. Lynnfield Water Dist.*, 18 N.E.3d 1138 (Mass. App. Ct. 2014) (on review of order entered after bench trial); *Denver St. LLC v. Town of Saugus*, 970 N.E.2d 273, 280 (Mass. 2012) (on review of order entered after bench trial); and *SDCO St. Martin, Inc. v. City of Marlborough*, 5 F. Supp. 3d 139, 144 (D. Mass. 2014) (granting summary judgment that the challenged payment was an unlawful tax).

neighborhood (A207, ¶724). The City claimed that the funds were to be used (1) to fund enhanced city services to improve the outdoor dining program, and (2) to create a North End Community Benefit Fund to improve the quality of life for residents during the outdoor dining season (A207, ¶724).

But the complaint alleged that most of the so-called "enhanced" city services were traditional, standard services that the City had provided to all neighborhoods for many years *before* there even was outdoor dining (A208, ¶725). These included street cleaning, sidewalk cleaning, rodent control, trash pickup, painting of streetlight poles, placing of banners on streetlight poles, and painting of road lane markers (A208, ¶725). In addition, in addressing the planned fee, the mayor admitted that there are "needs all across our City" pertaining to these exact issues and no one from the City ascribed blame for these problems to the restaurant owners or even to outdoor dining (A208, ¶725). None of these services were unique to outdoor dining or for the benefit of the North End's restaurants (A208, ¶725).[7]

---

[7]  See *Berry v. Danvers*, 34 Mass. App. Ct. 507, 510 (Mass. App. Ct. 1993) (holding sewer connection fee paid by condominium developer was an unlawful tax because benefits of the sewer connection program was for

The other purported "enhanced" services (like parking enforcement) were provided for *free* to *all* City neighborhoods where restaurants participated in outdoor dining. A208, ¶726. The "enhanced" city services provided no particular or unique benefit to the North End Italian restaurant owners. Id.

The complaint further alleged that none of the revenue from the fees was used by the "North End Community Benefit Fund," which was in fact never created, for any of these purposes (A73, ¶233, A164, ¶528, A209, ¶727-28).

The complaint also alleged that the City used thousands of dollars from the fees collected from the North End restaurants to buy a fully electric street sweeper, as part of the Mayor's Green New Deal. A19, ¶27. The cost of the vehicle was $552,000—more than twice the cost of all other expenses for the 2022 North End outdoor dining program. Id., A77,

---

town's entire system and fees were not particularized to new connections charged with its cost); see also *SDCO St. Martin, Inc. v. City of Marlborough*, 5 F. Supp. 3d 139, 144-45 (D. Mass. 2014)("[Plaintiff was wrongly] being charged for a service that is generally provided to the public without any charge additional to normal usage charges. It is not receiving a particularized benefit in exchange for its payments. … The payments … are not, therefore, legitimate municipal fees for particularized service rendered.")

¶244. The City bought the electric street sweeper in the summer of 2022. A209, ¶729. It has used the electric street sweeper to clean the streets in all Boston neighborhoods, not just the North End. A80, ¶248. Moreover, the 2022 outdoor dining season ended in September 2022 (A81, ¶250-51) and the City banned outdoor dining in the North End thereafter.

The fact of the extraordinary street sweeper expense alone, coupled with the banning of the program in 2023 and 2024 (and in 2025, after the district court's ruling on the motion), creates a plausible claim that the 2022 fees were not charged "in exchange for a particular government service which benefit[ed] the [North End Restaurants] in a manner 'not shared by other members of society.'" [8]

Finally, the complaint squarely alleged that the City collected the fees to raise revenue. A210, ¶737, A211, ¶740. It used the funds to pay for standard services that the City had long provided to the North End

---

[8] This is another reason the district court's truncation of the first part of the test, by which it edited out the "in a manner not shared by other members of society" aspect, is so critical to the error committed here. That language informs and goes hand-in-hand with the "revenue raising" part of the test.

and other neighborhoods in the City well before outdoor dining even existed in Boston (¶737).[9]

These allegations raised a plausible claim for unlawful tax. As explained in Point VI below, they also raised serious issues of misrepresentation to the public about fee money, and misallocation of those fees. The district court's decision to keep "lock[ed] the doors of discovery in federal court," under the circumstances, was error and should be reversed.

## III. THE DISTRICT COURT ERRED BY APPLYING A LEGALLY ERRONEOUS "CLASS OF ONE" COMPARATOR TEST.

### A. The district court wrongly compared neighborhood to neighborhood.

The district court concluded that "the Plaintiffs have not plausibly pled that *the North End* is similarly situated to other neighborhoods where on-street dining was permitted." ADD2 (emphasis added).[10] This

---

[9]    The complaint also alleged that *Emerson College's* other requirement, voluntary payment, was not met. The Complaint alleged that the Plaintiffs only paid the fees "under protest" and that the imposition was coercive under the circumstances. A210 (¶¶735-6).

[10]    The district court repeated different versions of its "neighborhood to neighborhood" test throughout the order, e.g., "[t]he other neighborhoods Plaintiffs cite are not similarly situated," ADD17, and

was error under the caselaw of this Circuit, as stated in *Back Beach Neighbors Committee v. Town of Rockport*, 63 F.4th 126 (1st Cir. 2023).

This Court has instructed that a class-of-one constitutional challenger must allege that it is similarly situated in all relevant respects to another who was treated differently vis-à-vis the governmental entity. *Back Beach*, 63 F.4th at 130-31. Moreover, and importantly to this case, "the degree of similarity required may be relaxed somewhat if the plaintiff has presented evidence of "personal malice and 'bad faith' retaliation." *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (FN 4).

This Court has expressly rejected an attempt by a class-of-one challenger to compare its geographic situs with another situs. *Back Beach* at 131 (rejecting the plaintiff Back Beach Neighbors Committee's "claim … premised on the argument that Back Beach has been treated differently from the Town's other public beaches"). But in its decision below, ADD16-18, the district court adopted as the governing rule the exact error which this Court rejected in *Back Beach*: "the Committee's claim is premised on the argument that Back Beach [the place, not the

---

"[t]he most salient comparator … would not be other restaurants, but other neighborhoods in Boston." ADD18.

plaintiff committee] has been treated differently from the Town's other public beaches." *Back Beach* at 131.

The *Back Beach* Court correctly required that the plaintiff neighbors committee in that case present similar entity comparators, like "other residents or neighborhood associations [in Rockport]." *Id.*; see also 535 F. Supp 3d 57, 63. Here, the district court ruled that a neighborhood-to-neighborhood comparison (rejected by the Court in *Back Beach*) was the proper comparison. This was error.

The constitutional challenger and other similarly situated persons or entities are the appropriate entities of comparison for class-of-one analysis, not the neighborhoods, beaches or communities in which they are situated. This is why the district court and this Court on appeal in *Back Beach*, faulted the plaintiff-appellant Back Beach Neighbors Committee for "mak[ing] no effort to establish how or why [Back Beach] is similarly situated to [the Town's other beaches] in any relevant way, **_and_** does not mention any other putative comparator." 63 F.4th at 131 (emphasis added).[11]

---

[11] The district court in *Back Beach* similarly criticized the lack of a comparator entity. *Back Beach Neighbors Comm. v. Town of Rockport*, 535 F. Supp. 3d 57, 63 (D. Mass 2021) ("[the plaintiff challenger] …

- 29 -

In rejecting the idea that public beaches were an appropriate unit of comparison, this Court concluded that the plaintiff committee had not plausibly alleged that the other beaches were similarly situated:

> Even if, as the Committee contends, the Town's public beaches are appropriate units of comparison in the class-of-one equal protection analysis, the complaint falls short of plausibly alleging that the Town's other beaches are similarly situated.

*Back Beach* at 131 (emphasis added). This "even if" statement reflected the fundamental holding of the case: a class of one challenger must present a similarly situated comparator in the form of an individual or entity (or better, group of them) who is treated differently than it was vis-à-vis the government.

The *restaurant-to-restaurant* comparison is the required comparison, because the restaurants were the allegedly constitutionally deprived entities and thus needed to be compared to other similarly situated entities. A public beach has no constitutional rights just like a neighborhood, e.g., the North End, has no constitutional rights. It is the people or entities who need to be compared to other similarly situated

___

fails to identify any individuals or groups to which it is similarly situated, such as other residents or neighborhood associations in Rockport") (Gorton, J.).

people or entities. The Court's neighborhood-to-neighborhood test misapprehends the constitutional principles at issue and set up an impossible-to-meet standard, and should accordingly be reversed.

### B. The district court failed to assess the similarly situated comparators alleged in the complaint.

The district court not only applied the wrong test, it also failed to assess the proffered comparators. As required by *Olech*[12] and *Back Beach,* the complaint in this case plausibly asserted that the plaintiff-appellants are similarly situated to other restaurant "comparators" who engaged in the same activity vis-à-vis the City, and yet were treated differently, spelling out in detail how the North End restaurants were similarly situated to restaurants in other neighborhoods in Boston.

Pages 125 to 162 of the complaint alleged how the various physical, geographic and neighborhood features and other circumstances of non-plaintiff restaurants in the neighborhoods of Back Bay, Downtown, Beacon Hill, the South End, Charlestown, East Boston, Fenway, Dorchester, Jamaica Plain, Allston, Mission Hill, and the West End were similarly situated to the North End restaurant plaintiffs.

---

[12] The "class of one" theory was enunciated by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

The complaint asserted that the banned North End restaurants "share a host of important physical and geographic features with restaurants in Boston's other neighborhoods that also participated in the program." The complaint specified that the "common features include, but are not limited to:

> (1) the restaurants' location in residential buildings; (2) the restaurants' proximity to the street; (3) the width of the streets on which the restaurants are located; (4) the size of the restaurants' outdoor on-street patios and cafes; (5) the location of the restaurants to each other within their neighborhoods; (6) the availability of parking near the restaurants; (7) the number of restaurants on a particular street; (8) the type of pedestrian and vehicle traffic near the restaurants; and (9) the type of neighborhoods in which the restaurants are located.

A138, ¶439. The complaint also addressed these factors with respect to numerous comparators in specific detail.

Additionally, the complaint offered sixty-eight exhibits of pictorial comparisons, and twenty engineering drawings overlaid on aerial photographs showing comparable physical characteristics of the comparators, like the two shown below (the first depicting restaurants on Hanover Street in the North End, and the second depicting restaurants on Newbury Street in Back Bay) taken from Exhibit 14 of the Complaint (A257-58):

Case: 25-1063   Document: 00118263804   Page: 42   Date Filed: 03/25/2025   Entry ID: 6709040



NOTES

1. Plan prepared from Geographic Information System (GIS) data provided by the Massachusetts Bureau of Geographic Information (MassGIS). 2019 MassGIS color ortho photo georeferenced.

2. Site boundary locations are based on an overlay of the site features on MassGIS data. Therefore, all site features are approximately located.

3. This plan is not to be used for construction, survey or boundary purposes.

**Legend**
- Bricco 241 Hanover St.
- Tresca 233 Hanover St
- Dolce Vita 221 Hanover St.
- Parcel Boundaries

0 10 20 40 60 80 Feet

ARIES ENGINEERING
104 PLEASANT STREET
CONCORD, NH 03301
(603) 228-0008
www.aries-eng.com
© 2024 ARIES ENGINEERING, LLC

DRAFT WALKWAY STREET MEASUREMENTS
HANOVER STREET RESTAURANTS
BOSTON MASSACHUSETTS

HANOVER STREET AND SIDEWALK MEASUREMENTS

MARCH 2024    FIGURE 7



NOTES

1. Plan prepared from Geographic Information System (GIS) data provided by the Massachusetts Bureau of Geographic Information (MassGIS). 2019 MassGIS color ortho photo georeferenced.

2. Site boundary locations are based on an overlay of the site features on MassGIS data. Therefore, all site features are approximately located.

3. This plan is not to be used for construction, survey or boundary purposes.

**Legend**
- La Voile, 261 Newbury St
- Crazy Good Kitchen, 268 Newbury St
- PURO Ceviche 264 Newbury Street Boston
- Parcel Boundaries

0 10 20 40 60 80 Feet

ARIES ENGINEERING
104 PLEASANT STREET
CONCORD, NH 03301
(603) 228-0008
www.aries-eng.com
© 2024 ARIES ENGINEERING, LLC

DRAFT WALKWAY STREET MEASUREMENTS
HANOVER STREET RESTAURANTS
BOSTON MASSACHUSETTS

NEWBURY STREET AND SIDEWALK MEASUREMENTS

MARCH 2024    FIGURE 8

These drawings and others like them showed the essential characteristics of street and sidewalk width which the City had used in explaining its "density" justification,[13] as well as other characteristics, and showed that numerous restaurants in multiple other neighborhoods throughout the city were similar.

The district court, however, summarily rejected these comparators without any analysis, assigning inordinate weight to the singular factor of the "neighborhood in which the restaurant is located." ADD18. Not one of the comparators or comparisons mattered to the district court, because the "North End is different from other neighborhoods because of the unique impacts of outdoor dining on the quality of residential life." ADD18. The district court rubber-stamped the City's justification for treating the North End differently, and did not address the alleged comparators at all.

---

[13] As the complaint showed, the major streets in the North End are not particularly narrow, and in many cases are as broad or broader than major streets in other locations (e.g., Newbury Street). See, e.g., A257, A258, and A139-144 (¶¶441-60). Second, there are "narrow" streets in every neighborhood in Boston, including several that had multiple outdoor dining participants (e.g., Union Street). See A145-46 (¶¶468-71).

The district court explained its ruling by stating that plaintiffs must "contend with *all* aspects relevant to the regulation," but determined, inexplicably, that Plaintiffs:

> have not identified any other neighborhood with similar relevant aspects pertaining to restaurant density, residential quality of life concerns, and proximity to construction projects, that would make a valid comparator. Therefore, the restaurants in the North End are not similarly situated with restaurants outside the North End. This alone is fatal to the class-of-one claim. (ADD18).

The district court's "restaurant-to-restaurant" analysis was dismissive:

> [E]ven if the Court were to compare restaurant to restaurant, Plaintiffs cite certain relevant aspects, such as "width of the streets" or the "restaurants' location in residential buildings," while averring that restaurants outside the North End are similarly situated. Doc. No. 21 ¶439. That is not a valid application of the law.

The district court went on to explain:

> Plaintiffs cannot pick and choose the aspects that would make the restaurants similar; they must contend with all aspects relevant to the regulation, including the neighborhood in which the restaurant is located. See Back Beach, 63 F.4th at 131. This requires comparing neighborhoods, as that is a relevant aspect pertaining to the policy. Plaintiffs allege that the justification of the policy was that the "North End is different from other neighborhoods because of the unique impacts of outdoor dining on the quality of residential life." Doc. No. 21 ¶198. Beyond that, they have not identified any other neighborhood with similar relevant aspects pertaining to restaurant density, residential quality of life concerns, and proximity to construction projects, that would make a valid

comparator. Therefore, the restaurants in the North End are not similarly situated with restaurants outside the North End. This alone is fatal to the class-of-one claim.

ADD18-19.

First, the conclusion that the plaintiffs "have not identified any other neighborhood with similar relevant aspects pertaining to restaurant density, residential quality of life concerns, and proximity to construction projects" is just wrong.

Each of these three factors was addressed in the complaint in multiple ways. As to restaurant density, for example, the complaint alleged (comparing Newbury Street and Hanover Street restaurants):

> [T]here is an uncanny likeness between the restaurants on Newbury Street in Back Bay and restaurants on Hanover Street in the North End. In past years, there have been approximately 20 to 24 Newbury Street restaurants that participated in the program. In the North End, there were approximately 30 restaurants on Hanover Street that participated in the 2022 program. (A139, ¶441)

The complaint explained the similarities in further detail:

> Both streets run through the heart of their respective neighborhoods (¶442) …

> [B]oth streets are heavily traveled by pedestrians and cars (442). …

> The streets have comparable widths (¶443) …

> Newbury … and … Hanover … are in vibrant locales with a mix of residential and commercial activity, including dining. Most restaurants in both locations are on the first floor of residential buildings. … There are also restaurants in both locations on street corners. (¶444) …
>
> On Newbury Street, there are several restaurants with on-street patios that are side-by-side or otherwise quite close to each other, which is also true of many on-street patios of restaurants on Hanover Street. (¶445) …
>
> Both streets often experience dense foot traffic throughout the day and night. Traffic also is impacted on both streets due to the presence of many intersections and crosswalks. (¶447)

The complaint offered similar comparisons to other restaurants and restaurant-dense streets in other neighborhoods (e.g., to Boylston Street in Back Bay at A144 (¶461), Union Street in Downtown at A145 (¶468), and Chestnut Street in Beacon Hill at A150 (¶483)). The fact of these allegations cannot be reconciled with the court's conclusion that "Plaintiffs have not identified any other neighborhood with similar relevant aspects pertaining to *restaurant density*. …" ADD18.

As to "residential quality of life concerns," the complaint alleged throughout that the specific components of "quality of life" had nothing to do with outdoor dining (e.g., A203, ¶705), but also that these were concerns common to other neighborhoods throughout the city (A118). The complaint alleged that the mayor herself acknowledged that the exact

"quality of life" issues which the City used to justify the North End ban predated outdoor dining and existed throughout the City (A18, ¶¶25). Thus, these "quality of life" concerns were common to the alleged comparators, not unique to the North End, and no fair reading of the complaint permitted that determination.

As to proximity of construction projects, the complaint first alleged that this basis was pretextual and not a valid basis for the fees or ban. A22, ¶40, A24, ¶47. Second, the complaint alleged that many other outdoor dining neighborhoods had similar proximity to construction challenges. For example, the complaint asserted that "[t]he North End, West End, Downtown Boston, and Charlestown have lived with construction-related traffic from the [North Washington Street] bridge project for over five years." A103, ¶326. Similarly, the complaint alleged that "the West End [and] Charlestown … are the two neighborhoods most directly impacted by traffic caused by the bridge construction."

The district court also pointed to the "exceptional[] dens[ity]" of the North End, "with the highest density of restaurants in the state, located

adjacent to the Sumner Tunnel[14] and the North Washington Street Bridge construction project." ADD17-18. But these "facts" were drawn from the recitation in the complaint of *the City's justification* for the 2022 fees and 2023 bans.

As plaintiffs alleged, the City's density statistics were "both misleading and irrelevant." A105, ¶335. The density numbers in other neighborhoods were comparable to the North End, and there were other factors rendering the City's density statistics not pertinent to the comparison (e.g., the City controlled the application process including how many restaurants could apply). A105 (¶¶335-338). Additionally, the complaint alleged that the mayor's statement that the North End had "three times the number of on-street restaurants than the next highest

---

[14] Another record from the 28,000 pages produced just before the hearing on the City's motion included evidence that the City was not actually concerned about the traffic impact of the Sumner Tunnel project on the North End. A461-64. The Plaintiffs presented this evidence to the Court and requested a continuance of the hearing, and the court denied the motion within hours of its filing. A426-35, A7. As the Plaintiffs pointed out in the briefing below to no avail, the City not only withheld this document for many months, but continued to press before the district court that the City was legitimately concerned about the Sumner tunnel project's traffic impact on the North End. A430-32.

neighborhood" (a critical density component) was demonstrably false. The complaint asserted that:

> City records show that in 2021, the top four neighborhoods with restaurants that participated in on-street outdoor dining were the North End with 70, followed closely by Downtown Boston with 62, Back Bay with 37, South Boston with 30, and the South End with 24.[15]

These allegations should have been credited as true in assessing the complaint. Instead, the district court accepted the City of Boston's "density" justifications for the challenged fees and bans. This was error.

### C.    The district court failed to weigh the substantiated allegations of bad faith retaliation and animus.

Having met the pleading requirements of similarly situated and differential treatment, and having adequately alleged that the City's conduct was retaliatory and based on improper animus (A167-71, ¶¶544-

---

[15] A62-63. Other public records produced by the City at the eleventh hour directly contravened its density argument, showing that Downtown had even more total (including sidewalk café) outdoor dining setups than the North End in 2021. A465-471. Like the evidence regarding the Sumner Tunnel construction "concern," the district court refused to consider this evidence. Specifically, the evidence shows that Downtown Boston had 84 total outdoor dining restaurants compared with the North End's 78. A465. Additionally, the table shows that Downtown had only 8 fewer on-street outdoor dining setups than the North End in the same year. Id. But even accepting the 70-62 disparity as to on-street cafes, this eight-restaurant difference hardly makes the North End uniquely dense with outdoor dining.

65), nothing more was required to state a plausible claim under *Olech* and progeny, including *Back Beach*. To then shift the analysis to a mere rational basis review was error. Accepting as fact what the Plaintiffs asserted were pretextual bases, despite the allegations of retaliatory motive and animus, is like accepting the Village of Willowbrook's "rational basis" claim to need 18 more feet (to pave the street and install a sidewalk in front of the Olech home) in *Olech*. That is the result the Supreme Court rejected in *Olech*, and yet is precisely what the district court did in this case.[16]

## IV. THE DISTRICT COURT FAILED TO ADDRESS THE CLAIMS ARISING FROM THE 2024 BAN.

The complaint raised equal protection, due process, and related claims[17] not just as to the 2022 fees and 2023 ban, but also as to the 2024 ban, which the City imposed after the initial complaint in this case was

---

[16] Cf. *Brockton Power LLC v. City of Brockton*, 948 F. Supp. 2d 48, 71 (D. Mass. 2013) (Sorokin, J.) ("[T]he plaintiffs have alleged there was no rational basis for the difference in treatment, and they have done so with more than mere conclusory allegations. As such, their equal protection claim survives the defendants' motions.").

[17] The related claims include a state law-based claim that the City's conduct was arbitrary, capricious, and contrary to law.

filed.[18] Explaining "The City's Second Retaliatory Ban on Outdoor Dining in the North End in 2024," the complaint alleged:

> The press release announcing [the 2023 ban] also declared the City would assemble a "North End On-Street Outdoor Dining Task Force" (the "Task Force"), which later was comprised of six North End residents and five North End business owners. The ostensible purpose of the Task Force was to determine how certain outdoor dining issues could be remedied in future iterations of the program. The creation of the Task Force gave the appearance the City was engaging in a fair process to enable resumption of outdoor dining in the North End in 2024.

A12, ¶44. The complaint further alleged that the task force was a "charade," meant to mislead the public about the City's intentions for the North End. It continued:

> [T]he City strategically placed two North End residents on the Task Force who had zealously advocated for the ban. By doing so, the City ensured that meetings would be divisive, there would be no compromise or rational discussion of issues, and there would never be a consensus on any substantive matter of importance. The Task Force met for just a handful of hours over a seven-month period ending in October 2023. City officials closely controlled the meetings. The media and public were not permitted to attend, and there was no public reporting on the meetings. The Task Force became dormant following its last meeting in October 2023.

---

[18] The district court faulted the plaintiffs for filing "three complaints." The first amendment was filed primarily to include the new allegations regarding the 2024 ban, which had not occurred at the time of the initial complaint.  The second amendment, which was filed with the assent of the City (A4), was exclusively an amendment as to form, correcting numbering errors and inserting a table of contents.

The result that followed, the complaint alleged, was pre-determined:

> Shortly after [the initial complaint in this case] was filed, the City quickly called for an unscheduled meeting of the Task Force on just 24 hours' notice. Following the meeting, the City — not the Task Force— immediately prepared its own summary of the Task Force's findings and attempted to have the Task Force rubber stamp them. The majority of Task Force members ardently disagreed with the proposed findings, stating they did not want their names on the document. Instead, they authored actual findings of the majority that forcefully supported resumption of outdoor dining in the North End.

> The City outright ignored the majority's findings and announced it was resuming the ban on outdoor dining in 2024, for the same pretextual reasons that it had provided for the 2023 ban.

The detailed description of the 2024 ban added that the City's two-page letter announcing the 2024 ban was sent within one hour of receiving the recommendations of the Task Force majority to allow outdoor dining in the North End, having been prepared in advance. A23-24 (¶¶44-48). The City published the decision on its website the same day. Id., A129 (¶¶406-07). In other words, while holding out to the public and the restaurants a fair process for determining "future iterations of the program," the City had no intention of having outdoor dining in the

North End in 2024.[19] The district court did not address the 2024 ban in any way in its ruling. This was error.

## V.    THE DISTRICT COURT FAILED TO WEIGH SUBSTANTIAL EVIDENCE OF DISCRIMINATORY INTENT.

The complaint in this case alleged that the mayor of Boston, who was intimately involved in the North End outdoor dining bans, specifically *uninvited and excluded* white electeds, who had received an invitation by accident, from an "electeds of color" holiday party.

Simply put, this allegation of a direct exclusionary act, coupled with the other allegations of discriminatory intent, should have been enough for a plausible claim of discriminatory intent. Yet, the district court either ignored or discarded it without mention, referencing only the fact of the city's hosting of the "electeds of color" holiday party, and "a joke, perhaps, about white people," but editing out the allegation that white City Council members who mistakenly received the invitation ***were uninvited***. A172, ¶565. The district court acknowledged the "hosting" of a holiday party for "Electeds of Color" (ADD15) and some of the other relevant

---

[19]  The City of Boston repeated its on-street outdoor dining ban in the North End in 2025.

allegations, but not the exclusionary act, and ruled that "[n]one of these facts, in isolation or together, plausibly allege discriminatory intent." Id.

While the overt race-based exclusionary act pales in comparison to other exclusionary acts perpetrated against minorities, it is nevertheless a race-based exclusionary act, which was clearly alleged, and which should not have been overlooked by the district court in assessing the plausibility of the claims asserted in the complaint.

This error also tainted the district court's view of the anti-Italian discrimination claim, which asserted that the City's North End-only fees in 2022 and bans in 2023 and 2024 were unconstitutional discrimination against Italians. The plaintiffs alleged that the North End only ban should be viewed in the context of, *inter alia*: (1) this exclusionary act, (2) the "joke" (a characterization of the district court) about "expensive, disruptive and white" problems at the exact time the mayor was considering and threatening the ban; (3) the reality that North End restaurants meant almost exclusively white, Italian-owned restaurants (A22-23, ¶41); (4) the City's 2022 decision to impart the management of the outdoor dining program to its office of economic opportunity and inclusion, the stated mission of which was repairing economic harm (A98-

99, ¶310); and (5) the closed door meetings with NEWRA, which had specifically advocated a redistribution of North End outdoor dining revenue to "business communities in other neighborhoods." A95, ¶296. Under the circumstances, the district court's determination that there was not even a plausible claim of anti-Italian discrimination was erroneous.

## VI. THE COMPLAINT STATED PLAUSIBLE PROCEDURAL AND SUBSTANTIVE DUE PROCESS CLAIMS.

Appellants also seek reversal of the ruling below as to procedural and substantive due process. The procedural due process claims should not have been dismissed because the City of Boston had no authority to rescind licenses that were in place pursuant to the statewide COVID-19 legislation. Even if there was some discretion vested in the City to adopt a ban, the complaint adequately alleged (1) the requisite factual and legal bases for a protected property interest and (2) a deprivation without any process. See VI, A. below.

As to substantive due process, the complaint's allegations adequately stated a plausible claim that the City of Boston violated the fundamental rights of the Plaintiffs by, *inter alia*, (1) banning outdoor dining in response to a lawsuit, and (2) misrepresenting to the plaintiffs

and the public the purpose of the fees it collected from the North End restaurants. See VI, B., below.

## A.   The Complaint's Procedural Due Process Claim

### 1. The City had no authority to impose a North End ban under the statute.

The district court's conclusion that "none of the Executive Orders or statutes stated or implied that the outdoor-dining program would continue the following year" was wrong as a matter of law and fact.[20] Contrary to the district court's reading, the express language of the governing legislation extended the North End restaurants' licenses until April 1, 2024. Moreover, the City wrongly assumed that the emergency legislation had lapsed when it imposed the first of the bans in 2023. As the City itself stated: "[T]he executive order which allowed for the continuation of outdoor dining … will expire on March 31, 2023. On this date, the legal flexibility of the temporary program ends." A391. But the law did not expire, as the City expected.

---

[20] Details of the executive orders and legislation were described in the SAC (*see* A178-83 at ¶¶594-620) and are summarized here.

What did happen requires a retracing of the legislative history. In June of 2021, the Legislature approved the first of three emergency laws that extended certain COVID-19 measures through April 2024, including the authorization of outdoor dining (A180, ¶601). The 2021 law contained language similar to COVID-19 Order Nos. 35 and 50,[21] the Governor's executive orders which originally permitted approval of outdoor dining requests by cities and towns and the modifications of earlier granted approvals (¶¶602-603). It also authorized local officials to "establish the process for approving" requests for outdoor dining (¶604) and "modify the scope of" prior approvals. Id. Like the two executive orders, the 2021 law contained no language authorizing municipal officials to suspend any provision of the law, exclude restaurants in any geographic section of a city or town from participating in an authorized program, or use outdoor dining in a punitive way.

The 2021 law[22] specifically set forth a timeline establishing the duration of outdoor dining rights that had been (1) approved for

---

[21] The text of the two Executive Orders, and three COVID-19 emergency laws described in this section are appended to the brief at **ADD35-59**.

[22] Massachusetts Session Laws, Acts of 2021, Chapter 20, § 19 (ADD45).

expansion or (2) extended from an earlier granted approval issued under COVID-19 Order Nos. 35 or 50, both of which were effectively extended until April 1, 2022.[23]

On April 1, 2022,[24] and March 29, 2023,[25] the Legislature enacted its second and third emergency laws that extended the authorization of outdoor dining. ADD52, ADD56. The 2022 and 2023 laws mirrored the 2021 law in all material respects. The 2022 law replaced "April 1, 2022" with "April 1, 2023" each time the date appeared, and the 2023 law similarly amended the 2022 law by replacing "April 1, 2023" with "April 1, 2024."

On February 16, 2023, however, while the Plaintiffs' licenses were in effect, and based expressly on the assumption that the 2022 law and thus the outdoor dining licenses would expire (A391), the City announced

---

[23] In 2021, the Plaintiffs participated in the City's 2021 outdoor dining as authorized by COVID Order Nos. 35 and 50, as extended by the 2021 law. The City approved the Plaintiffs' applications for 2021. By virtue of the timeline provisions of the 2021 law, the Plaintiffs' outdoor dining licenses and rights did not automatically revert to their prior status until April 1, 2022.

[24] Massachusetts Session Laws, Acts of 2022, Chapter 42, § 27 (ADD52).

[25] Massachusetts Session Laws, Acts of 2023, Chapter 2, § 38 (ADD56).

the North End 2023 season ban, refusing to accept applications from North End restaurants. At that time, the Plaintiffs' outdoor dining licenses and rights were still in effect under the 2022 law.

Then, on March 29, 2023, also while the Plaintiffs' 2022 licenses were still in effect, the legislature enacted the 2023 law, extending existing licenses *until April 1, 2024*. Since the Plaintiffs' licenses were still in effect when the Legislature passed the 2023 law, they were extended until April 1, 2024. On February 5, 2024, the City announced that it was banning outdoor dining in the North End for the 2024 outdoor dining season. When the City announced the 2024 ban, the Plaintiffs' licenses were still in effect. The district court's conclusion that "none of the Executive Orders or statutes stated or implied that the outdoor-dining program would continue the following year" is entirely incorrect, because the licenses were extended by operation of the statute.

### 2. The Complaint adequately alleged a property interest based on the statutory scheme, the importance of outdoor dining, and the City's representations.

Even if this reading of the statutes — which even the City shared (see A391)— is wrong, the complaint adequately alleged that (1) the Orders and emergency legislation established a legal framework

- 50 -

providing the Plaintiffs with continuous property interests in the outdoor dining licenses on equal footing, (2) that the licenses were sufficiently important to the Plaintiffs to establish such an interest, and (3) that there was a mutual understanding between the parties sufficient to create the interest.

The factual allegations supporting the core elements of (1) a protected property interest[26] and (2) a deprivation without any process

---

[26] *Board of Regents v. Roth*, 408 U.S. 564 (1972) and *Perry v. Sindermann*, 408 U.S. 593 (1972) are the companion, seminal cases on what constitutes a protected property interest. *Roth* explained that to constitute a protected interest, a person must have a "legitimate entitlement" to the property interest, which is "more than a unilateral expectation" or "an abstract need or desire." *Roth*, 408 U.S. at 577.

In defining a "legitimate claim of entitlement," *Roth* referenced two approaches. First, an entitlement is defined by the importance of the interest to individuals who rely on it "in their daily lives." *Id.* In such cases, "that reliance must not be arbitrarily undermined." *Id.* Second, "property interests" are created and defined by "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* For example, a "property interest" would exist if state law creates a reasonable expectation to one's receipt of a benefit, such as welfare recipients' interest in receiving welfare payments as defined by law. *Id.*

In *Perry,* the Court further emphasized the significance of prior conduct between parties, explaining that one may have a "property interest" based on "rules or mutually explicit understandings that support his claim of entitlement to the benefit." 408 U.S. at 601. *See also Redondo-Borges v. United States HUD*, 421 F.3d 1, 8 (1st Cir. 2005).

- 51 -

were set out in detail in the complaint. See *PFZ Properties, Inc. v. Rodriguez*, 928 F.2d 28 (1st Cir. 1991). For example, the complaint alleged that the program was remedial and was vital to the Plaintiffs' survival during the peak of the pandemic. A12 (¶3), A216. Thereafter, the program became essential to their economic recovery from the massive losses incurred due to the public health crisis and related recession. Id., A34 (¶93).

Additionally, the complaint alleged that in late 2022 and early 2023, the City repeatedly referred to prospective 2023 applicants, including the Plaintiffs, as "licensees" in its communications (A186, ¶632), accurately reflecting the Plaintiffs' legal status. The City also wrote in late 2022 that one of its centrals aims was to "[r]etain as many restaurants from this year's program while increasing the participation rate in neighborhoods that are underrepresented." A88, ¶277. That statement, of course, included the sixty-two North End restaurants that participated in the 2022 program, which included the Plaintiffs.

Then, on February 16, 2023, the day the City announced the 2023 ban, the City made public statements that created a reasonable expectation that the on-street dining program would continue in 2024

- 52 -

and North End restaurants would be entitled to participate. More specifically, the City represented that it was forming a North End Outdoor Dining Task Force that "will determine how these issues [the alleged reasons for the ban] could be remedied in *future iterations* of the permanent outdoor dining program." A99, ¶310 (emphasis supplied). The City added that it "is committed to stewarding a robust permanent outdoor dining program" and it was "important that all voices are heard and that stakeholder concerns are heard." Id.[27] The district court did not address this last allegation in any way.

---

[27] The Plaintiffs also have, and asserted below, a legitimate claim of entitlement to a property interest in continued outdoor dining licenses based on a longstanding "ethic that pervades our legal system" in matters "where government exerts power upon an individual in a matter of consequence," *Yerardi's Moody Street v. Board of Selectmen*, 19 Mass. App. Ct. 296, 303 (1985); *MacLaurin v. City of Holyoke*, 475 Mass. 231, 251-253 (2016). In *Yerardi's*, the court held that the aggrieved party should have the right to a hearing of an adjudicatory nature in which the governing body states its reasons at or near the time of decision. *Id.* at 304. The Massachusetts Supreme Judicial Court also has indicated that this right applies where (1) the government authority exerted power over an individual on a matter of consequence, (2) key facts are in dispute, (3) there is no controlling decisional authority as to the applicable standard, and (4) there is no statutory avenue for review. *MacLaurin*, 475 Mass. at 351-353. The decisions and reasoning of *Yerardi's* and *MacLaurin* provide the Plaintiffs with a protected interest in the continuation of their outdoor dining licenses and warrant that they be afforded a hearing. Plaintiffs also alleged and argued below, and maintain, that they had a property

- 53 -

### 3. The City provided the Plaintiffs with no process regarding the 2022 North End Plan and the 2023 and 2024 bans.

Here, the complaint adequately alleged the City deprived the Plaintiffs of any meaningful pre-deprivation and post-deprivation processes as to the three policies (¶¶628-645). The decision to rescind the program and revoke the in-place outdoor dining licenses of the North End restaurants was made without notice, by executive fiat.

### B.    The Complaint's Substantive Due Process Claim

The allegations in the complaint and reasonable inferences drawn from them plausibly allege that the City engaged in "fundamental procedural irregularity, racial animus, or the like" or a violation of a "fundamental principle," contrary to the Plaintiffs' substantive due process rights. *Clark v. Boscher*, 514 F.3d 107, 113 (1st Cir. 2008); *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45-47 (1st Cir. 1992.). The alleged conduct includes the following:

- The City's decision to make the North End alone pay hundreds of thousands of dollars to participate in a citywide remedial plan was to promote the Mayor's political agenda of economic justice based on equity as opposed to equal

---

interest in the goodwill of their businesses. (¶¶568, 647, 700). *See*, e.g., *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310 (9th Cir. 1989).

treatment of similarly situated Boston businesses (¶¶217, 668);

- Within two days after the North End restaurants publicly opposed the harsh terms of the 2022 plan including the $7,500 fee, the City immediately planned to ban outdoor dining in the North End unless the restaurants agreed to the plan (¶663);

- The next day, which was three days after North End restaurants opposed the plan, the Mayor made a public comment at the St. Patrick's Day breakfast, a highly publicized annual event, that she was getting used to dealing with problems that are "expensive," "disruptive," and "white" (¶¶19, 664);

- One week after the restaurants opposed the plan, the Mayor retaliated against them by sending a letter threatening to ban outdoor dining in the North End unless they agreed to the plan. The letter underscored the economic significance of the program to the restaurants, and used the threat of rescission of a remedial program at a time of financial hardship as economic coercion to force the Plaintiffs to accede to a proposed policy (¶¶21,197);

- At a press conference to discuss the outdoor dining controversy held days after the Mayor sent her letter, the City barred a group of North End restaurant owners from attending to prevent them from stating their opposition to the plan (¶215);

- The City falsely promised the North End restaurant owners that it would establish a North End Community Benefit Fund and use "every penny" of the participation fees on program overseen by the Fund's committee to mitigate impacts of outdoor dining in the North End, but never even established the fund (¶¶220-221, 233);

- The City instead used the fees collected from the North End restaurants to pay for an electric street sweeper that cost $552,000, while touting the vehicle as part of the City's climate justice agenda and its Green New Deal. In doing so, the City misled the fee-payers and the public about the purpose and use of the fees (¶¶728, 733);

- The City decorated the electric street sweeper with North End scenery to create the appearance that it was a dedicated vehicle and then used it in neighborhoods across the City (¶247);

- The City improperly expensed $552,000 for the sweeper to the North End outdoor dining program (¶246);

- The City represented to the public that it had spent approximately $688,000 on North End outdoor dining but never informed the public that $552,000 of that sum was allocated to the purchase of the electric street sweeper that was used citywide (¶261);

- The City rescinded the outdoor dining program in the North End in 2023 as retaliation against the North End restaurants for their exercise of their right to file suit challenging the 2022 fees.

- The City deceived the Plaintiffs and the public to believe that it was forming a legitimate Task Force to remedy any alleged issues with outdoor dining in the North End and to follow the Task Force's recommendations. Instead, the City had predetermined that it would impose a ban for 2024 irrespective of the Task Force's recommendations in furtherance of its retaliatory program of exclusion (¶¶370-389);

- The City banned the North End restaurants from participating in the City's 2024 outdoor dining program in

retaliation for their filing of this lawsuit accusing the City of violating their constitutional rights (¶696);

These allegations — accepting all of them as true and drawing all reasonable inferences in the pleader's favor— raise a plausible claim that the Plaintiffs' substantive due process rights were violated. Cf. *Brockton Power*, 948 F. Supp. at 69-70, *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1577 (11th Cir. 1989), and *Mad Room, LLC v. City of Miami*, 2023 U.S. Dist. LEXIS 220762 (S.D. Fla. Dec. 12, 2023). That the district court saw it differently, on balance, or interpreted statements of the City differently, is not a lawful basis to have dismissed the case.

## VII.   RULE 8 WAS NOT VIOLATED AND DISMISSAL OF THE COMPLAINT WAS NOT WARRANTED UNDER THE CIRCUMSTANCES.

The district court's ruling that Rule 8 compels dismissal is (1) unsupported by the language of the rule and a reasonable reading of the complaint, and (2) inconsistent with the purpose of the rule, as evidenced by the City's response and the Court's ruling, both of which systematically addressed the claims.

The text of the rule is critical: "A pleading that states a claim for relief must ***contain***: … a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8 (emphasis added).

First, and most importantly, the SAC does "*contain* a short and plain statement," as the Federal Rules of Civil Procedure require. It included an introduction that outlines the heart of the factual allegations and summarizes the legal issues in a mere fourteen pages and fifty-one paragraphs, which cover the three years of challenged programs. While the content of the introduction is elaborated upon in the later sections of the complaint, the introduction itself is intended to function as the short and plain statement required by the rule.

The court rejected this argument, without addressing it, except to say that "the SAC goes substantially too far."[28] The Court ascribed to the plaintiffs the contention that it "complies with Rule 8 because the pleading 'contains' a short and plain statement in the form of a fourteen-page introduction," and then stated that "[t]his view of the Rule is misguided." But the word "contains" is the operative verb in the Rule.

---

[28] In the event this Court agrees with the district court that the Complaint "goes substantially too far," the Plaintiff-Appellants request remand with leave to amend.

The rule requires merely that a "pleading … contain a short and plain statement showing that the pleader is entitled to relief."[29]

The purpose of the Rule 8 requirement is to give defendants fair notice of the basis for the claims against them.[30] There is no question in this case that the City and the Court were able to understand the basis of the claims. While the complaint was admittedly long, it raised claims arising from three years of disparate treatment, involving legislation, executive orders, and City action covering a five-year period, and one equal protection claim (class-of-one) which demanded precise detail as to

---

[29] The district court addressed the rule's purpose by stating: "A complaint 'should be short because unnecessary prolixity in a pleading places an unjustified burden on the court and the party,'" quoting the Second Circuit's opinion in *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Importantly, the Second Circuit in *Salahuddin* noted that "[d]ismissal … is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised" and pointed out the "jurisprudential preference for adjudication of cases on their merits rather than on the basis of formalities. …" 861 F.2d 40, 42. The *Salahuddin* court also commented that it "will generally be an abuse of discretion to deny leave to amend when dismissing a nonfrivolous original complaint on the sole ground that it does not constitute the short and plain statement required by Rule 8." *Id.*

[30] *Stroman v. Bristol Cnty. Dist. Attorney's Office*, 2023 U.S. Dist. LEXIS 160008 (D. Mass. 2023) (Sorokin, J.) (citing *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 101 (1st Cir. 2013) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

comparators and another (the anti-Italian claim) which required specific pleading of historical elements.

In particular, the class-of-one equal protection claim required allegations of similar situation to others treated differently (comparators), for which there was no easy shortcut in this case. The equal protection facts, neatly organized as such, cover approximately forty pages of the complaint for this reason. This was not gratuitous detail, but a good faith attempt to plead as required under the governing law.

Similarly, the discrimination-based equal protection claims required that the history of both the neighborhood and the sequence of events leading up to the alleged discrimination be pled with particularity, or face dismissal. Just recently, this Court reaffirmed the importance of the exact type of detail offered in the complaint:

> [T]he Supreme Court has repeatedly recognized, in a variety of legal contexts, that a plaintiff can prove intentional discrimination with various forms of evidence. See, e.g., *Arlington Heights*, 429 U.S. at 267-68 (explaining, in equal protection case challenging government policy, that "historical background of the decision," "specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," and "legislative or administrative history" may all be evidence of discriminatory purpose)

*Wadsworth v. Nguyen*, 2025 U.S. App. LEXIS 3782, *74 (1st Cir., February 17, 2025). The detail provided in the complaint presented to the district court was necessary support for the claims at issue in the case. The court may have felt it went "substantially too far," but the length was warranted under the circumstances and given the controlling law, and did not compel dismissal of the claims.

## CONCLUSION

The fundamental issues in this case go beyond the wisdom or imprudence of Boston's different rules for and exclusion of the North End restaurants from its outdoor dining program. Statements like "[i]f they sue, can we just say fine, we are shutting down the [] program" should always amount to a key to the "locked doors" of discovery, particularly when the defendant is a governmental entity with vast power and the responsibility of fostering the public trust, and especially when there are substantiated allegations of misuse of and mis-statements about money collected from the public. The Court should address the significant errors and reverse and remand with instructions to deny the City's motion to dismiss or, alternatively, with instructions to grant leave to amend.

*/s/ Kieran G. Altieri*
Kieran G. Altieri (COA No. 1215166)
ALTIERI LAW & CONSULTING, PLLC
100 Cambridge Street 14th Floor
Boston, MA 02114
(603) 413-5285
kaltieri@altierilaw.net

- 63 -

## ORAL ARGUMENT STATEMENT

The Appellant restaurants request oral argument to address the important questions of law arising from the City of Boston's design and implementation of a controversial governmental program, involving multiple city departments, and which affects the livelihoods of multiple hundreds of employees of the Plaintiff restaurants, and hundreds more employed at other North End restaurants affected by the outcome of this case.

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,815 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Times New Roman font.

Dated:  March 24, 2025

*/s/ Kieran G. Altieri*
Kieran G. Altieri

## CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which electronically served a copy on all counsel of record.

Dated:  March 24, 2025

*/s/ Kieran G. Altieri*
Kieran G. Altieri

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

**Page**

Order on Defendant's Motion to Dismiss, filed December 20, 2024 ........... ADD1

Judgment, filed December 20, 2024 ............................................................... ADD34

Covid Order No. 35 ......................................................................................... ADD35

Covid Order No. 50 ......................................................................................... ADD41

Acts of 2021 Chapter 20 ................................................................................. ADD45

Acts of 2022 Chapter 42 ................................................................................. ADD52

Acts of 2023 Chapter 2 ................................................................................... ADD56

i

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NORTH END CHAMBER OF COMMERCE et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 24-10039-LTS |
| CITY OF BOSTON, | ) ) | |
| Defendant. | ) ) ) | |

<u>ORDER ON DEFENDANT'S MOTION TO DISMISS (DOC. NO. 22)</u>

December 20, 2024

SOROKIN, J.

The North End Chamber of Commerce and several restaurants in the North End ("Plaintiffs") filed this lawsuit against the City of Boston ("the City"), alleging violations of their rights under the United States Constitution and the laws of the Commonwealth of Massachusetts. The case arises out of the response to the COVID-19 pandemic, when the City exercised authority given to it (and all municipalities) by the Commonwealth to allow restaurants to serve customers on public streets. Disputes developed beginning with the 2022 season, when the City began curtailing on-street dining in the North End, initially imposing fees and eventually banning it altogether. The fees and termination of the program applied only to restaurants in the North End. According to the Plaintiffs, Mayor Michelle Wu explained that she pursued this course in light of the "unique" impact of on-street dining in the North End, including issues affecting the residents' quality of life and its proximity to two construction projects. The wisdom of such

ADD1

decisions is fundamentally a policy judgment ordinarily entrusted to elected officials in our democratic society, not to federal judges.

Of course, elected officials do not possess unbridled authority when making such judgments. They are bound by and must operate within the limits established by the United States Constitution as well as federal and state laws. Here, the decisions of the Mayor fall squarely within those legal parameters for a number of reasons. First, the fees and eventual termination of on-street dining do not infringe upon an express or fundamental constitutional right, such as free speech or the free exercise of religion. Second, Plaintiffs have not stated a colorable claim that they were singled out based upon their race, ethnicity, or national origin. Numerous restaurants owned by people of all races, ethnicities, and nationalities (including white Italian Americans) were able to offer on-street dining under the City's policy. Finally, Plaintiffs have not plausibly pled that the North End is similarly situated to other neighborhoods where on-street dining was permitted. The City regulated on-street dining by neighborhood, just as it regulates many other matters by neighborhood, and Plaintiffs themselves emphasize the uniqueness of the North End. In any event, Plaintiffs have also failed to plausibly allege that the different on-street-dining policies in the North End lacked a rational basis or otherwise sprung from bad faith or a desire to punish the Plaintiffs.

Plaintiffs are understandably upset with the City's policy authorizing on-street dining in other neighborhoods while banning it in the North End. No doubt they disagree with the Mayor's evaluation of the various factors bearing on her decision and believe the City could reasonably and safely authorize on-street dining in the North End. Plaintiffs' unhappiness, however, cannot alone give rise to a cause of action against the City and unlock the doors of discovery in federal court. To accomplish that, Plaintiffs must state a claim that the City's policy

2

ADD2

violates the law under the standards applicable to all plaintiffs in all civil cases.  This they have

not done.  For these reasons, and as explained in detail below, the Court ALLOWS the Motion to

Dismiss.

I.     BACKGROUND

The Court draws the following facts from the Second Amended Complaint ("SAC"),

Doc. No. 21, and accepts them as true for purposes of resolving the Motion to Dismiss, Doc. No.

22.  See Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  In response to the

COVID-19 pandemic in 2020, the City implemented an outdoor-dining program, which

authorized restaurants in designated areas of Boston to offer dining on public streets.[1]  Doc. No.

21 ¶ 2.  For the 2020 and 2021 outdoor-dining seasons, the City waived certain fees for this

opportunity in the North End.  Doc. No. 21 ¶ 191.  In 2022, the City imposed an "impact fee" of

$7,500 on participating North End restaurants and a monthly fee of $480 for each parking space

used by the restaurants' outdoor patios.[2]  Id. ¶ 12.  The City did not charge an impact fee or a

monthly parking fee on participating restaurants in any other neighborhood of Boston.  Id.  The

impact fee would pay for:

> (1) increased enforcement of outdoor café compliance and parking, (2) Boston
> Transportation Department enforcement overtime, (3) Boston Police Department
> presence overtime, (4) initial licensing and ongoing site enforcement, (5) full-time
> and seasonal 'hokeys,'[3] (6) rat baiting, (7) power washing of sidewalks, (8) painting
> of streetlight poles, (9) placement of banners on streetlight poles; and (10) painting
> of street lane lines.

---

[1] Before the pandemic, the City permitted dining on public sidewalks.  That program, which may
have expanded somewhat during the pandemic, is not at issue here.

[2] The SAC also alleges that some North End restaurants qualified for hardship waivers, enabling
them to pay a reduced fee, and that others could pay prorated fees based on the period of time
they participated in outdoor dining that season.  Doc. No. 21 ¶ 224.

[3] The SAC refers to the personnel from both the Department of Public Works and the Boston
Police Department staffed by the City and stationed in the North End as "hokeys."  Doc. No. 21
¶ 129.

ADD3

Id. ¶ 150.  The City also limited the outdoor-dining season in the North End to just five months, compared to the eight-to-nine months outside of the North End.  Id.  Mayor Wu justified the different treatment of North End restaurants because of the "unique impacts of outdoor dining on the quality of residential life," such as "trash, rodents, traffic, and parking problems."  Id. ¶ 22.

In response to this change in City policy, in 2022, four North End restaurant owners sued Mayor Wu in her official capacity, challenging the fees the City charged for on-street-dining licenses in the North End as unconstitutional and in violation of Massachusetts law.  See Mendoza v. Wu, No. 1:22-cv-10710, 2022 U.S. Dist. LEXIS 189785, at *1 (D. Mass. Oct. 18, 2022).  After the filing of two sets of motions to dismiss, an amended complaint, and several related pleadings, the plaintiffs in that action (by then including the restaurant owners as well as the restaurants themselves) moved to voluntarily dismiss the case without prejudice prior to any ruling by the Court.  First Mot. Dismiss Pls.' Cause Action Voluntarily Pursuant to Rule 41(a)(2) Without Prejudice, Mendoza v. Wu, No. 1:22-cv-10710 (D. Mass. May 31, 2023), ECF No. 36. Judge Talwani allowed the motion, rendering no ruling on the merits of the claims.

After the 2022 outdoor-dining season, the North End/Waterfront Residents Association ("NEWRA"), a community organization, lobbied against continuing outdoor dining for future seasons in the North End.  Doc. No. 21 ¶¶ 29, 31.  The City also assembled a "North End On-Street Outdoor Dining Task Force" to "determine how certain outdoor dining issues could be remedied in future iterations of the program."  Id. ¶ 44.  In 2023, the City banned on-street dining in the North End,[4] id. ¶ 29, "due to reasons including the North End's high density of restaurants and foot traffic, narrow streets and sidewalks, resident parking scarcity, and other related

---

[4] The City did allow dining on other public property, chiefly in North End Park, for restaurants adjacent to the park, and continued to issue permits for sidewalk patios.

4

ADD4

considerations," id. ¶ 412. Specifically, "[w]ith about [ninety-five] restaurants in just over a third of a square mile, the North End has the densest per capita number of restaurants in the state." Id. ¶ 334. The City also said the "scheduled closures of the Sumner Tunnel and continued congestion around the North Washington Street Bridge construction project [were] expected to put a greater strain on North End traffic [that] summer and make it harder for residents and first responders to navigate the area." Id. ¶ 309. The City did not ban on-street dining elsewhere.

Approximately six months after voluntary dismissal of the first lawsuit, and in light of the City's policy prohibiting on-street dining (but not sidewalk dining) in the North End, the North End Chamber of Commerce ("NECC"), joined by the four named restaurants in the prior suit, along with several others, filed this action. Doc. No. 1. Plaintiffs argue that treating restaurants in the North End differently than restaurants in other areas of the City evinced animus against Italian Americans. Id. ¶ 544. They allege that most of the restaurants in the North End serve Italian American food, id. ¶ 13, and "almost all" of the Plaintiffs "are owned by people who have Italian heritage and are white," id. ¶ 565.

To further buttress these claims, Plaintiffs cite a number of statements made by Mayor Wu prior to the termination of on-street dining in the North End. On March 21, 2022, at the St. Patrick's Day breakfast, Mayor Wu stated that she was "getting used to dealing with problems that are expensive, disruptive and white." Id. ¶ 192. Four days later, Mayor Wu sent a letter to North End restaurant owners, stating: "If a critical mass of restaurant owners also believe this program is unworkable as proposed, then I am prepared to rescind North End outdoor dining before the start of the season." Id. ¶ 21. Finally, in 2022, Mayor Wu proclaimed the second Monday in October to be Indigenous Peoples' Day, the same day as Columbus Day, a move

5

ADD5

Plaintiffs describe as "a deliberate ethnic affront meant to overshadow or symbolically replace the only federal Italian holiday."[5]  Id. ¶ 268.

Plaintiffs filed their original Complaint in this Court on January 4, 2024, amending it for the first time on March 7, 2024, and then again on April 1, 2024.  Doc. Nos. 1, 16, 21.  In the SAC, Plaintiffs advance five claims: Counts I and II assert violations of the Equal Protection Clause; Count III asserts violations of Procedural and Substantive Due Process; and Counts IV and V request declaratory judgments concerning the outdoor-dining program policies.  Doc. No. 21 at ii.  The City moved to dismiss, contending each count fails to state a claim and that the SAC violates Rule 8(a)(2) of the Federal Rules of Civil Procedure ("Rule 8").  Doc. No. 22. Plaintiffs have opposed.  Doc. No. 27.  The Court held a hearing on December 6, 2024.

II.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In so doing, the complaint must advance "factual allegations, either direct or

---

[5] The Court takes judicial notice that the second Monday in October is a federal "legal public holiday" called Columbus Day.  5 U.S.C. § 6103.  The Supremacy Clause of the United States Constitution provides that "every State shall be bound" by federal law.  U.S. Const. art. VI, cl. 2. Therefore, local officials cannot repeal, eliminate, or "replace" Columbus Day or any other federal holiday.  Of course, nothing in the text of § 6103 either requires state or local governments to observe Columbus Day or prevents local or state officials (or federal officials, for that matter) from designating the second Monday in October as also commemorating other events, people, or causes.  Indeed, that is precisely what Mayor Wu's predecessor did by designating the second Monday in October as Indigenous People's Day in 2021.  Exec. Order of Mayor Kim Janey Relative to Indigenous Peoples in Boston (Oct. 6, 2021), https://drive.google.com/file/d/1W3bWMFH3d5gKaC4dgtEJ69xpoV-trv6L/view [https://perma.cc/AYF3-EHKZ].  In addition, federal law does not require states or municipalities to declare Columbus Day as a state or local holiday, and, apparently, several states do not celebrate such a holiday.  See Drew Desilver, Working on Columbus Day or Indigenous Peoples' Day? It Depends on Where Your Job Is, Pew Rsch. Ctr. (Oct. 5, 2023), https://www.pewresearch.org/short-reads/2023/10/05/working-on-columbus-day-or-indigenous-peoples-day-it-depends-on-where-your-job-is/ [https://perma.cc/GDP9-AJWQ].

6

ADD6

inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997). Courts must "take all factual allegations [in the complaint] as true and . . . draw all reasonable inferences in favor of the plaintiff." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007). But "[t]he court need not accept a plaintiff's assertion that a factual allegation satisfies an element of a claim, . . . nor must a court infer from the assertion of a legal conclusion that factual allegations could be made that would justify drawing such a conclusion." Cordero-Hernandez v. Hernandez-Ballesteros, 449 F.3d 240, 244 n.3 (1st Cir. 2006).

III.    DISCUSSION

The Court proceeds as follows. First, it will consider the alleged Rule 8 violation. Next, it will address whether one particular Plaintiff has standing to bring its claims. Finally reaching the merits, it will evaluate the Equal Protection claims, then the Procedural and Substantive Due Process claims, and end with the claims arising under the Declaratory Judgment Act.

A. Rule 8 Violation

"A district court has the power to dismiss a complaint when a plaintiff fails to comply with the Federal Rules of Civil Procedure." Kuehl v. FDIC, 8 F.3d 905, 908 (1st Cir. 1993). Rule 8 requires plaintiffs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Rule "protect[s] a defendant's inalienable right to know in advance the nature of the cause of action being asserted against him." Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 84 (1st Cir. 2008). A complaint "should be short because 'unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.'" Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1281, at 365 (1969)).

ADD7

"Unnecessary prolixity" fairly describes the SAC.  It contains well over 700 numbered paragraphs spanning over 200 pages.  It is neither "short" nor "plain."  This is one type of prolix pleading against which Rule 8 safeguards.  See Jackson v. Polaroid Corp., 181 F.3d 79 (1st Cir. 1999) (unpublished table decision) (affirming dismissal of "long and redundant" 350-paragraph complaint because of noncompliance with Rule 8).

Nonetheless, Plaintiffs defend their SAC, not by asserting it is either "short" or "plain," but rather contending it complies with Rule 8 because the pleading "contains" a short and plain statement in the form of a fourteen-page "introduction."  Doc. No. 27 at 50.  This view of the Rule is misguided.  While laying out in detail the theory of a complaint, along with supporting factual allegations, can be helpful, the SAC goes substantially too far.  "A complaint should not be a preview of counsel's argument to the jury at the end of the case and it should avoid unnecessary facts, descriptive terms, repetitions[,] argumentative language, or characterizations."  Washburn v. Kingsborough Cmty. Coll., No. 20-cv-00395, 2022 U.S. Dist. LEXIS 51086, at *4 (E.D.N.Y. Mar. 22, 2022) (cleaned up).  Here, Plaintiffs summarized several meetings and communications, included photos of those meetings and of an electric sweeper, provided a "brief" history of Italians in the North End, repeated Mayor Wu's statement at the St. Patrick Day breakfast five times, quoted several seemingly random "residents," inserted multiple characterizations of "legendary" restaurants and "jaw dropping" fees, described the media's response to the on-street-dining ban, omitted virtually no detail of the entire course of events, and much more.  The Court has considered whether each or even many of these assertions are necessary to advance the causes of action set forth in the SAC; they are not.  To require the City to answer the SAC as presently drafted imposes an unfair and unnecessary burden—one of the harms Rule 8 seeks to prevent.  It also imposes a significant burden on the Court as it attempts to

8

ADD8

sift through the allegations of the pleading.  Accordingly, for this reason alone—failure to comply with Rule 8—the Motion to Dismiss is ALLOWED.

Ordinarily, in such circumstances, the Court would provide leave to amend the complaint.  However, the Court does not do so here for three reasons.  First, despite facing a Rule 8 challenge, Plaintiffs, represented by counsel, did not request leave to amend in their Opposition to the Motion to Dismiss (spanning over fifty pages), nor in their surreply (also spanning over fifty pages with exhibits).  Second, the SAC is the third complaint filed by Plaintiffs in this action, which was preceded by several pleading attempts in the prior action before Judge Talwani.  Third, the Court proceeds to review the substance of the claims and, as the Court explains below, the claims pursued in the SAC do not survive on the merits.

B.  Standing

The Court must first attend to standing.  See United States v. AVX Corp., 962 F.2d 108, 113 (1st Cir. 1992).  The City does not dispute the standing of the individual Plaintiffs and, of course, the allegations in the SAC establish their standing at this stage of the proceedings.  The City does, however, contend that NECC lacks associational standing to sue either directly or on behalf of its members.  Doc. No. 23 at 41.

To satisfy the case-or-controversy requirement of Article III of the United States Constitution, plaintiffs must establish "each part of a familiar triad: injury, causation, and redressability."  See Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)).  In addition, an organizational party must demonstrate that "(1) one or more of its members would have standing to sue as an individual; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977) (cleaned up).

9

ADD9

NECC has satisfied, and the City does not challenge, the first prong of the standing test because some of the restaurants named as Plaintiffs are members of the NECC, and those restaurants allege having suffered harm from the City's outdoor-dining policies.  Regarding the second prong, Plaintiffs assert that NECC's purpose is to "advance[e] [sic] the business, commercial, industrial, and civic interests of the North End district of Boston and its trade areas."  Doc. No. 27 at 49.  This plausibly satisfies the second prong of the standing requirement for motion-to-dismiss purposes.

The third prong is a bit more complicated.  "[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought."  Warth v. Seldin, 422 U.S. 490, 515 (1975).  If the association seeks equitable relief, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."  Id.  Therefore, the claims arising out of the Declaratory Judgment Act and those seeking injunctive relief requiring the City to change its policies "turn[] on a question of law . . . not particular to each member of the Association, and because the declaration [or other equitable relief] [would apply] equally to all members of the Association, there is no need for individual proof or participation."  Playboy Enters. v. Pub. Serv. Comm'n, 906 F.2d 25, 35 (1st Cir. 1990).  Thus, for these claims, NECC has established the third prong and thus has associational standing.

The claims seeking monetary damages are different.  NECC is not "entitled to be compensated for the various injuries suffered by its members," and the member restaurants are necessary as parties to assess each of their damages separately.  Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 307 (1st Cir. 2005).  Thus, NECC does not have associational standing to

10

ADD10

press the claims for monetary damages.  The Motion to Dismiss is thus ALLOWED as to NECC insofar as it seeks monetary damages.

### C. Equal Protection Claims

"The Equal Protection Clause requires states to treat alike all persons similarly situated." Toledo v. Sanchez, 454 F.3d 24, 33 (1st Cir. 2006).  To determine whether a state violates this provision of the Constitution by treating two groups differently, courts must first assess whether the state action burdens a suspect class or impinges upon a fundamental right.  See Cook v. Gates, 528 F.3d 42, 61 (1st Cir. 2008).  Certain suspect classifications, such as race or national origin, are subject to "strict scrutiny, which entails both a compelling governmental interest and narrow tailoring." Massachusetts v. U.S. Dep't of Health & Hum. Servs., 682 F.3d 1, 8-9 (1st Cir. 2012).  However, where there is no fundamental right or suspect classification implicated, a plaintiff must establish that "no rational basis exist[ed] for that difference in treatment, and that the different treatment was based on a malicious or bad faith intent to injure." Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 10 (1st Cir. 2013).

Plaintiffs advance three main arguments.  First, Plaintiffs contend that implementing a different outdoor-dining policy in the North End triggers strict scrutiny because it constitutes discrimination based on national origin and race—"white, Italian Americans"—and implicates a fundamental right—on-street-dining licenses.  Doc. No. 27 at 23, 39.  In the alternative, they allege a "class-of-one" claim.  See id. at 1.  Finally, they argue that the City's policies treating the North End differently could not survive rational-basis review.  Id. at 16.  The Court considers each argument in turn.

#### 1. Strict Scrutiny

At the outset, the Court dispenses with Plaintiffs' assertion that the United States Constitution vests in them a "fundamental right" to use public streets for private profit as an

11

ADD11

extension of their restaurants.  Such a right is neither expressly created in the Constitution nor fairly inferred from any provision thereof.  See Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (listing recognized fundamental rights as those guaranteed by Constitution, including "specific freedoms protected by the Bill of Rights," "the right[] to marry," "to have children," "to direct the education and upbringing of one's children," "to marital privacy," "to use contraception," "to bodily integrity," and stating that Court has "always been reluctant to expand the concept").  Thus, to trigger strict scrutiny, Plaintiffs must successfully implicate a suspect classification.

"When the government uses explicit [suspect] classifications for the distribution of benefits, discriminatory intent is presumed, and those policies are always subjected to strict scrutiny."  Anderson v. City of Bos., 375 F.3d 71, 82 (1st Cir. 2004).  The policies cited by Plaintiffs do not explicitly classify based on race,[6] ethnicity, or national origin.[7]  They are facially neutral and, as a result, Plaintiffs fail to state a claim for express use of prohibited classifications.

When policies do not explicitly discriminate based on suspect classification, as is the case here, strict scrutiny may still apply if "the legislation in some sense was designed to accord disparate treatment on the basis of racial [or national origin] considerations."  Washington v. Seattle Sch. Dist., 458 U.S. 457, 484-85 (1982).  A discriminatory purpose may be shown in two

---

[6] At times, Plaintiffs claim the ban on-street dining in the North End constitutes racial discrimination against white people. Doc. No. 21 ¶¶ 19, 41, 74, 192, 565.

[7] Membership within a suspect class involves characteristics that define a discrete group, which are generally immutable or otherwise not within the members' control.  See Lyng v. Castillo, 477 U.S. 635, 638 (1986).  Owning a restaurant in the North End is plainly a characteristic that one would have control over and likely does change from time to time.  Cf. Walsh v. Massachusetts, 618 F.2d 156, 158 (1st Cir. 1980) ("The shortest way of disposing of this complaint is to note that it erroneously assumes that a distinction drawn upon strictly county lines is on that account a violation of the Equal Protection Clause.").

ADD12

ways.  See Anderson, 375 F.3d at 82-83.  First, Plaintiffs may demonstrate that "a clear pattern, unexplainable on grounds other than race [or national origin], emerges from the effect of the state action."  Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977).  Second, and alternatively, a discriminatory purpose may be proved via "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos., 996 F.3d 37, 45 (1st Cir. 2021).  Such discriminatory intent may be shown by evaluating "the degree of disproportionate racial effect, if any, of the policy; the justification, or lack thereof, for any disproportionate racial effect that may exist; and the legislative or administrative historical background of the decision."  Id. (quoting Anderson, 375 F.3d at 83).

Plaintiffs' factual allegations fail to plausibly allege a discriminatory purpose by way of a pattern of action explainable only on grounds of national origin.  Plaintiffs fail to identify a pattern of conduct historically targeting the North End, Italian restaurants, or "white Italian Americans."  Doc. No. 27 at 23.  At most, they allege shifts in policy in 2022 and 2023 affecting the North End: eliminating the fee waiver for outdoor dining, shortening the outdoor-dining season, and eventually no longer allowing on-street dining.  These changes were not "unexplainable on grounds other than race [or national origin]," but rather justified, as Plaintiffs allege in their SAC, by the unique impacts of the program on the North End.  The policy also applied uniformly without regard to the identity of the owner or the type of food served by the restaurant.  With respect to the "degree of disproportionate racial effect," the very policy Plaintiffs allege harms "white Italian Americans" or "Italian restaurants" actually benefits several Italian restaurants (and likely restaurants owned by those of Italian descent) that enjoyed

13

ADD13

on-street dining outside the North End.[8]  See Doc. No. 21 ¶¶ 453, 454, 459, 487, 504, 506, 507. This favorable treatment undermines any inference of discriminatory purpose or intent against the "class" that Plaintiffs purport to allege.  See, e.g., Turner v. Eastconn Reg'l Educ. Serv. Ctr., 588 F. App'x 41, 44 (2d Cir. 2014) (holding plaintiff's allegation that member of same protected class "received favorable treatment would undermine any inference that the [d]efendants were motivated by [discriminatory] animus"); Fitzgerald v. Nat'l R.R. Passenger Corp., No. 13-6979, 2016 U.S. Dist. LEXIS 91114, at *16 (E.D. Pa. July 13, 2016) ("The fact that several African American employees were chosen for the very positions that Plaintiff sought undercuts Plaintiff's claim that the decisions were motivated by racial animus").  In sum, these facts do not plausibly support a "clear pattern" from which one can reasonably infer discriminatory purpose sufficient to invoke strict scrutiny.

Plaintiffs also fail to allege legislative or administrative history that would support a claim of discriminatory intent.  Plaintiffs offer no facts supporting the inference that the City imposed the challenged regulations because many restaurants in the North End serve Italian food or are owned by those of Italian heritage or white people.  A joke, perhaps about white people, made by the Mayor at the St. Patrick's Day breakfast hardly suggests animus against Italian Americans.[9]  Similarly, the designation of Indigenous People's Day is not evidence of animus.

> The government does not violate the Equal Protection Clause every time it affirms or celebrates an ethnicity.  Otherwise, Columbus Day itself would arguably have been an [E]qual [P]rotection violation—but of course it wasn't.  Under Plaintiffs' theory, every national or ethnic group in [the city]—Asians, Scandinavians, Arabs,

_____

[8] Plaintiffs have not alleged that no restaurants outside of the North End are owned by white people or Italian Americans.  Based on Plaintiffs' pleadings, that is not a reasonable inference to draw.

[9] The Court notes no basis to infer discrimination against "white" people.  The challenged regulations apply to any restaurant in the North End and the restaurants not subject to these stricter limitations are located in all the other neighborhoods without regard to the race of its owners.

14

ADD14

> Pacific Islanders, and so on—could assert claims against [the mayor] and the city for declaring a holiday celebrating a nationality or ethnicity different than theirs.

Conf. of Presidents of Major Italian Am. Orgs., Inc. v. City of Phila., No. 22-1116, 2023 U.S. App. LEXIS 2200, at *6 (3d Cir. Jan. 27, 2023). Nothing about these designations supports the inference of discriminatory intent, especially given the fact that a different mayor had designated Indigenous People's Day as a holiday the year before the challenged conduct here.[10] Finally, Plaintiffs also allege that Mayor Wu's hosting a holiday party for "Electeds of Color" "underscores her racial views and provides context for her treatment of the plaintiffs in this case, almost all of which are owned by people who have Italian heritage and are white." Doc. No. 21 ¶ 565. None of these facts, in isolation or together, plausibly allege discriminatory intent.

Plaintiffs also attempt to show discriminatory intent by pointing to a disproportionate impact of the challenged regulations on persons of Italian heritage. This approach fails. What Plaintiffs have alleged is a regulation of restaurants, in a certain neighborhood, predominately serving Italian food, and predominately owned by persons of Italian heritage. "But a disparate impact standing alone does not demonstrate discriminatory intent, and a few instances of disparate impact in enforcement do not amount to a consistent pattern." Bruce & Tanya & Assocs., Inc. v. Bd. of Supervisors of Fairfax Cnty., 854 F. App'x 521, 533 (4th Cir. 2021) (cleaned up). And Plaintiffs have not augmented these facts with other allegations describing a pattern of discriminatory actions toward persons of Italian heritage. In fact, the SAC alleges several Italian restaurants in other neighborhoods obtained on-street-dining permits. See Doc. No. 21 ¶¶ 453, 454, 459, 487, 504, 506, 507. Therefore, even with the benefit of the plaintiff-

---

[10] A court may consider "documents that are incorporated into or attached to the complaint, as well as matters of public record subject to judicial notice." Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth., 4 F.4th 63, 69 n.4 (1st Cir. 2021).

15

ADD15

favorable standard governing motions to dismiss, Plaintiffs fail to plausibly allege the sort of discrimination that would trigger strict scrutiny.

    2. *Class-of-One*

"[A]n equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.'" Engquist v. Or. Dep't of Agric., 553 U.S. 591, 601 (2008) (cleaned up). "A claim for a 'class of one' equal protection violation is cognizable when—and only when—a plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."[11] SBT Holdings, LLC v. Town of Westminster, 547 F.3d 28, 34 (1st Cir.2008) (cleaned up). The First Circuit has hesitated "to open[] up local permitting decisions to detailed federal judicial scrutiny under equal protection rubric," and it has more generally limited "class of one" analysis by imposing two additional requirements. Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 44 (1st Cir. 1992). First, to be similarly situated requires asking "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent." SBT Holdings, 547 F.3d at 34. In other words, Plaintiffs must show that they are "similarly situated in all respects relevant to the challenged government action." Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 640 (1st Cir. 2013). To do so requires an "extremely high degree of similarity" which "must be enforced with particular rigor in the land-use context because zoning

---

[11] Plaintiffs advance a class-of-one claim and a selective-treatment claim in Count I. In addition to showing that a plaintiff was treated differently from those similarly situated, a selective treatment claim requires that the treatment was based on impermissible considerations such as race, religion, or the exercise of constitutional rights or bad faith. Id. at 508. As the Court will explain, the selective-treatment claim fails for the same reasons that the class-of-one claim fails; namely, Plaintiffs fail to allege that others were indeed similarly situated, and Plaintiffs fail to sufficiently allege that the treatment was motivated by impermissible considerations such as membership in a suspect class or bad faith.

16

ADD16

decisions will often, perhaps almost always, treat one landowner differently from another."

McCoy v. Town of Pittsfield, 59 F.4th 497, 507-08 (1st Cir. 2023).  Second, in determining

whether the differential treatment withstands a rational basis, courts examine whether the

defendants' conduct was "motivated by malicious or bad faith intent to injure."  SBT Holdings,

547 F.3d at 35 (cleaned up).

Measured against these standards, the SAC fails to plausibly plead a class-of-one claim.

Most permitting decisions in which such classes-of-one are considered concern the use of private

property.  See, e.g., SBT Holdings, 547 F.3d at 30; Custodio, 964 F.2d at 34.  Not so here, where

Plaintiffs claim a right to use public property—portions of streets in Boston—for private profit.

Unsurprisingly, Plaintiffs cite no case supporting their position involving the use of public

property for private profit.[12]

Turning to the requirements for such a claim, Plaintiffs fail on all grounds.  The other

neighborhoods Plaintiffs cite are not similarly situated.  None of those neighborhoods, to the eye

of "a prudent person, looking objectively," are "roughly equivalent" "in all relevant respects" to

the North End, nor have Plaintiffs pled plausibly "an extremely high degree of similarity."  The

North End, as characterized by Plaintiffs in their own pleading, is an exceptionally dense

---

[12] Plaintiffs instead repeatedly invoke Brockton Power LLC v. City of Brockton, where this
Court denied a motion to dismiss a class-of-one Equal Protection claim.  948 F. Supp. 2d 48, 70
(D. Mass. 2013).  That case, however, offers little help to Plaintiffs here.  In Brockton Power, the
plaintiffs alleged that the defendants, in a years-long, targeted effort, employed several strategies
to thwart the plaintiffs' efforts to develop a power plant, including "improper attempts to change
applicable zoning regulations; refusal to process, or summary denial of, necessary review and
approval of project plans and applications, without regard for applicable regulations and legal
standards; discriminatory efforts to prevent the plaintiffs from gaining access to drinking and
cooling water; persistent litigation and manipulation of state agency and court proceedings; total
disregard for repeated warnings from the City's legal counsel; and stringent, public opposition to
the project and its proponents."  Id. at 56.  Brockton Power also concerned the use of private
property.  Plaintiffs' situation is wholly different.

17

ADD17

neighborhood, with the highest density of restaurants in the state, located adjacent to the Sumner Tunnel and the North Washington Street Bridge construction project. Plaintiffs allege that the restaurants in the North End should be compared to other restaurants in other neighborhoods of Boston. Doc. No. 21 ¶ 439. But the different treatment Plaintiffs describe and complain of concerns the neighborhood of the North End. See id. ¶ 717 ("The City's blanket refusal to review and approve any application for an on-street outdoor dining license for restaurants in the North End is contrary to law . . . "). The most salient comparator, then, would not be other restaurants, but other neighborhoods in Boston. Cf. Back Beach Neighbors Comm. v. Town of Rockport, 63 F.4th 126, 131 (1st Cir. 2023) (explaining, where different treatment was based on failure to enforce regulations at Back Beach, appropriate unit of comparison would be other public beaches in town similar in all relevant respects).

But even if the Court were to compare restaurant to restaurant, Plaintiffs cite certain relevant aspects, such as "width of the streets" or the "restaurants' location in residential buildings," while averring that restaurants outside the North End are similarly situated. Doc. No. 21 ¶ 439. That is not a valid application of the law. Plaintiffs cannot pick and choose the aspects that would make the restaurants similar; they must contend with all aspects relevant to the regulation, including the neighborhood in which the restaurant is located. See Back Beach, 63 F.4th at 131. This requires comparing neighborhoods, as that is a relevant aspect pertaining to the policy. Plaintiffs allege that the justification of the policy was that the "North End is different from other neighborhoods because of the unique impacts of outdoor dining on the quality of residential life." Doc. No. 21 ¶ 198. Beyond that, they have not identified any other neighborhood with similar relevant aspects pertaining to restaurant density, residential quality of life concerns, and proximity to construction projects, that would make a valid comparator.

18

ADD18

Therefore, the restaurants in the North End are not similarly situated with restaurants outside the North End. This alone is fatal to the class-of-one claim.

Next, Plaintiffs fail to plausibly plead bad faith or malicious intent to injure. Plaintiffs do not advance allegations establishing that the City bore an affirmative intent to harm them. They do state that the alleged "quality of life" justification for the different treatment was baseless (and therefore pretext masking bad faith), because the outdoor-dining program did not actually cause the issues relating to rats, rodents, traffic congestion, accessibility problems, and trash afflicting the neighborhood. Even accepting this as true (i.e., assuming that outdoor dining did not cause all of these issues), the SAC alleges something materially different. The statements of and decisions by the City set out in the SAC allege that the City concluded on-street dining exacerbated, rather than created, these problems, and that this conclusion led first to its decision to limit on-street dining and then to eliminate it altogether. While Plaintiffs may argue that the City could have addressed these concerns in other ways, that is not before the Court to decide, nor does it convert the rationale to one made in bad faith. The City's weighing and prioritizing different considerations yielding a decision different from the one Plaintiffs might prefer is not evidence of bad faith or an attempt to harm or injure Plaintiffs.[13]

Plaintiffs also argue that the City acted in bad faith by retaliating against them after the exercise of their constitutional rights to petition the government and to seek redress in the Courts. See Fabiano v. Hopkins, 352 F.3d 447, 453 (1st Cir. 2003). The former arises from the exclusion for fire safety reasons of some restaurant owners from a press conference held by

---

[13] Plaintiffs also complain of a lack of transparency or consultation in the course of the Mayor's decision making regarding on-street dining in the North End. Doc. No. 21 ¶ 13. They point to no law requiring the Mayor to have conducted herself differently. Further, Plaintiffs have not alleged that the Mayor conducted herself differently when dealing with other restaurant owners in other neighborhoods.

19

ADD19

Mayor Wu addressing on-street dining.  The latter emerged from a statement by Mayor Wu after a few Plaintiffs filed the first lawsuit.  In particular, Mayor Wu stated that "[i]f a critical mass of restaurant owners also believe this program is unworkable as proposed, then [she was] prepared to rescind North End outdoor dining before the start of the season."  Doc. No. 21 ¶ 21.  Even if the Court construed the latter comment as a "public threat,"[14] Plaintiffs "adduce no direct evidence establishing retaliatory motive.  Instead, they rely entirely on circumstantial evidence: that is, [the complained of action] followed the" plaintiffs' exercise of their constitutional rights. Rubinovitz v. Rogato, 60 F.3d 906, 911 (1st Cir. 1995).  The law requires that "the malice/bad faith standard should be scrupulously met."  Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen, 932 F.2d 89, 94 (1st Cir. 1991).  Plaintiffs have alleged the Mayor decided the North End was a unique neighborhood (a point on which Plaintiffs agree), and that various aspects of this "uniqueness" caused the Mayor to first impose a fee and then eliminate on-street dining. Whether this decision was the "best policy" or the "wisest" decision is not for a court to decide. See New Orleans v. Dukes, 427 U.S. 297, 303 (1976) ("[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines[.]").  That the Mayor said she would go only so far, accepting the facts as pled by Plaintiffs, is not a retaliatory threat. Plaintiffs have not plausibly alleged the decision was made in bad faith.  Cf. Rubinovitz, 60 F.3d at 912 (finding "enough indication of a malicious orchestrated campaign causing substantial harm" where one city official sought to punish single landowner after landowner evicted

---

[14] Plaintiffs contend that the preceding statement by Mayor Wu, given its timing, was a public threat.

20

ADD20

official's friend, going so far as to arrange for city to terminate utility services to landowner's property).

### 3. Rational-Basis Scrutiny

Absent a classification triggering strict scrutiny, the court will deploy rational-basis review, which is generally deferential to the government actor. See Massachusetts v. United States HHS, 682 F.3d 1, 9 (1st Cir. 2012). "Under rational basis scrutiny, a classification will withstand a constitutional challenge as long as it is rationally related to a legitimate state interest and is neither arbitrary, unreasonable nor irrational." D'Angelo v. N.H. Sup. Ct., 740 F.3d 802, 806 (1st Cir. 2014); see also Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42, 47 (1st Cir. 2003) (noting "even foolish and misdirected provisions will be upheld under this test" (cleaned up)). "[A] classification 'must be upheld against [E]qual [P]rotection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Heller v. Doe, 509 U.S. 312, 320 (1993) (emphasis added) (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)).

The Court need not imagine a set of facts that would provide a rational basis for the City's policies because Plaintiffs have already supplied them. To justify the fees imposed on Plaintiffs, the City considered the "unique impacts of outdoor dining on the quality of residential life," such as "trash, rodents, traffic, and parking problems." Doc. No. 21 ¶ 22. To justify the ban on on-street dining in the North End, the City cited "the North End's high density of restaurants and foot traffic, narrow streets and sidewalks, resident parking scarcity, and other related considerations." Id. ¶ 412. The City also pointed to the "scheduled closures of the Sumner Tunnel and continued congestion around the North Washington Street Bridge construction project." Id. ¶ 309. These explanations more than suffice to show that the reasons underlying the policies were rationally related to legitimate government interests. Plaintiffs do

21

ADD21

not challenge the accuracy of the concerns; that is, they do not allege that the construction projects or the rodent problem did not exist. Instead, Plaintiffs argue that they were not the real reasons the City shifted its policies. However, the law does not require the City to "prove" the legitimacy of these justifications, only that the reasons it provided rationally related to valid government interests. In addition, the City is entitled to proceed one step at a time in addressing public concerns. Dukes, 427 U.S. at 30 ("Legislatures may implement their program step by step . . . in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations."). While these considerations may not be entirely absent from other neighborhoods, Plaintiffs' own allegations establish that the City has sufficiently articulated a rational basis for treating the North End differently. These reasons are neither arbitrary nor irrational. Cf. Willowbrook v. Olech, 528 U.S. 562, 563 (2000) (holding village's demand of thirty-three-foot easement as opposed to fifteen-foot-easement applied to others was "irrational and wholly arbitrary"). Therefore, Plaintiffs' Equal Protection claims fail under rational basis review. The Motion to Dismiss is ALLOWED as to Counts I and II.

D. Due Process

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits a state from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This prohibition "applies fully to a state's political subdivisions, including municipalities and municipal agencies." Harron v. Town of Franklin, 660 F.3d 531, 535 (1st Cir. 2011). The Due Process Clause has both procedural and substantive components. "The former ensures that government, when dealing with private persons, will use fair procedures." Id. at 535-36 (cleaned up). The latter "functions to protect individuals from particularly offensive actions on the part of government officials, even when the government

22

ADD22

employs facially neutral procedures in carrying out those actions." Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006). Plaintiffs' claims invoke both components.

### 1. Procedural Due Process

"The threshold issue in a [P]rocedural [D]ue [P]rocess action is whether the plaintiff had a constitutionally protected property interest at stake." Clukey v. Town of Camden, 717 F.3d 52, 55 (1st Cir. 2013). Property interests are defined by state law. Id. To establish a constitutionally protected property interest, "the plaintiffs must identify a legitimate claim of entitlement to the property in question—a claim of entitlement created and defined by existing rules or understandings that stem from an independent source such as state law." Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 8 (1st Cir. 2005) (cleaned up). "[A]n abstract need or desire or a unilateral expectation are not sufficient to cement a constitutionally protected interest." Id. (cleaned up). In general, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005).

Plaintiffs plainly do not have a property interest in on-street-dining licenses. They make five arguments why they do. None succeed.

First, Plaintiffs argue that because their 2022 licenses were in effect when the 2023 ban was announced, they had a "reasonable and legitimate expectation of receiving the continuous benefit." Doc. No. 27 at 36-37. Yet nothing in the Executive Orders or statutes authorizing the City to approve applications for on-street dining required the approval of such requests or established criteria for the approval of such requests. Governor Baker issued an executive order enabling—but not requiring—cities and towns to grant approvals permitting outdoor-dining

23

ADD23

service.[15]  See Governor's COVID-19 Order No. 50 § 1, https://www.mass.gov/doc/september-10-2020-order-making-certain-phase-iii-adjustments/download (last visited Dec. 18, 2024) (providing cities "may" allow outdoor dining).  Massachusetts then enacted law cementing this discretionary authority.  See 2021 Mass. Acts ch. 20, § 19(b) (stating "a city or town may approve a request for expansion of outdoor table service").  It also provided that "a city, town or local licensing authority may modify the scope of the approval as the city, town or local licensing authority deems proper and appropriate."  Id. § 19(d).  Massachusetts law now provides that "a city or town may approve a request for expansion of outdoor table service," and that "the mayor, board of selectmen, select board or other chief executive officer, as established by charter or special act, shall establish the process for approving such requests."  Mass. Gen. Laws ch. 40A, § 3B(b) (2024); accord 2021 Mass. Acts c. 20, § 19(b) (providing for the same).  Further, none of the Executive Orders or statutes stated or implied that the outdoor-dining program would continue the following year.  Cf. Bd. of Regents v. Roth, 408 U.S. 564, 578 (1972) (noting plaintiffs "secured absolutely no interest" where terms of employment "made no provision for renewal whatsoever").

The grant of licenses, as explained by Plaintiffs in their SAC, see Doc. No. 21 ¶ 201, was never automatic and thus not an entitlement.  See Roth, 408 U.S. at 577.  Of course, this explanation mirrors the actual provisions of the relevant laws delegating authority to the City to establish the scope of the program and the process by which restaurants may apply.  As would-be

---

[15] Plaintiffs' counsel contended at the hearing that once the City authorized on-street outdoor dining anywhere in Boston, it was required to allow it everywhere.  Not so.  City zoning ordinances designate various portions of the city for residential or commercial uses; for example, no on-street dining exists where restaurants may not operate.  More importantly, Plaintiffs fail to cite any language in the City's policies or regulations requiring the City to offer on-street dining in the North End.  Nor do they cite any language in either the Executive Order or subsequent statutes precluding a locality from authorizing on-street dining in some areas, but not others.

ADD24

holders of the on-street-dining licenses issued pursuant to a discretionary permitting system, and in the absence of a fundamental right, Plaintiffs do not have a property interest in the licenses. Cf. Harron, 660 F.3d at 537 ("As a would-be holder of a liquor license, [Plaintiff] had no property interest in the license."); see also Caesars Mass. Mgmt. Co., LLC v. Crosby, 778 F.3d 327, 333-34 (1st Cir. 2015) ("Massachusetts courts have held that, if the state actor retains discretion to grant or withhold the permit or license, there is no protected property interest.").

Second, Plaintiffs assert that the importance of outdoor dining created a protected property interest. Doc. No. 27 at 37. The subjective importance of on-street dining to Plaintiffs does not create a protected property interest. In fact, a need for property is not sufficient to create a property interest in it. The Supreme Court has made clear that, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Roth, 408 U.S. at 577. Plaintiffs contend that the fees and ban also "placed North End restaurants at a substantial competitive disadvantage when compared to restaurants in every other neighborhood." Doc. No. 21 ¶ 421. But a business does not have a protected property interest to be free from competition. See Ill. Transp. Trade Ass'n v. City of Chi., 839 F.3d 594, 596 (7th Cir. 2016) (holding property "does not include a right to be free from competition"). As Plaintiffs do not have a legitimate claim of entitlement to on-street-dining licenses, that the licenses were important does not render the licenses a property interest.

Third, Plaintiffs allege that certain "mutual understandings" existed such that Plaintiffs came to expect the continuation of the program in the North End. Doc. No. 27 at 37-39. In so doing, they rely on a case, pertaining to a plaintiff's entitlement to continued employment, that draws upon contract principles. See Perry v. Sindermann, 408 U.S. 593, 602 (1972). This

25

ADD25

argument also fails. For one thing, there is no contract or contractual provision explicitly evincing a formal entitlement of on-street-dining licenses. Even if there were, Perry does not aid Plaintiffs as they suggest. There, the Court held that evidence of a contractual provision "would not, of course, entitle [the plaintiff] to reinstatement," but rather would obligate the government officials "to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency." Id. at 603. Plaintiffs point to a slide in a presentation, identifying the objectives of the outdoor-dining program, stating that the City intended to "[r]etain as many restaurants from this year's program while increasing the participation rate in neighborhoods that are underrepresented."[16] Doc. No. 21 ¶ 277. They also point to a statement made in a press release hinting that there could be "future iterations" of the program. Doc. No. 27 at 39. Indeed, Plaintiffs also alleged:

> The City invited all Boston restaurants to participate in the program. The City decided whether to approve or deny a restaurant's application. The City itself— not the restaurants or the neighborhoods—made the call on how many restaurants would participate. And this is precisely what happened in 2021 and 2022. In 2022, under the Wu Administration, 350 restaurants applied for outdoor dining, yet the City approved just 280 of them, turning away 20% of the applicants. In addition, the City reviewed and approved the size of the on-street patio for each restaurant.

Id. ¶ 201. None of these allegations, separately or together, plausibly make out the creation of a property right or some shared agreement or entitlement to a particular form of outdoor dining. They, at most, reflect a discretionary policy decision to continue a discretionary program. Nor

---

[16] The Court notes that several other slides in a presentation for North End restaurants participating in the outdoor-dining program stated: (1) "Restaurants that participated in the 2021 temporary outdoor dining program must re-apply for 2022"; (2) "Restaurants with permanent patios who wish to extend beyond their currently licensed patio will need to apply for the temporary program as well"; and (3) "The use of the public way is a privilege and must be shared by businesses, residents, visitors, and special events. The City may ask the licensee to remove their patio at any time." 2022 Temporary Outdoor Dining Requirements, City of Boston Webinar, https://drive.google.com/file/d/1hyVeOGB7IsuVlKicjQGtJHzmt2OdyDKW/view [https://perma.cc/JXM2-NRA7]. Attendance at the program was "mandatory" for restaurants interested in participating in the outdoor dining program. Doc. No. 21 ¶ 632.

ADD26

do any of these factual allegations plausibly suggest the City relinquished or limited the discretionary legal authority it possessed to deny a license or to eliminate the outdoor-dining program entirely.

Fourth, Plaintiffs contend they have a property interest based on an "ethic that pervades our legal system." Doc. No. 27 at 39. Relying on a single state-court decision from almost forty years ago, Plaintiffs assert they have a protected property interest where the "government exerts power upon an individual in a matter of consequence has been related, on occasion, not strictly to the Constitution, but to an ethic that pervades our legal system." Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen, 473 N.E.2d 1154, 1159 (Mass. App. Ct. 1985). However, not only does Yerardi's concern an agency decision—not at issue here—but the court noted that, where an agency denies an individual relief, "it would do well to state its reasons at or near the time of decision." 473 N.E.2d at 1159. Thus, Plaintiffs' own factual allegations render Yerardi's inapposite—Plaintiffs have pled at length the City's justifications for the fees and end of on-street dining in the North End. In any event, Yerardi's concerns an "ethic" giving rise to a right, in certain circumstances, to an explanation of the reason(s) for governmental action taken against an individual license holder—it does not describe an ethic that creates substantive property rights.

Finally, Plaintiffs aver that they have a property interest in the goodwill of their businesses. Doc. No. 27 at 40. This argument also fails. Plaintiffs neither cite to binding authority[17] recognizing a protected property interest of a business's goodwill, nor explain how the City's policies led to a loss of goodwill.

---

[17] Plaintiffs instead cite Soranno's Gasco, Inc. v. Morgan, which relied on California law and is not relevant in the instant case. 874 F.2d 1310 (9th Cir. 1989).

ADD27

The Court need not go further as Plaintiffs fail to make the threshold showing that they were deprived of a protected property interest. The Motion to Dismiss Count III is ALLOWED.

### 2. *Substantive Due Process Claim*

To establish a Substantive Due Process claim, a plaintiff "must plausibly allege that the actions taken against [the plaintiff] were so egregious as to shock the conscience and that they deprived [the plaintiff] of a protected interest in life, liberty, or property." Gianfrancesco, 712 F.3d at 639. As previously explained, no protected property interest in on-street-dining licenses exists. Cf. Medeiros v. Vincent, 431 F.3d 25, 32 (1st Cir. 2005) ("The right to 'make a living' is not a 'fundamental right,' for either [E]qual [P]rotection or [S]ubstantive [D]ue [P]rocess purposes."). For that reason alone, the Substantive Due Process claim fails.

Even if Plaintiffs possessed a protected property interest, which they do not, the facts they allege fail to shock the conscience despite the benefit of the plaintiff-friendly Rule 12 standard. "In order to shock the conscience, conduct must at the very least be extreme and egregious, or, put another way, truly outrageous, uncivilized, and intolerable." Pagan, 448 F.3d at 32 (cleaned up). The First Circuit has held, "with a regularity bordering on the monotonous, that the [S]ubstantive [D]ue [P]rocess doctrine may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determinations of state or local decisionmakers, whether those decisions are right or wrong." Id. at 33. "Any permit or license denial, no matter how unattractive, that falls short of being 'truly horrendous' is unlikely to qualify as conscience-shocking." Id.; cf. Harron, 660 F.3d at 536 ("[T]here are no truly horrific circumstances alleged here relating to the refusal to transfer or issue a liquor license for the tavern." (cleaned up)); Collins v. Nuzzo, 244 F.3d 246, 250 (1st Cir. 2001) ("[T]he denial of a land use permit, even if arbitrary, did not constitute a [S]ubstantive [D]ue [P]rocess violation unless it was a truly horrendous situation." (cleaned up)).

28

ADD28

Here, at most, the City imposed fees for, and later prohibited, private restaurants in an especially dense neighborhood to operate on public streets, while allowing continued use of the public sidewalks. That simply does not shock the conscience even when the City cut a different path in other neighborhoods. Cf. Cnty. of Sacramento v. Lewis, 523 U.S. 833, 836-37, 854-55 (1998) (finding officer's decision to engage in reckless high-speed chase after minor speeding violation, eventually causing death of sixteen-year-old motorcycle passenger, did not shock the conscience); Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 624 (1st Cir. 2000) (affirming dismissal where police officers' moving into owners' house without permission, refusing to leave, and subsequently harassing and threatening owners did not sufficiently shock the conscience); Clark v. Boscher, 514 F.3d 107, 113 (1st Cir. 2008) (affirming dismissal where town's denial of necessary permits to develop residential subdivisions did "not rise to the level of behavior that shocks the conscience"). Therefore, Plaintiffs' Substantive Due Process claim is unavailing and the Motion to Dismiss with respect to Count IV is ALLOWED.

E.   Declaratory Judgment Act

Count V of Plaintiffs' SAC alleges that the City's decisions, policies, and practices were arbitrary, capricious, and contrary to law. Doc. No. 21 at 192. "The Declaratory Judgment Act provides a procedure for resolving certain kinds of controversies, but it is not a source of substantive rights in itself." Colonial Penn Grp., Inc. v. Colonial Deposit Co., 834 F.2d 229, 232 (1st Cir. 1987); see also Reiter v. Ill. Nat'l Cas. Co., 213 F.2d 946, 949 (7th Cir. 1954) (noting that Declaratory Judgment Act "granted authority to employ a new remedy in enforcing a cause of action for which there was previously a remedy[;] . . . it did not increase in anywise the jurisdiction of the United States District Court over the substantive rights of litigants or create new causes of action"). The federal Declaratory Judgment Act is not a means by which persons may seek general review of a city's decisions or policies. See Mitchell v. Dakota Cnty. Soc.

29

ADD29

Servs., 959 F.3d 887, 897 n.2 (8th Cir. 2020) ("The Declaratory Judgment Act does not provide a means for standing or relief."). The only legal authority Plaintiffs cite for this Count, besides the Declaratory Judgment Act itself, is a state-court decision regarding an appeal of an administrative agency's decision. Doc. No. 27 at 45. Of course, the decisions at issue in this case are not decisions of an administrative agency but rather the Mayor, the executive officer of the City. This Count fails to plausibly allege a claim able to stand on its own, let alone facts that would support one. The Motion to Dismiss Count V is thus ALLOWED.

Count VI alleges that the impact and parking fees imposed on Plaintiffs for the outdoor-dining program constituted an unlawful tax. Doc. No. 21 at 196. Under Massachusetts law, a municipality is not authorized to collect taxes unless that power is expressly granted by the state legislature. See Silva v. City of Attleboro, 908 N.E.2d 722, 725 (Mass. 2009). However, a municipality may collect user fees without legislative authority. Id. Plaintiffs hold the "burden of proving the invalidity of the exaction." Id. To constitute a lawful fee, as opposed to an unlawful tax, courts consider whether: (1) "they are charged in exchange for a particular governmental service which benefits the party paying the fee"; (2) "they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge"; and (3) "the charges are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses." Emerson Coll. v. City of Bos., 462 N.E.2d 1098, 1105 (Mass. 1984).

Plaintiffs fail to plausibly allege that the impact and parking fees imposed in 2022 on restaurants in the North End were unlawful taxes. The Court comes to this conclusion, taking the facts in the SAC as true, but not the legal conclusions drawn therefrom. See Ashcroft v. Iqbal,

30

ADD30

556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

First, Plaintiffs themselves allege that the fees are charged in exchange for a benefit—namely, a permit to authorize on-street dining that would otherwise be unlawful. These permits were, as Plaintiffs allege, "central to their recovery and the revitalization of economic activity in this struggling neighborhood" and "enable[ed] restaurants to recoup some of their losses." Doc. No. 21 ¶¶ 3, 10. In short, Plaintiffs do not allege facts plausibly supporting the imposition of a fee without a corresponding benefit.

Second, Plaintiffs paid the fee by choice. The SAC alleges that only those restaurants in the North End "who choose to participate" in the outdoor dining program pay the fee. Id. ¶ 151. The SAC further states: "Whether a restaurant decided to participate in outdoor dining was purely a voluntary choice for each restaurant throughout the City. In fact, about [a] third of the North End's restaurants did not participate in the outdoor dining program in 2020, 2021, and 2022." Id. ¶ 289 (emphasis added). That payment of the fee was a voluntary choice conflicts with the fee constituting a tax. Faced with this challenge, Plaintiffs retort that the fees were "highly coercive" because the restaurants participating in the program would have a "competitive advantage" over those not participating. Doc. No. 21 ¶ 736. Maybe so, but the restaurants still had a choice. Restaurants with liquor licenses certainly enjoy a competitive advantage over those without such a license. Yet, the decision to apply for such a license is a choice, and the requirement to pay for the license is a fee, not a tax. See Bertone v. Dep't of Pub. Utils., 583 N.E.2d 829, 836 (Mass. 1992) ("Fees are not taxes even though they must be paid in order that a right may be enjoyed." (cleaned up)). Plaintiffs do not plead any facts that support an inference that the City compelled the restaurants to apply to participate in the program and consequently

31

ADD31

pay the associated fees if its applications were granted.  Furthermore, Plaintiffs allege that the City offered hardship waivers, enabling qualifying restaurants to pay a reduced fee for participation in outdoor dining.  See Doc. No. 21 ¶ 224.  This cuts against any inference of coercion.  Thus, Plaintiffs fail to plausibly allege the fee was involuntary.

Finally, Plaintiffs also fail to make out the third requirement.  The impact fee the City received paid for services that were related to the program, including rat baiting, power washing of sidewalks, and painting of street lane lines.  Id. ¶ 150.  One of the fees did not even go to the City; the parking fees were paid directly to garages to provide parking for residents who lost it as a direct result of the outdoor-dining program.  Id. ¶ 146.  Plaintiffs counter that some of the funds also benefited areas of the City other than the North End.  Id. ¶ 27.  Specifically, the City used some of the collected funds to purchase an electric street sweeper with "[s]pecifications for north end streets navigation," Doc. No. 21-6 at 2, that was deployed in the North End while adorned with "a scene of St. Stephen's Church on Hanover Street," "a scene of the Old North Church and the statue of Paul Revere," and "signs of cities and provinces in Italy, including 'Roma,' 'Milano,' 'Calabria,' 'Venezia,' and 'Torino.'"  Doc. No. 21 ¶ 247.  That the sweeper was also used in other neighborhoods, id. ¶ 247, resulting in other areas receiving some benefit is "inconsequential" because the Court's "inquiry does not involve an exact measuring or quantifying of the comparative economic benefits of the limited group and the general public. Instead, the inquiry is whether the limited group is receiving a benefit that is, in fact, sufficiently specific and special to its members," Windsor Ct., LLC v. Lynnfield Water Dist., 18 N.E.3d 1138 (Mass. App. Ct. 2014) (unpublished table decision) (citing Denver St. LLC v. Town of Saugus, 970 N.E.2d 273, 280 (Mass. 2012)).  See Am. Trucking Ass'ns v. Alviti, 944 F.3d 45, 54 (1st Cir. 2019) ("In any event, we do not think that the [charge] provide a general benefit

32

characteristic of a classic tax . . . . The key question is whether the assessment raises revenue for purposes that aren't especially beneficial or useful to the payers." (cleaned up)).  Moreover, because Plaintiffs do not allege any facts that the fees were "deposited in the City's general fund, just like tax revenues," they fail to make a showing that the fee was a tax under the third factor described in Emerson College.  SDCO St. Martin, Inc. v. City of Marlborough, 5 F. Supp. 3d 139, 144 (D. Mass. 2014).  For all of these reasons, the Motion to Dismiss pertaining to both Counts V and VI is ALLOWED.

IV.    CONCLUSION

For the foregoing reasons, the Court ALLOWS the City's Motion to Dismiss, Doc. No. 22.  The Clerk shall enter a judgment of dismissal with each side to bear its own fees and costs.

SO ORDERED.

 /s/ Leo T. Sorokin              
United States District Judge

33

ADD33

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**North End Chamber of Commerce, Inc. et al**
        Plaintiffs

                                                CIVIL ACTION NO.:
        v.                                      24-cv-10039-LTS


**City of Boston**
        Defendant
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **JUDGMENT**
December 20, 2024

Sorokin, D.J.

In accordance with the Order entered on <u>December 20, 2024</u>, allowing the defendant's Motion to Dismiss. The case is closed with each side to bear its own fees and costs

        SO ORDERED.

                                /s/ Leo T. Sorokin
                                Leo T. Sorokin
                                United States District Judge

ADD34



OFFICE OF THE GOVERNOR
**COMMONWEALTH OF MASSACHUSETTS**
STATE HOUSE • BOSTON, MA 02133
(617) 725-4000

**CHARLES D. BAKER**
GOVERNOR

**KARYN E. POLITO**
LIEUTENANT GOVERNOR

## ORDER CLARIFYING THE PROGRESSION OF THE COMMONWEALTH'S PHASED WORKPLACE RE-OPENING PLAN AND AUTHORIZING CERTAIN RE-OPENING PREPARATIONS AT PHASE II WORKPLACES

COVID-19 Order No. 35

**WHEREAS,** on March 10, 2020, I, Charles D. Baker, Governor of the Commonwealth of Massachusetts, acting pursuant to the powers provided by Chapter 639 of the Acts of 1950 and Section 2A of Chapter 17 of the General Laws, declared that there now exists in the Commonwealth of Massachusetts a state of emergency due to the outbreak of the 2019 novel Coronavirus ("COVID-19");

**WHEREAS,** on March 11, 2020, the COVID-19 outbreak was characterized as a pandemic by the World Health Organization;

**WHEREAS,** the Federal Centers for Disease Control have advised that COVID-19 is spread mainly by person to person contact and that the best means of slowing the spread of the virus is through practicing social distancing and protecting oneself and others by minimizing personal contact with environments where this potentially deadly virus may be transmitted;

**WHEREAS,** on March 23, 2020, in order to restrict all non-essential person-to-person contact and non-essential movement outside the home as a means of combatting the spread of COVID-19 within the Commonwealth, I issued COVID-19 Order No. 13, which designated certain COVID-19 Essential Services, as defined in the Order, temporarily closed the brick-and-mortar premises of businesses and organizations that do not provide COVID-19 Essential Services, and prohibited gatherings of more than 10 people;

**WHEREAS,** on March 31, 2020, April 28, 2020, and May 15, 2020, I issued COVID-19 Orders No. 21, 30, and 32, respectively, which extended the period in which COVID-19 Order No. 13 would continue to restrict the operation of businesses and organizations that do not provide COVID-19 Essential Services;

1

PRINTED ON RECYCLED PAPER

ADD35

**WHEREAS,** recent public health data indicate continued improvement in key areas of measurement as a result of the extraordinary efforts of health care providers in the Commonwealth and the public's unselfish compliance with the restrictions imposed in COVID-19 Order No. 13 and other measures implemented in response to the COVID-19 health crisis;

**WHEREAS,** on May 18, 2020, I issued COVID-19 Order No. 33, which authorized the re-opening of certain brick-and-mortar premises designated as "Phase I" workplaces ("Phase I enterprises"), subject to the requirement that all such workplaces comply with workplace safety rules and standards implemented to protect against the risk of the COVID-19 virus and which otherwise further extended the period in which COVID-19 Order No. 13 will continue to restrict the operations of businesses and organizations that do not provide Essential Services or that have not been designated as Phase I workplaces;

**WHEREAS,** a sustained trend of improvement in public health data will permit a continuing, carefully phased relaxation of certain restrictions that COVID-19 Order No. 13 has placed on businesses and other organizations, provided that any adjustment can only be maintained or expanded on the basis of continuing improvements in the public health data, and further provided that any adjustment must reflect the reality that the Commonwealth remains in the midst of a public health emergency, as demonstrated by reporting from the Department of Public Health that as of May 31, 2020, 1,824 persons remain hospitalized in the Commonwealth as a result of COVID-19 and 436 of these patients are receiving treatment in intensive care units;

**WHEREAS,** sections 7, 8, and 8A of Chapter 639 of the Acts of 1950 authorize the Governor, during the effective period of a declared emergency, to exercise any and all authority over persons and property necessary or expedient for meeting a state of emergency, including but not limited to authority over assemblages in order to protect the health and safety of persons, transportation and travel by any means or mode, regulating the sale of articles of food and household articles, variance of the terms and conditions of licenses and permits issued by the Commonwealth or any of its agencies or political subdivisions, and policing, protection, and preservation of public and private property;

**NOW, THEREFORE,** I hereby order the following:

### 1. Advance Preparations by Phase II Enterprises

Beginning immediately, businesses and other organizations that are included within Phase II of the re-opening plan, as defined in Section 2 below, may open their physical workplaces and facilities ("brick-and-mortar premises") to workers for the purpose of preparing for a Phase II re-opening when authorized. In preparing their premises for re-opening, Phase II businesses and other organizations ("Phase II enterprises") must at all times comply with all generally applicable COVID-19 workplace safety rules and any relevant sector-specific COVID-

2

ADD36

\*\*\*

Pages Intentionally Omitted

\*\*\*

ADD37

subject to adoption of COVID-19 health and safety rules implemented under the authority of formal league rules or other binding agreements or affiliations.

Professional sports organizations may not engage in inter-team games within the Commonwealth and may not open any facilities within the Commonwealth to the public until further Order.

### 4.  Preparations and Accommodation for Outdoor Restaurant Dining Service

Restaurants will be authorized to provide outdoor table service at the commencement of Phase II of the Commonwealth's phased re-opening of workplaces.  If the public health data reflects continued positive progression, restaurants will be authorized at a later date and by a subsequent Phase II Order to commence indoor table service.  In each case, restaurants will be required to comply with sector-specific COVID-19 workplace safety rules for restaurants.

"Outdoor table service" shall mean service that is provided outside the restaurant building envelope, whether on a sidewalk, patio, deck, lawn, parking area, or other outdoor space. Outdoor table service may be provided under awnings or table umbrellas or other cover from the elements, provided, however, that at least 50 percent of the perimeter of any covered dining space must remain open and unobstructed by any form of siding or barriers at all times.

Notwithstanding the provisions of chapter 40A of the general laws, or any special permit, variance or other approval thereunder, or any other general or special law to the contrary, a city or town may approve requests for expansion of outdoor table service, including in the description of licensed premises as described below.  Prior to such approval, the mayor, select board, or chief executive as established by charter or special act, shall establish the process for approving such requests.  Such process need not comply with the notice and publication provisions of section 11 of chapter 40A.

Any such approval may be exercised immediately upon filing of notice thereof with the city or town clerk, without complying with any otherwise applicable recording or certification requirements.

In order to provide improved opportunities for outdoor table service, for any type of license that permits the sale of alcoholic beverages for on-premises consumption, a local licensing authority ("LLA") may grant approval for a change in the description of the licensed premises for the purpose of permitting outdoor alcohol service as the LLA may deem reasonable and proper, and issue an amended license to existing license holders, without further review or approval by the Alcoholic Beverages Control Commission ("ABCC") prior to issuance.  Upon approval of an amended license, the LLA shall provide notice of the amended license to the ABCC.  Nothing in this Order shall prevent the ABCC from exercising its statutory or regulatory enforcement authority over any such amended license issued.

6

ADD38

On November 1, 2020 or the date this Order is rescinded, whichever is sooner, any approval issued under this Section, including any amended license issued by an LLA as a result of this Order, shall automatically revert back to its status prior to the approval of the change for expansion of outdoor table service or in the description of a licensed premises.

### 5. Sector-Specific Rules

The Director of Labor Standards and the Commissioner of Public Health shall issue, subject to my approval, COVID-19 workplace safety rules for certain, specific Phase II enterprise workplace sectors ("Sector-Specific Rules") to address the particular circumstances and operational needs of those specific workplace sectors. These Phase II Sector-Specific Rules shall supplement the generally applicable COVID-19 safety rules applicable to all workplaces in the Commonwealth. Phase II enterprises shall adopt and comply with all Sector-Specific Rules applicable to their workplaces.

### 6. Limitations on Gatherings

A Phase II enterprise that is authorized to open its brick-and-mortar premises to workers under the terms of this Order shall not be subject to the 10-person limitation on gatherings established in Section 3 of COVID-19 Order No. 13 in its normal operations of those premises; provided, however, that Phase II enterprises must comply with the social distancing requirements in the Commonwealth's generally applicable COVID-19 workplace safety rules, any more specific limitations on gatherings and meeting sizes included in any applicable Sector-Specific Rules, and any other similar restrictions specified in this Order.

Section 3 of COVID-19 Order No. 13 shall otherwise remain in effect for businesses or organizations not permitted to open their brick-and-mortar premises as COVID-19 Essential Services, or Phase I or Phase II enterprises.

### 4. Exceptions

This Order shall have no application to any of the following businesses, organizations, workplaces, or facilities:

a. Any municipal legislative body, the General Court, or the Judiciary
b. Federal governmental entities
c. Any health care facility or provider licensed by the Department of Public Health or the Board of Registration in Medicine
d. Any of the following workplaces or facilities with specialized functions and populations:
  - Public and private elementary and secondary (K-12) schools
  - Residential and day schools for special needs students

7

ADD39

- Licensed, approved, or exempt child care programs and any emergency child care centers and emergency residential programs operating under emergency authorization
- Facilities operated by the Department of Correction or any Sheriff
- Facilities operated or licensed by the Department of Mental Health or the Department of Developmental Services
- And any other facilities or workplaces that the Commissioner of Public Health may in writing exempt from the terms of this Order

This Order is effective immediately and shall remain in effect until rescinded or until the state of emergency is ended, whichever occurs first.

Given in Boston at 2:20 PM this 1st day of June, two thousand and twenty

CHARLES D. BAKER
GOVERNOR
Commonwealth of Massachusetts

8

ADD40



**CHARLES D. BAKER**
GOVERNOR

OFFICE OF THE GOVERNOR
**COMMONWEALTH OF MASSACHUSETTS**
STATE HOUSE • BOSTON, MA  02133
(617) 725-4000

**KARYN E. POLITO**
LIEUTENANT GOVERNOR

## ORDER MAKING CERTAIN PHASE III ADJUSTMENTS

### COVID-19 Order No. 50

**WHEREAS,** on March 10, 2020, I, Charles D. Baker, Governor of the Commonwealth of Massachusetts, acting pursuant to the powers provided by Chapter 639 of the Acts of 1950 and Section 2A of Chapter 17 of the General Laws, declared that there now exists in the Commonwealth of Massachusetts a state of emergency due to the outbreak of the 2019 novel Coronavirus ("COVID-19");

**WHEREAS,** on March 11, 2020, the COVID-19 outbreak was characterized as a pandemic by the World Health Organization;

**WHEREAS,** the Federal Centers for Disease Control and Prevention ("CDC") have advised that COVID-19 is spread mainly by person-to-person contact and that the best means of slowing the spread of the virus is through practicing social distancing and by minimizing personal contact with large groups and with environments where this potentially deadly virus may be transmitted including, in particular, spaces that present enhanced risks because of the large number of persons present or passing through the area who may spread the virus through respiratory activity or surface contacts;

**WHEREAS,** on March 23, 2020, in order to restrict all non-essential person-to-person contact, non-essential movement outside the home, and reduce opportunities for spreading the COVID-19 virus within the Commonwealth, I issued COVID-19 Order No. 13, which temporarily closed the brick-and-mortar premises of businesses and organizations that do not provide COVID-19 Essential Services;

**WHEREAS,** in response to gradual improvements in the public health data, on May 18, 2020, June 6, 2020, and July 2, 2020, I issued COVID-19 Orders No. 33, 37, and 43, respectively, which designated certain businesses and other organizations as Phase I, II, III, or IV

1

PRINTED ON RECYCLED PAPER

ADD41

enterprises and initiated a progressive, phased plan for re-opening workplaces and other facilities across the Commonwealth;

**WHEREAS**, the Commonwealth has maintained a continuing trend of improvement in public health data during the phased re-opening of workplaces and other facilities, which permits continuing, gradual relaxation of restrictions on businesses and other organizations, provided that any adjustment can only be maintained or expanded on the basis of continuing improvements in the public health data;

**WHEREAS,** expanded opportunities for outdoor dining, as approved by local authorities, have provided valuable support to restaurants and a popular amenity to the public that should be permitted to continue during the state of emergency without interruption or undue complication;

**WHEREAS**, the CDC, the Department of Public Health, and other public health authorities continue to improve their understanding of how COVID-19 is spread, where the risk of spread is greatest, and how best to mitigate the risk of transmission which permits periodic adjustments to safety measures addressing commercial, recreational, and social activities; and

**WHEREAS,** sections 7, 8, and 8A of Chapter 639 of the Acts of 1950 authorize the Governor, during the effective period of a declared emergency, to exercise any and all authority over persons and property necessary or expedient for meeting a state of emergency, including but not limited to authority over assemblages in order to protect the health and safety of persons, variance of the terms and conditions of licenses, permits, and certificates of registration issued by the Commonwealth or by any of its agencies or political subdivisions, and regulation of the sale of articles of food and household articles;

**NOW, THEREFORE,** I hereby Order the following:

1.   Extension of Outdoor Dining Provisions

Notwithstanding chapter 40A of the general laws, or any special permit, variance or other approval thereunder, or any other general or special law to the contrary, a city or town may approve requests for expansion of outdoor table service or extensions of earlier granted approvals, including a local licensing authority ("LLA") approving a request for a change in the description of licensed premises for the purpose of permitting outdoor alcohol service, until a date beyond November 1, 2020, as specified in this Section. For the purposes of this Order, "outdoor table service" shall mean restaurant service that includes food prepared on-site and under food permits issued by municipal authorities pursuant to 105 CMR 590.00 that is served to seated diners outside the restaurant building envelope, whether on a sidewalk, patio, deck, lawn, parking area, or other outdoor space.

2

ADD42

Before approving any request made under this Order or extending a prior approval issued pursuant to Section 4 of COVID-19 Order No. 35, a city, town, or LLA may modify the scope of any prior approval issued pursuant to Section 4 of COVID-19 Order No. 35 as the city, town, or LLA deems proper and appropriate including, without limitation, modifying the terms of an earlier granted approval to address potential issues with snow removal, pedestrian traffic, or similar concerns.

The provisions of Section 4 of COVID-19 Order No. 35 shall apply to any request for an extension of an earlier granted approval or an expansion of outdoor table service or for approval of a change in the description of the licensed premises for the purpose of permitting outdoor alcohol service made pursuant to this Section except that (i) the definition of outdoor table service adopted in paragraph 1 of this Section shall apply; and (ii) such approvals may extend until the date specified below.

Any approval issued under this Section shall remain in effect until 60 days past the end of the state of emergency or such earlier date the city or town establishes in granting the approval, whichever is sooner, at which time any approval issued under this Section, including any amended license issued by an LLA as a result of this Order, shall automatically revert back to its status prior to any approval issued under either this Section or Section 4 of COVID-19 Order No. 35.

Any approval issued under Section 4 of COVID-19 Order No. 35 for expanded outdoor table service, including any amended license issued by an LLA changing the description of the licensed premises for the purpose of permitting outdoor alcohol service as a result of COVID-19 Order No. 35 shall remain in effect until November 1, 2020, unless the city or town approves a request to extend such approval pursuant to this Order or otherwise deems such approval automatically extended consistent with all other provisions of this Order.

2.   Opening of Indoor and Outdoor Gaming Arcades

Effective at 12:01 am on September 17, 2020, indoor and outdoor gaming arcades may open their brick-and-mortar premises to workers, customers, and the public, and restaurants, indoor and outdoor recreational facilities, and other enterprises with gaming devices on their premises may permit these devices to be used by patrons. Schedule A to COVID-19 Order No. 43 is hereby amended, as attached, to reflect this adjustment.

The Director of the Department of Labor Standards ("DLS") shall issue, subject to my approval, COVID-19 workplace safety rules to address the particular circumstances and operational needs of indoor and outdoor gaming arcades and other enterprises with gaming devices on their premises that are made available for use by patrons. These rules shall serve as "Sector-Specific Rules" for such activities and facilities as that term is defined in Section 4 of COVID-19 Order No. 43.

3

ADD43

ADD44

The provisions of Sections 4 and 5 of COVID-19 Order No. 43 (and Section 4 of COVID-19 Order No. 37 as incorporated in COVID-19 Order No. 43), which set requirements for compliance with generally applicable and Sector-Specific COVID-19 safety rules and mechanisms for enforcement for all Phase III enterprises shall apply to indoor and outdoor gaming arcades and other enterprises with gaming devices on their premises that are made available for use by patrons pursuant to this Order. Any penalty issued in an enforcement action shall be administered as provided in COVID-19 Order No. 48.

This Order is effective immediately and shall remain in effect until rescinded or until the state of emergency is ended, whichever occurs first.

Given in Boston at 2:15 AM/PM this
10 th day of September, two thousand and twenty

CHARLES D. BAKER
GOVERNOR
Commonwealth of Massachusetts

4

# Acts (2021)

# Chapter 20

## AN ACT RELATIVE TO EXTENDING CERTAIN COVID-19 MEASURES ADOPTED DURING THE STATE OF EMERGENCY.

*Whereas,* The deferred operation of this act would tend to defeat its purpose, which is to extend certain COVID-19 measures adopted during the state of emergency, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public health.

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:*

SECTION 1.   Section 13 of chapter 53 of the acts of 2020, as amended by section 1 of chapter 118 of the acts of 2020, is hereby further amended by striking out the words "February 28, 2021" and inserting in place thereof the following words:- May 1, 2022.

SECTION 2.   Said section 13 of said chapter 53 is hereby further amended by striking out the words "and (iv) a customer shall be limited to 192 ounces of malt beverages and 1.5 liters of wine per transaction" and inserting in place thereof the following words:- (iv) a customer shall be limited to 192 ounces of malt beverages and 1.5

ADD45

***

Pages Intentionally Omitted

***

SECTION 18.  (a) Notwithstanding any general or special law to the contrary, the governor shall provide notice to the clerks of the house of representatives and senate and the house and senate committees on ways and means not less than 45 days before the termination of the public health emergency declared by the governor on May 28, 2021 pursuant to section 2A of chapter 17 of the General Laws in response to the COVID-19 pandemic.

(b)  Notwithstanding any general or special law to the contrary, the commissioner of public health shall provide notice to the clerks of the house of representatives and senate and the house and senate committees on ways and means not less than 45 days before the termination of any public health order established pursuant to section 2A of chapter 17 of the General Laws in response to the public health emergency declared by the governor on May 28, 2021.

SECTION 19.  (a) As used in this section, the following words shall, unless the context clearly requires otherwise, have the following meanings:-

"Commission", the alcoholic beverages control commission, established by section 70 of chapter 10 of the General Laws.

"Outdoor table service", restaurant service that includes food prepared on-site and under a food establishment permit issued by a municipal authority pursuant to 105 CMR 590.00 that is served to seated diners outside the restaurant building envelope, whether on a sidewalk, patio, deck, lawn, parking area or other outdoor space.

(b)  Notwithstanding chapter 40A of the General Laws, any special permit, variance or other approval issued thereunder or any general or special law to the contrary, from the effective date of this

ADD47

act until April 1, 2022, a city or town may approve a request for expansion of outdoor table service, including in the description of licensed premises as described in subsection (c), or an extension of an earlier granted approval issued under section 4 of the governor's COVID-19 Order No. 35 or section 1 of the governor's COVID-19 Order No. 50. Before such approval, the mayor, select board or other chief executive officer, as established by charter or special act, shall establish the process for approving such requests. Such process shall not be required to comply with the notice and publication provisions of section 11 of said chapter 40A. An approval under this section may be exercised immediately upon filing of notice thereof with the city or town clerk, without complying with any otherwise applicable recording or certification requirements.

(c)   Pursuant to subsection (b), a local licensing authority may grant approval for a change in the description of the licensed premises for the purpose of permitting outdoor alcohol service as the local licensing authority deems reasonable and proper, and issue an amended license to existing license holders, without further review or approval from the commission prior to issuance. Upon approval of an amended license, the local licensing authority shall provide notice of the amended license to the commission. Nothing in this section shall prevent the commission from exercising the commission's enforcement authority over an amended license.

(d)   Before approving any request to extend an earlier granted approval issued under section 4 of the governor's COVID-19 Order No. 35 or section 1 of the governor's COVID-19 Order No. 50, a city, town or local licensing authority may modify the scope of the approval as the city, town or local licensing authority deems proper

ADD48

and appropriate including, but not limited to, modifying the terms of an earlier granted approval to address potential issues with snow removal, pedestrian traffic or similar concerns.

(e)  Any outdoor table service approved for expansion under this section, including an amended license issued by a local licensing authority under subsection (c), shall automatically revert back to the status prior to the approval of the change for expansion of outdoor table service or in the description of a licensed premises on April 1, 2022. Any extension of an earlier granted approval issued under section 4 of the governor's COVID-19 Order No. 35 or section 1 of the governor's COVID-19 Order No. 50 shall automatically revert back to the status prior to the approval issued under said section 4 of the governor's COVID-19 Order No. 35 or said section 1 of the governor's COVID-19 Order No. 50 on April 1, 2022.

SECTION 20.  (a) For the purposes of this section, "adequate, alternative means of public access" shall mean measures that provide transparency and permit timely and effective public access to the deliberations of the public body, including, but not limited to, providing public access through telephone, internet, satellite enabled audio or video conferencing or any other technology that enables the public to clearly follow the proceedings of the public body while those activities are occurring.

(b)  Notwithstanding section 20 of chapter 30A of the General Laws or any general or special law to the contrary, a public body, as defined in section 18 of said chapter 30A, shall not be required to conduct its meetings in a public place that is open and physically accessible to the public; provided, that if the public body does not

ADD49

\*\*\*

Pages Intentionally Omitted

\*\*\*

ADD50

SECTION 32.  Section 28 shall take effect on April 1, 2022 or 10 days following the date of publication in the Federal Register of a revocation of the National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak pursuant to Proclamation 9994, as continued in the Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic, whichever is earlier.

*Approved, June 16, 2021.*

ADD51

# Acts (2022)

# Chapter 42

AN ACT MAKING APPROPRIATIONS FOR FISCAL YEAR 2022
TO PROVIDE FOR SUPPLEMENTING CERTAIN EXISTING
APPROPRIATIONS AND FOR CERTAIN OTHER ACTIVITIES
AND PROJECTS

*Whereas,* The deferred operation of this act would tend to defeat its purposes, which are forthwith to make supplemental appropriations for fiscal year 2022 and to make certain changes in law, each of which is immediately necessary to carry out those appropriations or to accomplish other important public purposes, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public convenience.

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:*
SECTION 1.  To provide for supplementing certain items in the general appropriation act and other appropriation acts for fiscal year 2022, the sums set forth in section 2 are hereby appropriated from the General Fund unless specifically designated otherwise in this act or in those appropriation acts, for the several purposes and subject to the conditions specified in this act or in those appropriation acts, and subject to the laws regulating the disbursement of public funds for the fiscal year ending June 30, 2022. These sums shall be in addition to

ADD52

***

Pages Intentionally Omitted

***

ADD53

whichever is later" and inserting in place thereof the following words:- until March 31, 2023.

SECTION 25.  Said section 3 of said chapter 257, as so amended, is hereby further amended by adding the following paragraph:- Notwithstanding any general or special law to the contrary, in addition to the department's other monthly reporting requirements pursuant to this section, the department shall, until March 31, 2023, report quarterly to the joint committee on housing and the house and senate committees on ways and means detailing the activities of the governor's COVID-19 eviction diversion initiative from the prior quarter. The report shall include, but not be limited to: (i) the number of households approved or denied assistance, delineated by county; (ii) demographic data on the households that applied for assistance in each county including, but not limited to, gender, race and income; (iii) the mean and median number of months in arrears for households at the time of application; and (iv) the mean amount in arrears per household per month at the time of application.

SECTION 26.  Section 5 of chapter 345 of the acts of 2020 is hereby amended by striking out the words "December 31, 2021" and inserting in place thereof the following words:- December 31, 2022.

SECTION 27.  Section 19 of chapter 20 of the acts of 2021 is hereby amended by striking out the words "April 1, 2022", each time they appear, and inserting in place thereof, in each instance, the following words:- April 1, 2023.

SECTION 28.  Section 27 of said chapter 20 is hereby amended by striking out the words ", 22 and 25" and inserting in place thereof the following words:- and 22.

SECTION 29.  Said chapter 20 is hereby further amended by inserting

ADD54

\*\*\*

Pages Intentionally Omitted

\*\*\*

ADD55

# Acts (2023)

# Chapter 2

### AN ACT MAKING APPROPRIATIONS FOR THE FISCAL YEAR 2023 TO PROVIDE FOR SUPPLEMENTING CERTAIN EXISTING APPROPRIATIONS AND FOR CERTAIN OTHER ACTIVITIES AND PROJECTS

*Whereas,* The deferred operation of this act would tend to defeat its purposes, which are forthwith to make supplemental appropriations for fiscal year 2023 and to make certain changes in law, each of which is immediately necessary to carry out those appropriations or to accomplish other important public purposes, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public convenience.

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:*

SECTION 1. To provide for supplementing certain items in the general appropriation act and other appropriation acts for fiscal year 2023, the sums set forth in section 2 are hereby appropriated from the General Fund unless specifically designated otherwise in this act or in those appropriation acts, for the several purposes and subject to the conditions specified in this act or in those appropriation acts, and subject to the laws regulating the disbursement of public funds for the fiscal year ending June 30, 2023. These sums shall be in addition to

ADD56

\*\*\*

Pages Intentionally Omitted

\*\*\*

remotely-located individual, a witness to a remote notarization or a person named in a record presented for remote notarization, except: (i) as necessary to facilitate performance of a notarial act; (ii) to effect, administer, enforce, service or process a record provided by or on behalf of the individual or the transaction of which the record is a part; (iii) in accordance with said section 28, including the rules adopted pursuant thereto; or (iv) in accordance with other applicable federal or state law, or to comply with a lawful subpoena or court order.

SECTION 34.  Item 7008-1116 of section 2 of chapter 41 of the acts of 2019, as most recently amended by section 119 of chapter 126 of the acts of 2022, is hereby further amended by striking out the figure "2023" and inserting in place thereof the following figure:- 2024.

SECTION 35.  Said item 7008-1116 of said section 2 of said chapter 41, as most recently amended by section 120 of said chapter 126, is hereby further amended by striking out the figure "2023" and inserting in place thereof the following figure:- 2024.

SECTION 36.  Section 13 of chapter 53 of the acts of 2020, as most recently amended by section 15 of chapter 42 of the acts of 2022, is hereby further amended by striking out the words "April 1, 2023" and inserting in place thereof the following words:- April 1, 2024.

SECTION 37.  Subsection (b) of section 2 of chapter 118 of the acts of 2020, as most recently amended by section 19 of chapter 42 of the acts of 2022, is hereby further amended by striking out the words "April 1, 2023" and inserting in place thereof the following words:- April 1, 2024.

SECTION 38.  Section 19 of chapter 20 of the acts of 2021, as amended by section 27 of chapter 42 of the acts of 2022, is hereby further amended by striking out the words "April 1, 2023", each time

ADD58

they appear, and inserting in place thereof, in each instance, the following words:- April 1, 2024.

SECTION 39.  Section 23 of said chapter 20, as most recently amended by section 3 of chapter 107 of the acts of 2022, is hereby further amended by striking out the words "the termination of the declaration that an emergency exists which is detrimental to the public health declared by the governor on May 28, 2021 or until March 31, 2023, whichever is sooner" and inserting in place thereof the following words:- March 31, 2024.

SECTION 40.  Section 30A of said chapter 20, as amended by section 4 of said chapter 107, is hereby further amended by striking out the words "March 31, 2023" and inserting in place thereof the following words:- March 31, 2025.

SECTION 41.  Said chapter 20 is hereby further amended by striking out section 31A, inserted by section 31 of chapter 42 of the acts of 2022, and inserting in place thereof the following section:-

Section 31A.  Section 27A shall take effect March 31, 2024.

SECTION 42.  Subsection (a) of section 132 of chapter 24 of the acts of 2021 is hereby amended by striking out the words "2 members of the house of representatives, 1 of whom shall be appointed by the house minority leader; 2 members of the senate" and inserting in place thereof the following words:- 3 members of the house of representatives, 1 of whom shall be appointed by the house minority leader; 3 members of the senate.

SECTION 43.  Section 21 of chapter 76 of the acts of 2021 is hereby amended by striking out the words "December 31, 2021", each time they appear, and inserting in place thereof, in each instance, the following words:- June 30, 2023.

ADD59