No. 25-1063

# United States Court of Appeals
## For the First Circuit

_____

NORTH END CHAMBER OF COMMERCE, INC.; 119 SALEM ST., INC., d/b/a Ristorante Euno; ANTICO FORNO, INC., d/b/a Antico Forno; AQUA PAZZA, INC., d/b/a Aqua Pazza; ASSAGGIO, INC., d/b/a Assaggio; DOLCE, INC., d/b/a Dolce; FULL COMP, INC., d/b/a Mare Oyster Bar; IL PANINO EXPRESS, INC., d/b/a Quattro Ristorante; IL PANINO, INC., d/b/a Trattoria Il Panino [Parmenter St.]; MARNICO, INC., d/b/a Nico Ristorante; MONICA'S TRATTORIA ON PRINCE, INC., d/b/a Monica's Trattoria; MONICA'S, INC., d/b/a Vinoteca di Monica, d/b/a Monica's Restaurant; NICOMAR, INC., d/b/a Strega; SCHIAFFO, INC., d/b/a Carmelina's; STREGA PIZZERIA & CAFE CORP., d/b/a Rina's; TERRAMIA, INC., d/b/a Terramia Ristorante; TRATTORIA IL PANINO HANOVER, INC., d/b/a Trattoria Il Panino [Hanover St.]; TRESCA RESTAURANT GROUP, LLC, d/b/a Tresca; UMBRIA NORTH END, INC., d/b/a Umbria; VADO PAZZO, INC., d/b/a Bricco Ristorante & Enoteca; VILLA FRANCESCA'S, INC., d/b/a Ristorante Villa Francesca,

Plaintiffs-Appellants,

(For Continuation of Caption and Counsel See Inside Front Cover)

_____

On Appeal from the United States District Court for the District of Massachusetts in Civil Action No. 1:24-cv-10039-LTS

_____

## BRIEF OF DEFENDANT-APPELLEE CITY OF BOSTON
_____

Dated: May 23, 2025

_____

CASARECCE LLC, d/b/a Casarecce Restaurant,

Plaintiff,

v.

CITY OF BOSTON,

Defendant-Appellee.

_____

Counsel for Defendant-Appellee
**CITY OF BOSTON**

Samantha H. Fuchs
First Circuit Bar No. 1202037
Senior Assistant Corporation Counsel

Randall F. Maas
First Circuit Bar No. 1204232
Senior Assistant Corporation Counsel

Samuel B. Dinning
First Circuit Bar No. 1215223
Senior Assistant Corporation Counsel

City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
(617) 635-4034
samantha.fuchs@boston.gov
randall.maas@boston.gov
samuel.dinning@boston.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................... i

TABLE OF AUTHORITIES ............................................................................ iii

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF THE ISSUES..........................................................................2

STATEMENT OF THE CASE...............................................................................3

I.   PROCEDURAL HISTORY ...........................................................................3

II.  FACTS.............................................................................................................5

STANDARD OF REVIEW AND SUMMARY OF THE ARGUMENT.................8

ARGUMENT .......................................................................................................11

I.   THE DISTRICT COURT PROPERLY DISMISSED THE RESTAURANTS'
     EQUAL PROTECTION CLAIMS ...............................................................11

A.   The district court properly determined that the restaurants failed to plead
     sufficient facts to trigger strict scrutiny, including by failing to plausibly allege
     discriminatory intent...................................................................................13

B.   The district court correctly determined that the restaurants pleaded insufficient
     facts to support "class of one" or "selective enforcement" claims. ...................16

C.   The City's 2022, 2023, and 2024 on-street outdoor dining policies were
     rationally related to the legitimate government interest of maintaining quality
     of life in the North End...............................................................................25

II.  THE DISTRICT COURT GAVE PROPER CONSIDERATION TO THE
     RESTAURANTS' CLAIMS ABOUT THE 2024 BAN..................................28

III. THE DISTRICT COURT PROPERLY DETERMINED THAT THE CITY'S
     ON-STREET OUTDOOR DINING POLICIES IN THE NORTH END DID
     NOT VIOLATE THE RESTAURANTS' DUE PROCESS RIGHTS. ............30

A.   The district court properly determined that the Restaurants did not have a
     property interest in on-street outdoor dining.................................................31

B.   There was no procedural due process violation. .............................................37

C.   There was no substantive due process violation. .............................................39

i

IV. THE DISTRICT COURT CORRECTLY DETERMINED THAT THE FEES REQUIRED OF NORTH END RESTAURANTS WERE FEES FOR SERVICES, NOT TAXES. ..................................................................41

V. THE DISTRICT COURT CORRECTLY HELD THAT THE RESTAURANTS' 202-PAGE AND 742-PARAGRAPH SECOND AMENDED COMPLAINT VIOLATED RULE 8 OF THE FEDERAL RULES OF CIVIL PROCEDURE. ...............................................46

CONCLUSION ......................................................................................49

CERTIFICATE OF COMPLIANCE .....................................................50

CERTIFICATE OF SERVICE .................................................................51

# TABLE OF AUTHORITIES

**Cases**

Am. Council of Life Insurers v. D.C. Health Benefit Exch. Auth.,
815 F.3d 17 (D.C. Cir. 2016)..................................................................................43

American Trucking Associations, Inc. v. Alviti, 944 F.3d 45 (1st Cir. 2019)........43

Amsden v. Moran, 904 F.2d 748 (1st Cir. 1990)...................................................40

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ...................................................... 15, 42, 44

Back Beach Neighbors Comm.v. Town of Rockport,
63 F.4th 126 (1st Cir. 2023)...................................................................................18

Baker v. Coxe, 230 F.3d 470 (1st Cir. 2000)........................................................23

Banco Popular de P.R. v. Greenblatt, 964 F.2d 1227 (1st Cir. 1992) .....................38

Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortg. Fin. Corp.,
246 F.3d 1 (1st Cir. 2001).....................................................................................17

Bd. of Regents v. Roth, 408 U.S. 564 (1972)........................................................35

Bi-Metallic Investment Co. v. State Board of Equalization,
239 U.S. 441 (1915)..............................................................................................39

Brockton Power LLC v. City of Brockton, 948 F. Supp. 2d 48 (D. Mass. 2013)...24

Caesars Massachusetts Management Co., LLC v. Crosby,
778 F.3d 327 (1st Cir. 2015).................................................................................31

Centro Medico del Turabo, Inc. v. Feliciano de Melecio,
406 F.3d 1 (1st Cir. 2005).....................................................................................31

City of New Orleans v. Dukes, 427 U.S. 297 (1976) ................................. 26, 27, 28

Clark v. Boscher, 514 F.3d 107 (1st Cir. 2008).....................................................41

Cordi-Allen v. Conlon, 494 F.3d 245 (1st Cir. 2007)........................................ 17, 20

Correia v. Fitzgerald, 354 F.3d 47 (1st Cir. 2003) ...............................................11

Coyne v. City of Somerville, 972 F.2d 440 (1st Cir. 1992) ............................. 15, 22

Denver Street LLC v. Town of Saugus, 462 Mass. 651 (2012) ........................ 43, 45

Emerson College v. City of Boston, 391 Mass. 415 (1984)...................... 41, 42, 43

Engquist v. Or. Dep't of Agric., 553 U.S. 591 (2008) ...........................................17

F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 313 (1993) ................. 25, 27

Fuehl v. F.D.I.C., 8 F.3d 905 (1st Cir. 1993)........................................................46

García-Catalán v. United States, 734 F.3d 100 (1st Cir. 2013)...............................8

Garita Hotel Ltd. Partnership v. Ponce Fed. Bank,
F.S.B., 958 F.2d 15 (1st Cir. 1992)........................................................................8

Gianfrancesco v. Town of Wrentham, 712 F.3d 634 (1st Cir. 2013)......................17

González-Droz v. González-Colón, 660 F.3d 1 (1st Cir. 2011) .............................31

González-Fuentes v. Molina, 607 F.3d 864 (1st Cir. 2010) ..................................40

Greg Beeche Logistics, 2014 WL 4656503 (D. Mass. Aug. 5, 2014)....................47

Grutter v. Bollinger, 539 U.S. 306 (2003) ..........................................................13

Harron v. Town of Franklin, 660 F.3d 531 (1st Cir. 2011) ............................. 39, 41

Hasenfus v. LaJeunesse, 175 F.3d 68 (1st Cir. 1999)..........................................40

Heller v. Doe, 509 U.S. 312 (1993) ....................................................................27

Hodel v. Indiana, 452 U.S. 314 (1981) ...............................................................25

Jackson v. Polaroid Corp., 181 F.3d 79 (1st Cir. 1999) ......................................47

Jones v. Flowers, 547 U.S. 220 (2006) ...............................................................38

Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42 (1st Cir. 2003) ....................... 26, 27

Lyman v. Baker, 954 F.3d 351 (1st Cir. 2020)......................................................8

Massachusetts Bd. of Ret. v. Murgia, 427 U.S. 307 (1976) ................................13

McCoy v. Town of Pittsfield, NH, 59 F.4th 497 (1st Cir. 2023).............................20

Medeiros v. Vincent, 431 F.3d 25 (1st Cir. 2005)............................................ 28, 40

Mendoza v. Wu,
No. 1:22-cv-10710, 2022 WL 10483629 (D. Mass. Oct. 18, 2022).........................3

Middleborough Veterans' Outreach Ctr., Inc. v. Provencher,
502 F. App'x 8 (1st Cir. 2013) ............................................................................21

Minnesota State Board for Community Colleges v. Knight,
465 U.S. 271 (1984)...........................................................................................38

Mitchell v. Dakota Cnty. Soc. Servs., 959 F.3d 887 (8th Cir. 2020) .....................10

Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971 (1st Cir. 1989) .........................25

Mulero-Carrillo v. Roman-Hernandez, 790 F.3d 99 (1st Cir. 2015)......................40

National Foreign Trade Council v. Natsios, 181 F.3d 38 (1st Cir. 1999) ...............11

Newman v. Commonwealth of Massachusetts,
115 F.R.D. 341 (D. Mass. 1987)..................................................................... 46, 47

Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1 (1st Cir. 2011) ..........................9

Pagán v. Calderón, 448 F.3d 16 (1st Cir. 2006) ........................... 18, 31, 39, 40

Papa Gino's of America, Inc. v. Taurasi, 616 F. Supp. 77 (D. Mass. 1984)..........33

Perry v. Sindermann, 408 U.S. 593 (1972).........................................................36

Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256 (1979)............................14

Rectrix Aerodrome Centers, Inc. v. Barnstable Mun. Airport Comm'n,
610 F.3d 8 (1st Cir. 2010)...................................................................................17

Roslindale Motor Sales, Inc. v. Police Comm'r, 405 Mass. 79 (1989)....................33

RR Vill. Ass'n, Inc. v. Denver Sewer Corp., 826 F.2d 1197 (2d Cir. 1987) ..........38

Rubinovitz v. Rogato, 60 F.3d 906 (1st Cir. 1995) ..................................... 22, 23, 24

Salahuddin v. Cuomo, 861 F.2d 40 (2d Cir. 1988)........................................46

SBT Holdings, LLC v. Town of Westminster, 547 F.3d 28 (1st Cir. 2008)..........23

Schatz v. Republican State Leadership Comm., 669 F.3d 50 (1st Cir. 2012)..........8

Silva v. City of Attleboro, 454 Mass. 165 (2009) .............................................. 41, 42

Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310 (9th Cir. 1989) ..........................37

Tapalian v. Tusino, 377 F.3d 1 (1st Cir. 2000).............................................22

Two Guys From Harrison-Allentown, Inc. v. McGinley, 366 U.S. 582 (1961) .....28

Ungar v. Arafat, 634 F.3d 46 (1st Cir. 2011)...........................................38

United States v. Fla. E. Coast Ry. Co., 410 U.S. 224 (1973) ................................38

Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977)........14

Vill. of Willowbrook v. Olech, 528 U.S. 562 (2000) ...................................... 16, 18

Walker v. City of Hutchinson, 352 U.S. 112 (1956) ..........................................38

Washington v. Davis, 426 U.S. 229 (1976) ..................................................... 13, 14

Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483 (1955)............................28

Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36 (1st Cir. 2005)..........28

Yerardi's Moody Street v. Board of Selectmen, 19 Mass. App. Ct. 296 (1985).....36

Yerardi's Moody St. Rest. & Lounge, Inc. v.
Bd. of Selectmen of Town of Randolph, 932 F.2d 89 (1st Cir. 1991) ....... 16, 22, 24

Yerardi's Moody St. Restaurant & Lounge, Inc. v. Board of Selectmen,
878 F.2d 16 (1st Cir.1989).........................................................................21

Youngworth v. Gentile, 2006 WL 516757 (D. Mass. Feb. 27, 2006)....................47

**Statutes**

28 U.S.C. § 1291 ......................................................................................................1

28 U.S.C. § 1331 ......................................................................................................1

28 U.S.C. § 1367 ......................................................................................................1

28 U.S.C. § 2201 ......................................................................................................1

28 U.S.C. § 2202 ......................................................................................................1

42 U.S.C. § 1983 ......................................................................................................1

An Act Making Appropriations for Fiscal Year 2022,
2022 Mass. Acts Ch. 42 § 27 ...................................................................................5

An Act Making Appropriations for Fiscal Year 2023,

2023 Mass. Acts Ch. 2 § 38 .................................................................................5

An Act Relative to Extending Certain COVID-19 Measures,

2021 Mass. Acts Ch. 20 § 19 ....................................................... 5, 32, 33

**Other Authorities**

Office of Governor Charlie Baker and Lt. Governor Karyn Polito,

 COVID-19 Order No. 50 (September 10, 2020) ....................................32

Office of Governor Charlie Baker and Lt. Governor Karyn Polito,

COVID-19 Order No. 35 (June 1, 2020.................................................32

**Rules**

Fed. R. Civ. P. 8 .......................................................................... passim

**Treatises**

Charles Allen Wright & Arthur R. Miller,

*Federal Practice and Procedure* § 1281 (1969).....................................46

**Constitutional Provisions**

U.S. Const. amend. XIV ............................................................... 13, 31

# JURISDICTIONAL STATEMENT

Plaintiffs-Appellants, the North End Chamber of Commerce and 20 restaurants[1] located in Boston's North End neighborhood (the "Restaurants"), appeal from the district court's dismissal of all six of the claims they asserted against Defendant-Appellee City of Boston (the "City"). <u>See</u> Restaurants' Addendum ("Add.") 1-33. The Restaurants pleaded four claims against the City pursuant to 42 U.S.C. § 1983 and two claims against the City pursuant to 28 U.S.C. § 2201 & 2202. <u>See</u> Restaurants' Record Appendix ("R.A.") A136-211. The district court initially had federal question jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the Restaurants' state law claim pursuant to 28 U.S.C. § 1367. The Court of Appeals for the First Circuit has jurisdiction over this matter pursuant to 28 U.S.C. § 1291, as it is an appeal from a decision of the district court in a case in which it entered final judgment on December 20, 2024, and the Restaurants filed a timely notice of appeal on January 14, 2025. <u>See</u> Add. 34; R.A. A472-473.

---

[1] The Second Amended Complaint was brought by the North End Chamber of Commerce and 21 restaurants in the North End. ECF No. 1; R.A. 25-29. One of the 21 restaurant plaintiffs, Casarecce LLC, d/b/a Casarecce Restaurant, is not a party to this appeal. <u>See</u> R.A. 2.

1

# STATEMENT OF THE ISSUES

1.  Whether the district court correctly found that the Restaurants neither pleaded facts sufficient to trigger strict scrutiny nor established a valid "class of one" or "selective enforcement" claim, and whether the district court properly determined that there was a rational basis for the City's 2022, 2023, and 2024 outdoor dining policies based on the Restaurants' own allegations.

2.  Whether the district court properly considered the claims arising from the 2024 ban on on-street outdoor dining in the North End where the court's order cited allegations related to the 2024 outdoor dining seasons and the reasons for the 2024 ban were the same as those for the 2023 ban.

3.  Whether the district court properly dismissed the Restaurants' due process claims because the Restaurants lacked a property interest in on-street dining licenses, the City's policies pertaining to on-street dining were rules of general application that did not require notice and a hearing, and the actions of the City did not shock the conscience.

4.  Whether the district court properly determined that the 2022 fees on on-street outdoor dining in the North End were lawful user fees where they uniquely benefited those paying them, were voluntary, and compensated the City for costs it incurred mitigating the impacts of on-street dining.

5.  Whether the district court properly determined that the Restaurants' 202-page, 742-paragraph Second Amended Complaint violated Fed. R. Civ. P. 8 and its requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief."

## STATEMENT OF THE CASE

### I.    PROCEDURAL HISTORY

In 2022, following the City's announcement that it would assess fees for on-street dining in the North End, four North End restaurant owners filed suit against Boston Mayor Michelle Wu in her official capacity, claiming that the fees were unconstitutional and in violation of Massachusetts law. See Mendoza v. Wu, No. 1:22-cv-10710, 2022 WL 10483629 (D. Mass. Oct. 18, 2022). After the filing of two motions to dismiss, as well as an amended complaint (which, among other changes, added the four owners' restaurants as plaintiffs), the plaintiffs in that action moved to voluntarily dismiss the case without prejudice prior to any ruling by the court. First Mot. Dismiss Pls.' Cause Action Voluntarily Pursuant to Rule 41(a)(2) Without Prejudice, Mendoza v. Wu, No. 1:22-cv-10710 (D. Mass. May 31, 2023), ECF No. 36. The court (Talwani, J.) allowed the motion to dismiss. Mendoza v. Wu, No. 1:22-cv-10710 (D. Mass. May 31, 2023), ECF No. 40.

About seven months after voluntary dismissal of the first lawsuit, and in light of the City's 2023 policy prohibiting on-street dining in the North End, the

North End Chamber of Commerce, joined by the four named restaurants in the prior suit, along with several others, filed their original complaint in the action below on January 4, 2024. ECF No. 1; R.A. A1. The Restaurants amended their complaint first on March 7, 2024, and then again on April 1, 2024. ECF Nos. 16, 21; R.A. A3, A5. Among other changes, the amended complaints added allegations regarding the 2024 outdoor dining program. ECF Nos. 16, 21; R.A. A19-A25, A124-132. The Second Amended Complaint ("SAC") advanced six claims: Counts I and II asserted violations of the Equal Protection Clause; Counts III and IV asserted procedural and substantive violations of the Due Process Clause; Count V requested a declaratory judgment that the City's on-street outdoor dining policies are arbitrary, capricious, and contrary to law; and Count VI requested a declaratory judgment that the City's on-street outdoor dining policies are an unlawful tax. ECF No. 21; R.A. A136-211. The City moved to dismiss the SAC on April 5, 2024. ECF No. 22; R.A. A5. On December 5, 2024, the Restaurants requested a continuance of the hearing on the motion to dismiss scheduled for December 6, 2024. ECF No. 36; R.A. A7. After reviewing the filing, the district court denied the Restaurants' request for a continuance. ECF No. 37; R.A. A7. Subsequently, the district court heard oral argument on the motion to dismiss on December 6, 2024, and took the matter under advisement. ECF No. 38; R.A. A7. On December 20, 2024, the district court allowed the City's motion to dismiss in a 33-page order

4

("Order"). ECF No. 39; Add. 1-33. The Restaurants appealed on January 14, 2025. ECF No. 41; R.A. A472-473.

## II.    FACTS

In 2020, the COVID-19 pandemic resulted in strict guidelines for non-essential person-to-person contact. Add. 35. Given these restrictions, Governor Charlie Baker issued multiple executive orders that allowed local licensing authorities to permit restaurants to offer outdoor dining without the previous requirements of a hearing before the local licensing board or review by the Alcoholic Beverages Control Commission.[2] Id. The City of Boston, under Mayor Marty Walsh, Mayor Kim Janey, and Mayor Michelle Wu, used this process, which permitted the mayor to establish a process for considering such requests and allowed the municipality to modify both this process and any licensing decisions. See R.A. A13 ¶¶ 3-4. Ultimately, the laws allowed restaurants, under processes set up at the discretion of localities, to operate outside of areas for which they had obtained licenses pursuant to the normal state-created licensing scheme and provided authority for cities and towns to allow restaurants the opportunity to serve

---

[2] For the 2022 and 2023 outdoor dining seasons, the legislature codified the premise of these executive orders into law. Specifically, the expedited licensing process was established pursuant to Section 19 of Chapter 20 of the Acts of 2021 as amended by Section 27 of Chapter 42 of the Acts of 2022 and Section 38 of Chapter 2 of the Acts of 2023. Add. 45-59.

food and alcohol in outdoor areas, including on public streets and sidewalks, for which the private business possessed no other license or permit. See Add. 35-59.

In 2020 and 2021, the City operated on-street outdoor dining across the City, with no restrictions based on neighborhood. In the North End, the City received significant feedback from residents regarding the impact that outdoor dining on City streets had on their lives and their neighborhood. Id. at A224-25, Ex. 4. Residents highlighted the need for additional City intervention in order to mitigate "the impacts on parking, trash, rodents, and public safety." Id. Some residents characterized themselves as "at their wit's end after two seasons of unprecedented intrusion on neighborhood life." Id. Consequently, others requested that the City eliminate outdoor dining as a whole in the neighborhood. Id.

For the 2022 outdoor dining season, the City sought to balance the residents' concerns about the North End with the fact that outdoor dining "was meant to help provide support for restaurants struggling from the pandemic, as well as safe, outdoor spaces for residents to be together in person." Id. To that end, the City crafted a 2022 outdoor dining policy for the North End that allowed for restaurants to continue to use the public right-of-way for outdoor dining for a $7,500 seasonal usage fee and a $480 monthly payment for parking space replacement for residents. Id. at A15 ¶ 12. The City also shortened the North End's outdoor dining season from nine months to five months. Id. Each of the Restaurants chose to

6

participate in the 2022 on-street outdoor dining program, which expanded their dining capacity by allowing them to operate in the public right of way. Id. at A138 ¶ 436.

Unfortunately, the traffic congestion, parking problems, trash issues, and public safety concerns persisted throughout the 2022 outdoor dining season. Id. at A106 ¶ 339. For the 2023 outdoor dining season, the City considered additional matters. The 2023 outdoor dining season corresponded with construction on the Sumner Tunnel, coupled with ongoing construction of the North Washington Bridge. Id. at A98 ¶ 309. This construction was expected to compound traffic and navigation issues for residents and first responders in the North End. Id. Similarly, the fact that the North End had the densest concentration of restaurants in the state, with over 95 restaurants in one-third of a square mile, exacerbated the existing "traffic, sanitation issues, and accessibility problems for older residents and those with limited mobility." Id. Given these limitations, the City chose to restrict on-street outdoor dining in the North End for the 2023 outdoor dining season. Id. at A98 ¶¶ 308-09.

In 2024, the City continued its restriction of on-street outdoor dining in the North End. Id. at A131 ¶ 412. Based on the City's prior experiences with the impacts of on-street dining in the North End, continued feedback from residents,

and input from the North End On-Street Outdoor Dining Task Force, the City

decided these policies were the best course of action to account for the challenges

of accessibility, congestion, sanitation, and public safety in this unique

neighborhood. Id.

**STANDARD OF REVIEW AND SUMMARY OF THE ARGUMENT**

"An appellate court reviews the granting of a motion to dismiss *de novo*,

applying the same criteria that obtained in the court below." Garita Hotel Ltd.

Partnership v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 17 (1st Cir. 1992) (citation

omitted); see also Lyman v. Baker, 954 F.3d 351, 359 (1st Cir. 2020). Federal Rule

of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain

statement of the claim showing that the pleader is entitled to relief." Reading the

complaint "as a whole," the Court must conduct a two-step, context-specific

inquiry. See García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).

First, the Court must perform a close reading of the claim to distinguish the factual

allegations from the conclusory legal allegations. Id. Factual allegations must be

accepted as true, while conclusory legal allegations are not entitled credit. Id.

Second, the Court must "take the complaint's well-pled (*i.e.*, non-conclusory, non-

speculative) facts as true, drawing all reasonable inferences in the pleader's favor,

and see if they plausibly narrate a claim for relief." Schatz v. Republican State

Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). If they do not, then dismissal

is warranted. See Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

In this case, the district court correctly found that the Restaurants did not plausibly plead an equal protection claim (Counts I and II). In reviewing the Restaurants' allegations within a traditional equal protection framework, the district court concluded that the Restaurants did not adequately plead that they were entitled to strict scrutiny. Similarly, within the context of a "class of one" and selective enforcement claims, the district court properly considered the Restaurants allegations and determined that the Restaurants neither demonstrated that they were similarly-situated to others nor that any difference in treatment resulted from malice or intent to inhibit constitutional rights. Based on the Restaurants' own pleadings, the district court correctly concluded that the City's North End outdoor dining policies were rationally related to the legitimate government interest of maintaining quality of life in a unique neighborhood.

The district court gave proper consideration to the Restaurants' claims about the 2024 ban on on-street dining in the North End; it did not fail to address the 2024 ban as the Restaurants claim. The court's summary of the relevant facts specifically cites allegations related to the 2024 outdoor dining season. Moreover, the City's justifications for banning on-street outdoor dining in the North End in 2023 were the same for banning it in 2024.

The district court properly denied the Restaurants' due process claims (Counts III and IV). First, the Restaurants failed to make the threshold showing that they have a protected property interest in on-street outdoor dining licenses. Second, although the district court did not reach the issue, this Court should conclude that, in addition to lacking a property interest in on-street dining licenses, the Restaurants were not entitled to notice and a hearing because the City's on-street dining policies were rules of general application. Finally, with respect to the substantive due process claim, the City's on-street dining policies did not come close to conduct that shocks the conscience.[3]

Further, the district court properly denied the Restaurants' declaratory judgment claim regarding the lawfulness of the 2022 fees (Count VI). These fees were appropriately assessed as user fees to compensate the City for expenses incurred mitigating the impacts of on-street outdoor dining, including reductions in parking and increased service demands to ensure sanitation, accessibility, and public safety. By providing these services, for which the fees paid, the City was

---

[3] The Restaurants do not appeal the denial of Claim V, which sought a declaratory judgment that the City's on-street outdoor dining policies are arbitrary, capricious, and contrary to law. In any event, the district court properly ruled that the federal Declaratory Judgment Act "is not a means by which persons may seek general review of a city's decisions or policies." Add. 29-30, citing Mitchell v. Dakota Cnty. Soc. Servs., 959 F.3d 887, 897 n.2 (8th Cir. 2020).

able to allow the Restaurants to partake in on-street outdoor dining and enjoy the commercial benefits thereof.

Finally, the district court properly held that the Restaurants' SAC violated Rule 8 of the Federal Rules of Civil Procedure. The 202-page, 742-paragraph SAC is not a short and plain statement of their claim, and dismissal on this ground is appropriate.[4]

## ARGUMENT

**I.  THE DISTRICT COURT PROPERLY DISMISSED THE RESTAURANTS' EQUAL PROTECTION CLAIMS.**

On appeal, the Restaurants assert that the district court committed various errors across its equal protection claims. The Restaurants argue that the district court erred by "failing to weigh allegations which went to the heart of the dismissed claims," including alleged retaliatory language and bad faith; that the district court incorrectly applied the "class of one test," including the similarly-situated prong; and that the district court failed to weigh substantial evidence of

---

[4] The Restaurants also take issue, in a footnote, with the denial of their motion for a continuance of the district court's hearing on the City's Motion to Dismiss. Br. 18 n. 5. The First Circuit has "repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived." National Foreign Trade Council v. Natsios, 181 F.3d 38, 60 n.17 (1st Cir. 1999), and cases cited. Therefore, the Restaurants have waived this argument. Even if they had not, the district court's denial of their motion was not an abuse of discretion. See Correia v. Fitzgerald, 354 F.3d 47, 52 (1st Cir. 2003) (citation omitted). Any production of public records by the City is wholly separate from the issues in this case.

discriminatory intent.[5] <u>See</u> Restaurants' Brief ("Br.") 1-46. Each of these arguments fail to pass muster.

Contrary to the Restaurants' claims, the district court's decision proceeded along the traditional equal protection framework and gave ample consideration to each of the Restaurants' allegations. As a result, the district court correctly found that the Restaurants neither pleaded facts sufficient to trigger strict scrutiny nor established a valid "class of one" or "selective enforcement" claim. Finally, the district court properly determined that there was a rational basis for the City's 2022, 2023, and 2024 on-street outdoor dining policies based on the Restaurants' own allegations. The district court's decision thoroughly addressed each of the Restaurants' claims and evaluated them against the pleading standard. The Restaurants, despite their 742-paragraph SAC, did not meet it.

---

[5] For purposes of organization, the City will address each of the Restaurants' arguments on appeal within the traditional equal protection framework. First, the City will address the suspect class argument in tandem with the Restaurants' allegations of discriminatory intent; then, the City will address the class of one and selective enforcement claims associated with the Restaurants' arguments contained in Section III of their brief (Br. 27-41); and finally, the City will discuss the traffic congestion, cleanliness, accessibility, and public safety in the North End that provide the rational bases for the City's on-street outdoor dining policies.

**A. The district court properly determined that the restaurants failed to plead sufficient facts to trigger strict scrutiny, including by failing to plausibly allege discriminatory intent.**

The Equal Protection Clause of the Fourteenth Amendment prevents the government from denying to any person the equal protection of the laws. U.S. Const. amend. XIV. For a challenge brought under the Equal Protection Clause, courts first look to whether the government action infringes upon fundamental rights or implicates a suspect class and, thus, must withstand strict scrutiny to survive. See, e.g., Massachusetts Bd. of Ret. v. Murgia, 427 U.S. 307, 312 (1976).[6]

Here, the district court properly concluded that the Restaurants failed to allege facts that would trigger strict scrutiny. First, the Restaurants do not constitute a suspect class.[7] Even assuming, *arguendo*, that the corporate Restaurants had demonstrated that they were in a suspect class based on race, ethnicity, or national origin, their equal protection challenge was still flawed

---

[6] A policy that characterizes a suspect class based on its face always necessitates a strict scrutiny analysis. See, e.g., Grutter v. Bollinger, 539 U.S. 306, 326 (2003). As the district court found, the City's North End outdoor dining policies are facially neutral as to any suspect distinction. See generally Washington v. Davis, 426 U.S. 229 (1976).

[7] The Restaurants are corporations within the North End. Neither North End Restaurants nor North End Italian Restaurants are suspect classes. R.A. A163-64 ¶¶ 525-532. Indeed, neither of these classes are defined by discrete qualities, as is characteristic of a suspect class. See, e.g., Murgia, 427 U.S. at 313-314. As the district court noted, "North End Restaurants" is a class that likely evolves from "time to time." Add. 12 n. 7.

because it did not demonstrate that the City's policies both had a disproportionate effect and were enacted with discriminatory intent.[8]

In order to determine if a facially neutral statute merits review under a strict scrutiny standard, courts look to: (a) whether there is both a disproportionate effect on a suspect class; and (b) whether enactment of the policy was motivated by discriminatory intent. Davis, 426 U.S. at 239. Discriminatory intent means "the decisionmaker … selected … a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979).

In this case, the Restaurants produced no evidence of discriminatory intent.[9] Instead, the Restaurants selected statements that neither evidence bias nor have a

___

[8] The Restaurants' argument that the policies have a disproportionate effect on white people or people of Italian heritage has no merit. For example, the district court noted that the policy the Restaurants "allege harms 'white Italian Americans' or 'Italian restaurants' actually benefits several Italian restaurants (and likely restaurants owned by those of Italian descent) that enjoyed on-street dining outside the North End." Add. 13-14.

[9] Discriminatory intent can be shown through demonstrating a clear pattern of discrimination, historic background and events that indubitably underlie discrimination, or legislative or administrative history. See, e.g., Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266-69 (1977). The district court reviewed the Restaurants' claims against each of these methodologies. Add. 12-16. Contrary to the Restaurants' assertions, the district court performed a rigorous review of the Restaurants' allegations in its determination that there was no discrimination against a suspect class. Far from "overlooking" the allegations noted in the Complaint, the district court noted that the Restaurants failed to show a pattern of behavior that was unexplainable other than on the basis of a suspect class. Add. 13-14. Instead, the district court examined each of the allegations and

14

connection or relevance to the outdoor dining program and allege that these statements are enough to imply discriminatory intent. <u>See</u> Add. 14 ("A joke, perhaps about white people, made by the Mayor at the St. Patrick's Day breakfast hardly suggests animus against Italian Americans. Similarly, the designation of Indigenous People's Day is not evidence of animus."). These bald assertions that the Restaurants rely upon are the exact type of conclusory language that courts need not credit when assessing a complaint as sufficient to meet the pleading standard. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 663 (2009) ("the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements"). The Restaurants cannot overcome a motion to dismiss "by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus." <u>See</u> <u>Coyne v. City of Somerville</u>, 972 F.2d 440, 444 (1st Cir. 1992) (citation omitted). The Restaurants have identified no facts that show that the City enacted its on-street dining policies in order to harm white people or individuals with Italian heritage. To the contrary, the SAC demonstrates that the City acted consistent with its desire to mitigate the impact of on-street outdoor dining in a unique neighborhood. <u>See, e.g.,</u> R.A. A98 ¶ 309.

---

disagreed with the Restaurants' conclusion that they demonstrated animus against individuals who are white or of Italian-American heritage. <u>Id.</u>

15

**B. The district court correctly determined that the restaurants pleaded insufficient facts to support "class of one" or "selective enforcement" claims.**

The district court properly found that the Restaurants did not plead sufficient facts to sustain either a "class of one" or "selective treatment" claim. In order to plausibly plead a "class of one" claim, the Restaurants needed to demonstrate that they have "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). Similarly, for a selective treatment claim, the Restaurants needed to show that when compared with others similarly situated, they were selectively treated and that "such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen of Town of Randolph, 932 F.2d 89, 92 (1st Cir. 1991) (citation and internal quotations omitted). As the district court properly concluded, the Restaurants failed to plausibly demonstrate that the North End was similarly situated to other neighborhoods and that any distinct treatment was based on bad faith, malice, or intent to inhibit constitutional rights.[10]

---

[10] Given the overlap between the requirements of these two claims, the City will address the similarly-situated prong of the analysis, which applies to both claims. It

16

**1. The district court utilized the neighborhoods as the appropriate comparator, and correctly concluded that the Restaurants failed to demonstrate that they were similarly situated for purposes of the "class of one" and "selective enforcement" claims.**

For purposes of an equal protection challenge, the test for determining whether a plaintiff is similarly situated "is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortg. Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001). In order to meet this threshold in a "class of one" claim, a plaintiff must demonstrate an "extremely high degree of similarity between themselves and the persons to whom they compare themselves." Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2007). Indeed, "a class-of-one plaintiff bears the burden of showing that his comparators are similarly situated in *all respects relevant* to the challenged government action." Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 640 (1st Cir. 2013) (emphasis added).[11]

---

will then assess the "impermissible consideration" prong under the "selective treatment" analysis and the rational basis prong under the "class of one" analysis.
[11] This Court has previously expanded upon its rationale for requiring a strict showing for the similarly-situated prong: "Drawing distinctions is what legislators and regulators do every day: without this comparability sieve, every routine governmental decision at the state and local level—of which there are millions every year—could become a class-of-one case in federal court." Rectrix Aerodrome Centers, Inc. v. Barnstable Mun. Airport Comm'n, 610 F.3d 8, 16 (1st Cir. 2010) (citing Engquist v. Or. Dep't of Agric., 553 U.S. 591, 128 (2008)); Vill.

In the instant case, the district court correctly identified the North End neighborhood as the proper comparison point for purposes of evaluating the similarly-situated prong of the equal protection claims. <u>See</u> Add. 18 (citing to <u>Back Beach Neighbors Comm.v. Town of Rockport</u>, 63 F.4th 126, 131 (1st Cir. 2023) and summarizing "where different treatment was based on failure to enforce regulations at Back Beach, appropriate unit of comparison would be public beaches in town similar in all relevant respects"). The City's on-street outdoor dining policies were based on geographic location. The Restaurants acknowledge as much at various points in their Complaint. <u>See, e.g.</u>, R.A. A15 ¶ 12 ("the City prepared a special outdoor dining plan for the North End"); A22 ¶ 39 ("as to the North End, the press release stated, 'the City will not be permitting on-street dining in the North End this year'"); A51 ¶ 161 ("according to the City, the 2022 Outdoor Dining Pilot Program season would begin on April 1, 2022, in every Boston neighborhood except the North End"). The City's action dealt wholesale with the North End as a neighborhood. Consequently, the Restaurants needed to demonstrate that the North End was similarly situated to other neighborhoods in all respects relevant to the City's on-street outdoor dining policies.

---

of Willowbrook, 528 U.S. at 565–66 (Breyer, J., concurring in result); <u>Pagán v. Calderón</u>, 448 F.3d 16, 34-35 (1st Cir. 2006)).

The Restaurants failed to establish that the North End is similarly situated to other neighborhoods as it pertains to the 2022, 2023, and 2024 on-street outdoor dining policies. The North End is Boston's oldest neighborhood, bordered by water on two sides, with the highest concentration of restaurants in the City.[12] R.A. A12-A30 ¶¶ 2-81. Prior to outdoor dining, the neighborhood struggled with quality of life issues "such as trash, rodents, traffic, and parking problems." Id. at A17 ¶ 22. Major construction projects surrounded the neighborhood in 2023, as both the Sumner Tunnel construction began and the North Washington Bridge construction continued. Id. at A89 ¶ 315. These facts make the North End distinct among

---

[12] The Restaurants claim that the district court adopted the City's rationale rather than the facts stated within the SAC. First, this allegation does not reflect the reality of the district court's decision. The district court noted that the Restaurants alleged the policy rationale presented by the City and then simply claimed that they are pretextual. Add. 21-22. Notwithstanding this nuance, their SAC is replete with the same or similar facts underlying the City's rationale for its policies. For example, the Restaurants allege the North End is the City's oldest neighborhood, A30 ¶ 81; the North End has the highest concentration of restaurants in the City, A12 ¶ 2; there were quality of life issues "such as trash, rodents, traffic, and parking problems," "for decades before the outdoor dining program began," A17 ¶ 22; see also A41-42 ¶¶ 125-26; A42 ¶ 128; there were construction projects associated with the Sumner Tunnel and the North Washington Bridge planned for 2023, A100-105 ¶¶ 315-333; and the neighborhood is home to 11,000 residents. A32 ¶ 85. These facts, which mirror the City's rationale, all support the City's proposition that the North End is unique and required a different on-street outdoor dining policy in order to mitigate the impacts that on-street dining had on the neighborhood.

Boston's neighborhoods. As a result, the Restaurants did not plead that the North End is similarly situated in all relevant aspects.[13]

However, even if the proper comparison point for purposes of this inquiry is restaurants in other neighborhoods, the Restaurants still did not plead sufficient facts to support that they are similarly situated. The district court expressly addressed this point in its decision, highlighting that the Restaurants had failed to identify other neighborhood characteristics that supported that they were similarly situated in all of the factual aspects relevant to on-street outdoor dining. Add. 18-19. Specifically, the court noted that the neighborhood comparison, particularly involving restaurant density, quality of life issues, and proximity to construction projects were not addressed and, thus, the Restaurants failed to establish that they are similarly situated. Id.; see also Cordi-Allen, 494 F.3d at 251 (noting that the

_____

[13] The Restaurant's attempt to cherry-pick streets or characteristics is unavailing, as the test requires that they show that they are similarly situated in all aspects relevant to the government action. See McCoy v. Town of Pittsfield, NH, 59 F.4th 497, 507 (1st Cir. 2023). Given that the government action in this case dealt with the neighborhood as a whole, a smattering of characteristics does not meet the standard. The district court found as much, noting that the Restaurants failed to demonstrate any relevant comparator that had similar restaurant density, quality of life issues, and proximity to construction projects. Add. 18-19. Notably, the district court cites to the exact paragraph that the Restaurants identify in their appeal as showing the proper comparison. Br. 32; Add. 18. In rejecting the Restaurants' argument, the district court stated that the Restaurants have not made a "valid application of the law" and while they may cite certain relevant aspects, they may not "pick and choose the aspects that would make the restaurants similar." Add. 18-19.

plaintiff bears the burden of showing that the "parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile").

## 2. The district court properly found that the restaurants did not plead sufficient facts to demonstrate malice, bad faith, or intent to punish constitutional rights.

The district court properly concluded that the Restaurants failed to plausibly plead that the City's policy was based on impermissible considerations like malice or punishment for exercising constitutional rights. For a selective treatment claim, the Restaurants must not only show that they were selectively treated when compared to others similarly situated, but "that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Yerardi's Moody St. Restaurant & Lounge, Inc. v. Board of Selectmen, 878 F.2d 16, 21 (1st Cir. 1989).[14]

Regarding intent to punish or inhibit an exercise of constitutional rights, a plaintiff must offer "some proof that defendants' allegedly retaliatory actions were

---

[14] The First Circuit is undecided as to whether malice is required for a "class of one" claim. Middleborough Veterans' Outreach Ctr., Inc. v. Provencher, 502 F. App'x 8, 10 n. 3 (1st Cir. 2013). As noted below, the Restaurants did not adequately plead a "class of one" claim, with or without malice as a required element.

motivated by [the constitutional right]." <u>Rubinovitz v. Rogato</u>, 60 F.3d 906, 911 (1st Cir. 1995). As the district court noted, the Restaurants failed to plead "direct evidence establishing retaliatory motive." Add. 18-21. Instead, the Restaurants recount events with conclusory labels, which does not satisfy their pleading standard. <u>See</u> <u>Coyne</u>, 972 F.2d at 444 ("A plaintiff may not ... rest on subjective characterizations or conclusory descriptions of a general scenario which *could* be dominated by unpleaded facts.") (cleaned up). As a result, the Restaurants did not demonstrate that the City had enacted its 2022, 2023, and 2024 on-street outdoor dining policies in the North End based on an intent to punish or inhibit the exercise of the Restaurants' constitutional rights.

The Restaurants similarly failed to demonstrate that any "selective treatment" was based on bad faith or malice. Malice or bad faith cases are infrequent. <u>Rubinovitz</u>, 60 F.3d at 911. Consequently, this Court has held that the malice/bad faith standard must be scrupulously met. <u>Yerardi's</u>, 932 F.2d at 94. Consistent with this standard, courts have found bad faith where there is a "a malicious orchestrated campaign causing substantial harm." <u>Rubinovitz</u>, 60 F.3d at 912. This Court has consistently found this standard met only by cases with particularly egregious factual allegations. <u>See</u> <u>Tapalian v. Tusino</u>, 377 F.3d 1, 5-8 (1st Cir. 2000) (finding the record "laden with the language of personal malice and 'bad faith' retaliation," including a demand from an official for "a forty-foot boat

and two girls"); <u>SBT Holdings, LLC v. Town of Westminster</u>, 547 F.3d 28, 32 (1st Cir. 2008) (finding specific targeting where an official wrote, "[w]e've heard that [the owner] is financially insolvent and no longer connected to the project, which is why we started this process in the first place!"); <u>Baker v. Coxe</u>, 230 F.3d 470, 474 (1st Cir. 2000) (summarizing <u>Rubinovitz</u> as involving an official's "vendetta," "enlisting other government officials from various departments to cut off the landlord's gas, water, and sewage services, to charge the landlord with building code violations, and to frustrate relations with a contractor.").

The SAC, despite its 742 paragraphs, does not contain such facts. In its Order, the district court evaluated the Restaurants' allegations of bad faith and malice at length. Add. 19-21. When measured against <u>Rubinovitz</u> and its progeny, the Restaurants' allegations fall flat. Absent any indication of malice or retaliation, the Restaurants attempt to reframe policymaking deliberations with conclusory labels. For example, they cite the Mayor's statement – in an open letter to North End restaurants – that she was "prepared to rescind North End outdoor dining before the start of the season." R.A. A224-25, Ex. 4. As the district court found, this tactic strains common sense. <u>See</u> Add. 20 ("that the Mayor said she would go only so far, accepting the facts as pled by Plaintiffs, is not a retaliatory threat"). Likewise, the Restaurants point to a question from an employee contemplating the City's options if it were unable to collect the fee necessary to mitigate on-street

23

dining impacts, R.A. A17 ¶ 18 ("if they sue, can we just say, 'fine, we are shutting down the North End program'"), the Mayor's statement that "equity doesn't mean equality all across the board," R.A. A18 ¶ 24, and the City's appointment of two residents to the North End Task Force "who had zealously advocated for the ban," R.A. A12 ¶ 45, as evidence of bad faith. However, like the Restaurants' arguments regarding a St. Patrick's Day breakfast joke, Indigenous Peoples' Day, and an annual holiday party, these statements and actions do not demonstrate the City created its North End dining policies based on bad faith or malice towards anyone. This holds particularly true where the City had a rational basis for its policies. [15]

The Restaurants failed to demonstrate that the City had an intent to harm them, or acted out of animus towards them in crafting its North End-specific policies. The City's actions do not amount to a "maliciously orchestrated campaign." See Rubinovitz, 60 F.3d at 912. As the district court pointed out in its Order, the malice standard is one that must be "scrupulously met." Add. 20 (citing Yerardi's, 932 F.2d at 94. The Restaurants failed to meet this standard. Given this lack of evidence, the district court correctly found that the Restaurants did not

_____

[15] The Restaurants rely on Brockton Power LLC v. City of Brockton, 948 F. Supp. 2d 48 (D. Mass. 2013) as a comparison point for a case where the court found malice and no rational basis for the government's actions. See Br. 41, n.16. This reliance is misplaced. Notably, the district court, which also decided Brockton Power, explained that this comparison was inapt. Add. 17 n. 12 ("Plaintiffs' situation is wholly different").

establish that the City's policies were based on bad faith or malice against the

Restaurants.[16]

### C. The City's 2022, 2023, and 2024 on-street outdoor dining policies were rationally related to the legitimate government interest of maintaining quality of life in the North End.

The district court correctly found that the City's 2022, 2023, and 2024

policies were rationally related to a legitimate government interest. A classification

that does not proceed along suspect lines or implicate a fundamental right "must be

upheld against equal protection attack when the legislative means are rationally

related to a legitimate governmental purpose." Hodel v. Indiana, 452 U.S. 314, 331

(1981). Under this test, a court must uphold the regulation "if there is any

reasonably conceivable state of facts that could provide a rational basis for the

classification." F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 313 (1993);

see also Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971, 978 (1st Cir. 1989)

(noting that "under the rational basis test, duly enacted socioeconomic legislation

should be upheld so long as *any* set of facts could suffice to establish a rational

relationship between the law and the government's legitimate objectives")

(emphasis in original). Such social or economic policies, in this case one based on

---

[16] Notably, the district court also addressed the Restaurants' arguments regarding pretextual justifications for the policies as bad faith. In rejecting this argument, the district court correctly determined that "the City's weighing and prioritizing different considerations … from the one that the [Restaurants] might prefer is not evidence of bad faith or an attempt to harm or injure the [Restaurants]." Add. 19.

location, come with a "strong presumption of validity." <u>See</u> <u>Kittery Motorcycle, Inc. v. Rowe</u>, 320 F.3d 42, 47 (1st Cir. 2003) (noting that other courts have found that "[e]ven foolish and misdirected provisions will be upheld under this test") (internal citations omitted). Local economic regulations based on geographic decisions have been previously upheld in this context. <u>See, e.g.</u>, <u>City of New Orleans v. Dukes</u>, 427 U.S. 297, 303 (1976) (local ordinance upheld that removed the majority of vendors from the French Quarter where the ordinance rationally furthered the legitimate purpose of preserving the appearance and customs that were valued by residents and attractive to tourists).

The district court correctly found that the City's policies in 2022, 2023, and 2024 each were rationally related to the legitimate government interest of maintaining residential quality of life in a unique neighborhood. Add. 21-22. As the district court noted in its decision, it did not need to "imagine a set of facts that would provide a rational basis for the City's policies because the Plaintiffs have already supplied them." <u>Id.</u> at 21. For the 2022 policy, the City imposed the fee in order to mitigate the impacts of on-street outdoor dining in its oldest neighborhood with the highest concentration of restaurants in the City. R.A. A62 ¶ 199; <u>see also</u> Add. 21 (citing to the SAC, R.A. A17 ¶ 22). For the 2023 policy, the City determined that the pre-existing problems of trash, rodents, parking, and traffic, coupled with the Sumner Tunnel and North Washington construction projects,

required a prohibition on on-street outdoor dining. R.A. A98 ¶ 309. Similarly, in 2024, the City determined that the restriction on on-street outdoor dining should continue due to the "high density of restaurants and foot traffic, narrow streets and sidewalks, resident parking scarcity, and other related considerations." R.A. A131 ¶ 412. Each of these policies were rationally related to minimizing the impact of on-street dining on the quality of life in the North End, including exacerbation of the pre-existing issues of trash, rodents, and traffic. See Add. 22.

The Restaurants again demonstrate a fundamental misunderstanding of the rational basis standard by arguing that the City's justifications for their policies were pretextual. First, the law is clear that proffered facts "need not be supported by any evidentiary record at all." Kittery Motorcycle, Inc., 320 F.3d at 47 (citing Heller v. Doe, 509 U.S. 312, 320 (1993)) ("[a] State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification."); see also Beach Communications, 508 U.S. at 315("[a] legislative choice is not subject to courtroom fact finding and may be based on rational speculation unsupported by evidence or empirical data.").[17] Moreover, this argument was directly addressed by the district court's decision. The district court noted that the Restaurants' own SAC

_____

[17] As the Supreme Court has noted, the "judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." Dukes, 427 U.S. at 303. The district court noted the same. See Add. 20.

provided the facts to support these justifications. Add. 21-22. The Restaurants own

allegations, distinct from the City's justifications, highlight the exact issues that the

City sought to remedy through its policies. See *supra*, n 6. The district court stated

that "the [Restaurants] did not challenge the accuracy of these concerns; that is,

they do not allege the construction projects or the rodent problem did not exist."

Add. 22.[18]

Given that the City's policies were rationally related to a legitimate

government interest, the policies were valid. As the Restaurants failed to plausibly

plead any equal protection violation, the district court correctly dismissed Counts I

and II of the SAC.

## II.  THE DISTRICT COURT GAVE PROPER CONSIDERATION TO THE RESTAURANTS' CLAIMS ABOUT THE 2024 BAN.

The Restaurants argue that the district court erred by not addressing the

claims arising from the 2024 ban on on-street outdoor dining in the North End, as

---

[18] Furthermore, even if some of these issues existed in other neighborhoods, the City is not prevented from enacting policy in one neighborhood at a time to partially address a particular "evil." See Dukes 427 U.S. at 303 (see also Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 489 (1955); see also Two Guys From Harrison-Allentown, Inc. v. McGinley, 366 U.S. 582, 591 (1961) (holding that it was within the power of the legislature to decide to regulate only certain businesses that were particularly disruptive); see also Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 53-54 n.7 (1st Cir. 2005); Medeiros v. Vincent, 431 F.3d 25, 31-32 (1st Cir. 2005) ("a statute or regulation is not lacking in a rational basis simply because it addresses a broader problem in small or incremental stages") (abrogated on other grounds).

distinct from the 2022 restrictions and the 2023 ban. The Restaurants specifically point to allegations in the SAC stating that in early 2023, the City announced the creation of a task force to address outdoor dining issues in future years, but that this task force was a "'charade,' meant to mislead the public about the City's intentions for the North End." Br. 42.

This claim of error is without merit. Despite the fact that it faced the formidable task of recapitulating a 742-paragraph complaint, the district court did address factual allegations related to the 2024 outdoor dining season in its Order. See, e.g., Add. 4. The court's summary of the relevant facts specifically mentions the allegation that the City "assembled a 'North End On-Street Outdoor Dining Task Force' to 'determine how certain outdoor dining issues could be remedied in future iterations of the program.'" Add. 4, citing R.A. A23 ¶ 44. Additionally, in detailing the reasons why the City banned on-street outdoor dining in 2023, the court cited an online announcement from 2024. Add. 4, citing R.A. A131-32 ¶ 412. The full text of that announcement reads as follows:

> In 2023, due to reasons including the North End's high density of restaurants and foot traffic, narrow streets and sidewalks, resident parking scarcity, and other related considerations, the City issued permits in the neighborhood for compliant sidewalk patios, but did not issue permits for on-street outdoor dining. In 2024, the City intends to continue those policies in the North End and may craft additional neighborhood-specific guidelines as the program advances.

R.A. A131-32, ¶ 412.

The reference to the 2024 online announcement was sufficient to address the Restaurants' claims for both 2023 and 2024. The City's reasons for banning on-street outdoor dining in 2023 were the same for banning it in 2024, a point acknowledged in the SAC. R.A. A24 ¶ 47. In both years, the City concluded that on-street dining would compound the long-standing concerns of traffic congestion, cleanliness, accessibility, and public safety in the North End. See R.A. A131-132 ¶ 412. As the district court noted in its Order, the explanations cited in the 2024 announcement "more than suffice[d] to show that the reasons underlying the policies were rationally related to legitimate government interests." Add. 21.

## III. THE DISTRICT COURT PROPERLY DETERMINED THAT THE CITY'S ON-STREET OUTDOOR DINING POLICIES IN THE NORTH END DID NOT VIOLATE THE RESTAURANTS' DUE PROCESS RIGHTS.

Next, the Restaurants argue that the district court erred by dismissing Counts III and IV of the SAC, which alleged procedural and substantive violations of the Due Process Clause. The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits a state from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. The Due Process Clause has both procedural and substantive components. See Pagán, 448 F.3d at 32. The procedural component protects against deprivation of protected

liberty or property interests without a "constitutionally adequate process."

González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011). The substantive

component "functions to protect individuals from particularly offensive actions on

the part of government officials even when the government employs facially

neutral procedures in carrying out those actions." Pagán, 448 F.3d at 32.

**A. The district court properly determined that the Restaurants did not have a property interest in on-street outdoor dining.**

To assert a plausible due process claim, the Restaurants bear the threshold

burden of establishing "a legally plausible allegation of a 'protected property

interest' recognized under state law." Caesars Massachusetts Management Co.,

LLC v. Crosby, 778 F.3d 327, 332 (1st Cir. 2015) (citations omitted). To establish

a constitutionally protected property interest, "the plaintiffs must identify a

legitimate claim of entitlement to the property in question–a claim of entitlement

created and defined by existing rules or understandings that stem from an

independent source such as state law." Centro Medico del Turabo, Inc. v. Feliciano

de Melecio, 406 F.3d 1, 8 (1st Cir. 2005). Absent such a legal entitlement, a

plaintiff's due process claims—both procedural and substantive—must be

dismissed. See Caesars Massachusetts, 778 F.3d at 335 ("Since Caesars cannot

allege any protected property interest at stake, the procedural and substantive due

process claims have no foundation and are correctly dismissed for failure to state a

claim subject to relief.").

31

In its Order, the district court considered and rejected five arguments advanced by the Restaurants in support of a property interest in outdoor dining licenses. Add. 23-28. The Restaurants attempt to revive these arguments in their brief, but all of them are without merit.

First, the Restaurants argue that the City had "no authority to rescind licenses that were in place pursuant to the statewide COVID-19 legislation." Br. 46-47. This argument was properly rejected by the district court. The emergency legislation that expanded outdoor dining in Massachusetts gave municipalities discretion to decide whether to allow restaurants to expand their licenses to host outdoor dining in the public right of way. Mirroring the language of the Governor's 2020 COVID-19 Order Nos. 35 and 50, the 2021 statute provided that "a city or town <u>may</u> approve a request for expansion of outdoor table service." St. 2021, c. 20, § 19(b) (emphasis added); Add. 48. The statute, again mirroring Order No. 50, further provided that "a city, town or local licensing authority <u>may modify</u> the scope of the approval <u>as the city, town or local licensing authority deems proper and appropriate</u> including, but not limited to, modifying the terms of an earlier granted approval to address potential issues with snow removal, pedestrian traffic or similar concerns." St. 2021, c. 20, § 19(d) (emphasis added); Add. 48-49. This language is unambiguous; municipalities had discretion in whether to allow restaurants to expand into outdoor areas, were not required to give restaurants

32

space in the public way just because they chose to utilize the statute's authority, and, even if they chose to grant such permission, municipalities had discretion in how to subsequently modify any approval. See Roslindale Motor Sales, Inc. v. Police Comm'r, 405 Mass. 79, 83 (1989) ("The statute, which states that the commissioner 'may' grant a license to a proper person, gives broad discretion to the commissioner in granting licenses."); Papa Gino's of America, Inc. v. Taurasi, 616 F. Supp. 77, 79 (D. Mass. 1984) (finding plaintiffs had no right to a victualler's license where statute provided that licensing authorities "may" grant a license).

In their appellate brief, the Restaurants seize upon one particular sentence in the district court's Order, in which the court noted that "none of the Executive Orders or statutes stated or implied that the outdoor-dining program would continue the following year." Add. 24. The Restaurants contend that this was wrong as a "matter of law and fact." Br. 48. Devoting multiple pages to a "retracing of the legislative history," the Restaurants note that before the 2021 emergency law authorizing expanded outdoor dining expired, it was renewed, first on April 1, 2022, again on March 29, 2023, and once again on April 1, 2024. Br. 48-50. The disputed sentence from the Order was "entirely incorrect," the Restaurants maintain, "because the licenses were extended by operation of the statute." Br. 50.

33

This argument misses the mark. The Restaurants miscontextualize and therefore misapprehend the meaning of the disputed sentence. The district court was not denying the fact that the legislature ultimately chose to renew the expanded outdoor dining program in 2022, 2023, and 2024. Rather, the court was merely observing that each iteration of the program authorized expanded outdoor dining only for a period of one year, and that the program needed to be renewed on an annual basis if it was to continue. The district court was making the same point that it expressed in the very next sentence of its Order, namely that the "grant of licenses . . . was never automatic and thus not an entitlement." Add. 24.

Second, the Restaurants argue that the on-street dining program was "remedial and . . . vital to the Plaintiffs' survival during the peak of the pandemic," and that it "became essential to their economic recovery from the massive losses incurred due to the public health crisis and related recession." Br. 52. But the district court properly concluded that the "subjective importance of on-street dining to Plaintiffs does not create a protected property interest." Add. 25. As the Supreme Court has made clear, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents v. Roth, 408 U.S. 564, 578 (1972).

Next, the Restaurants assert that there was a "mutual understanding between the parties sufficient to create" a protected property interest in on-street dining licenses. Br. 51-53. The Restaurants point to allegations in the SAC that City communications referred to prospective applicants as "licensees," that the City stated in late 2022 that it sought to "[r]etain as many restaurants from this year's program while increasing the participation rate in neighborhoods that are underrepresented," and that in 2023 the City represented that the North End Outdoor Dining Task Force would "determine how [issues in the North End relating to traffic congestion, cleanliness, and accessibility] could be remedied in future iterations of the permanent outdoor dining program." Br. 52-53, citing R.A. A88-186 ¶¶ 277, 310, 632. However, the Restaurants' argument about a supposed "mutual understanding" was properly rejected by the district court. The court correctly observed that there is "no contract or contractual provision explicitly evincing a formal entitlement of on-street-dining licenses." Add. 26. Further, none of the various allegations from the SAC, "separately or together, plausibly make out the creation of a property right or some shared agreement or entitlement to a particular form of outdoor dining." Add. 26. The communications about the future expressed hope that the North End could be part of the on-street dining program in future years, but were not a "mutually explicit understanding[]," Perry v. Sindermann, 408 U.S. 593, 601 (1972), that the North End would be included.

The district court was also correct to reject the Restaurants' assertion of a property interest based on a longstanding "ethic that pervades our legal system" in matters "where government exerts power upon an individual in a matter of consequence." Br. 53 n.27, citing Yerardi's Moody Street v. Board of Selectmen, 19 Mass. App. Ct. 296, 303 (1985).[19] The case relied on by the Restaurants, Yerardi's, merely stands for the proposition that when an agency makes a decision, it "would do well to state its reasons at or near the time of decision." 19 Mass. App. Ct. at 304. Yerardi's is thus completely inapposite to this case. The City is not an agency, and the SAC provides detailed allegations about the City's stated reasons for the fees and bans on on-street dining in the North End. See, e.g., R.A. A17-132 ¶¶ 22, 199, 309, 339, 371, 412. Moreover, the district court properly reasoned that Yerardi's does not describe an ethic that gives rise to substantive property rights.

Finally, the district court properly rejected the Restaurants' argument that they have a property interest in the goodwill of their businesses. The Restaurants have not articulated why the City's on-street outdoor dining policies led to a loss of goodwill, and the only case cited by the Restaurants in support of the goodwill

---

[19] The Restaurants' assertions of a property interest based on an "ethic that pervades our legal system" or the goodwill of their businesses are raised in a footnote. Br. 53 n.27. As noted above, the First Circuit has "repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived." National Foreign Trade Council, 181 F.3d at 60 n.17, and cases cited.

argument, <u>Soranno's Gasco, Inc. v. Morgan</u>, 874 F.2d 1310 (9th Cir. 1989), relied on California law, and bears no resemblance to the facts of this case. <u>See</u> <u>id.</u> at 1313 (recounting how county officials not only suspended plaintiff's plant permits but also sent letters to its customers "informing them that [the permits] were suspended and that [the plaintiff] could not lawfully deliver gasoline while under suspension," and even threatened to revoke customers' permits if customers continued to receive gasoline from plaintiff).

In sum, the district court committed no error in rejecting all of the arguments in favor of a protected property interest adduced by the Restaurants.

## B. There was no procedural due process violation.

Without citing any case law, Br. 46-47, 54, the Restaurants assert that the SAC adequately pleaded a procedural due process claim. This argument fails. The district court ruled that because the Restaurants failed to make the threshold showing that they were deprived of a protected property interest, it needed to go no further in considering the procedural due process claim. Add. 28. While the lack of a property interest is a fully sufficient basis to affirm the dismissal of Count III, the appellate court "may affirm a judgment on any independently sufficient ground made manifest in the record." <u>Ungar v. Arafat</u>, 634 F.3d 46, 51 n.4 (1st Cir. 2011) (citing <u>Banco Popular de P.R. v. Greenblatt</u>, 964 F.2d 1227, 1230 (1st Cir. 1992)).

In addition to the fact that the Restaurants lacked a property interest, any procedural due process claim fails because the City's policies with respect to eligibility for on-street outdoor dining are rules of general application that are not subject to the notice and hearing requirements of the Due Process Clause. The Supreme Court has long drawn a distinction between "proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases, on the other." United States v. Fla. E. Coast Ry. Co., 410 U.S. 224, 245 (1973). Like statutes, local governmental orders, rules, and regulations are typically legislative in nature because they adopt general rules that are not aimed at particular cases or parties. See RR Vill. Ass'n, Inc. v. Denver Sewer Corp., 826 F.2d 1197, 1204-05 (2d Cir. 1987) (citing Minnesota State Board for Community Colleges v. Knight, 465 U.S. 271, 284 (1984), for the proposition that a "policy decision by [an] executive agency would be legislative action").

As with the requirements of due process in general, the "notice required will vary with circumstances and conditions." Jones v. Flowers, 547 U.S. 220, 226 (2006) (quoting Walker v. City of Hutchinson, 352 U.S. 112, 115 (1956)). "[W]here a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption." Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 445 (1915). In this legislative

context, individual due process rights—including notice and a right to be heard—do not attach. See id. at 445-46. Here, the City's rules about eligibility for on-street outdoor dining were a legislative determination rather than an administrative one because they apply to multiple businesses based on geographic districts. Accordingly, the Restaurants were not entitled to a notice and hearing before the City issued its rules regarding on-street outdoor dining.

**C. There was no substantive due process violation.**

The Restaurants also argue that the district court erred by dismissing the substantive due process claim. "Where, as here, a plaintiff's substantive due process claims challenge the constitutionality of certain executive acts, 'the plaintiff must show both that the acts were so egregious as to shock the conscience and that they deprived him of a protected interest in life, liberty, or property.'" Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011) (quoting Pagán, 448 F.3d at 32).

The district court properly ruled that there was no substantive due process violation. First, the substantive due process claim fails because the Restaurants lack a protected property interest in on-street dining licenses. "The right to 'make a living' is not a 'fundamental right,' for either equal protection or substantive due process purposes." Mulero-Carrillo v. Roman-Hernandez, 790 F.3d 99, 107 (1st Cir. 2015) (quoting Medeiros, 431 F.3d at 32).

In addition, the court properly ruled that the City's on-street outdoor dining policies were not "conscience-shocking." To allege conduct that shocks the conscience, a plaintiff must clear a high bar: the government's acts must be "truly outrageous, uncivilized, and intolerable," Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999); show "arbitrariness and caprice [that is] stunning," Amsden v. Moran, 904 F.2d 748, 754 n. 5 (1st Cir. 1990); or "[acts] so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power," González-Fuentes v. Molina, 607 F.3d 864, 881 (1st Cir. 2010) (internal quotations and ellipses omitted). The First Circuit has held, "with a regularity bordering on the monotonous, that the substantive due process doctrine may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determinations of state or local decisionmakers, whether those decisions are right or wrong." Pagán, 448 F.3d at 33. "Any permit or license denial, no matter how unattractive, that falls short of being 'truly horrendous' is unlikely to qualify as conscience-shocking." Id.

In their appellate brief, the Restaurants assemble a long list of allegations from the SAC that they contend raise a plausible substantive due process claim. Br. 54-57. As the district court properly concluded, however, the SAC's allegations merely show that "the City imposed fees for, and later prohibited, private restaurants in an especially dense neighborhood to operate on public streets, while

40

allowing continued use of the public sidewalks." Br. 29. The allegations fall far short of the level of conduct that the First Circuit has deemed "conscience-shocking." See, e.g., Harron, 660 F.3d at 536 ("[T]here are no truly horrific circumstances alleged here relating to the refusal to transfer or issue a liquor license for the tavern.") (cleaned up); Clark v. Boscher, 514 F.3d 107, 113 (1st Cir. 2008) (town's denial of permits to develop residential subdivisions "did not rise to the level of behavior that shocks the conscience"). Count IV was properly dismissed.

## IV. THE DISTRICT COURT CORRECTLY DETERMINED THAT THE FEES REQUIRED OF NORTH END RESTAURANTS WERE FEES FOR SERVICES, NOT TAXES.

Municipalities in Massachusetts may charge fees, either as "user fees, based on the rights of the entity as proprietor of the instrumentalities used" or as "regulatory fees (including licensing and inspection fees), founded on the police power to regulate particular businesses or activities." Emerson College v. City of Boston, 391 Mass. 415, 424 (1984) (citations omitted). Municipalities may not levy taxes unless authorized by state law. Silva v. City of Attleboro, 454 Mass. 165, 168 (2009) (citations omitted). Three traits distinguish fees from taxes:

> [1.] they are charged in exchange for a particular government service which benefits the party paying the fee in a manner not shared by other members of society;
> [2.] they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge; and

41

[3.] the charges are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses.

Emerson College, 391 Mass. at 424. (citations omitted).

The City's 2022 on-street dining fees were lawful user fees. The fees uniquely benefited those paying them: the restaurants who could operate their businesses on public streets. Add. 31. The fees were voluntary; the SAC acknowledges some restaurants chose not to participate in on-street outdoor dining. R.A. A92, A105 ¶¶ 289, 335. And the fees compensated the City for costs it incurred mitigating the impacts of on-street outdoor dining in the North End. See, e.g., id. A47-48, A226-34 ¶¶ 146, 150, Ex. 5-7.

The Restaurants assert the district court committed "two errors."[20] Br. 19. First, they argue the district court failed to consider whether the benefits the Restaurants received were "shared by other members of society." Second, they

---

[20] Though the Restaurants take issue with "two errors," they include a third argument, stating that the district court employed "a non-existent three-part 'unlawfulness' test." It is unclear what the Restaurants mean by this. The district court laid out the Emerson College test and explicitly considered each of the three prongs. It found that the Restaurants failed to plausibly allege facts indicating that any of the three prongs were unmet. The district court properly stated that the Restaurants "hold the 'burden of proving the invalidity of the exaction,'" Add. 30 (citing Silva v. City of Attleboro, 454 Mass. 165, 168 (2009)), and then appropriately applied the Iqbal pleading standard.

argue the district court should have given more weight to their allegations. The City will address these arguments in turn.[21]

First, the district court properly concluded that the Restaurants received a benefit not shared by other members of society; "namely, a permit to authorize on-street dining that would otherwise be unlawful." Add. 31. "Once a sufficiently particularized benefit is found, then the first <u>Emerson College</u> factor is satisfied." <u>Denver Street LLC v. Town of Saugus</u>, 462 Mass. 651, 660 (2012); <u>see also</u> <u>American Trucking Associations, Inc. v. Alviti</u>, 944 F.3d 45, 54 (1st Cir. 2019) ("The key question is whether the assessment 'raises revenues for purposes that aren't especially beneficial or useful to the payers.'") (quoting <u>Am. Council of Life Insurers v. D.C. Health Benefit Exch. Auth.</u>, 815 F.3d 17, 19 (D.C. Cir. 2016)). Here, the fees were used for services that were "especially beneficial or useful" to

---

[21] Additionally, the Restaurants purport to challenge the district court's findings under the second prong of the <u>Emerson College</u> test, though they do so in a two-sentence footnote. They argue the fees were paid "under protest" and thus were not voluntary. In so arguing, the Restaurants ignore the SJC's explanation of the term: voluntary means "that the party paying the fee has the option of not utilizing the government service and thereby avoiding the charge." 391 Mass. at 424. Any North End restaurant could decide not to pay the fee, and thereby not obtain the benefit of on-street outdoor dining. R.A. A92 ¶ 289 ("Whether a restaurant decided to participate in outdoor dining was purely a voluntary choice for each restaurant throughout the City. In fact, about a third of the North End's restaurants did not participate in the outdoor dining program in 2020, 2021, and 2022."). The Restaurants, on the other hand, voluntarily chose to pay the fee, presumably because they recognized the commercial benefit of hosting on-street outdoor dining.

the Restaurants. Specifically, the Restaurants were able to enjoy the commercial benefits of on-street outdoor dining because the City devoted the fees collected to addressing the impacts of their operations; specifically, providing increased and targeted services to ensure cleanliness, accessibility, effective travel, and public safety. See, e.g., R.A. A47-48, A226-34 ¶¶ 146, 150, Ex. 5-7.[22]

Second, the district court properly weighed the Restaurants' allegations. The district court specified in its Order that it "t[ook] the facts in the SAC as true, but not the legal conclusions drawn therefrom." Add. 30 (citing Iqbal, 556 U.S. at 678). The facts alleged in the SAC did not plausibly demonstrate either that the fees conferred no particularized benefit, as discussed above, or were merely intended to generate revenue. The district court repeatedly cited to the SAC's allegations as demonstrating that the fees were used to provide services responding to the impacts of on-street dining. Add. 32 (e.g., "The impact fee the City received paid for services that were related to the program, including rat baiting, power washing of sidewalks, and painting of street lane lines. [SAC] ¶ 150."; fees went to "[P]arking for residents who lost it as a direct result of the outdoor-dining program. [SAC] ¶ 146."). The SAC contains numerous allegations, including citations to

---

[22] To the extent the Restaurants argue "other members of society" includes restaurants in other neighborhoods, they simply rehash their equal protection argument, addressed above.

appendices, showing that the City used the fees to provide services necessitated by on-street outdoor dining. E.g., R.A. A47-48, A226-34 ¶¶ 146, 150, Ex. 5-7. The district court credited these allegations in its decision. It did not, however, credit the Restaurants' conclusions, which were unsupported by facts.

Finally, the Restaurants' repeated reliance on the City's purchase of a streetsweeper as evidence that fees were intended to provide general revenue is misplaced. A municipality setting fees need not do so with surgical precision; rather, the fees must be "reasonably designed to compensate the [municipality] for anticipated expenses." Denver St. LLC, 462 Mass. at 661. "[R]easonable latitude must be given to the agency in fixing the amount of charges, and such charges should not be scrutinized too curiously even if some incidental revenue was obtained." Id. As the district court found, again citing the SAC, the streetsweeper was intended to meet the challenges of navigating streets in the North End and "was deployed in the North End." Add. 32; see also R.A. A209 ¶ 729. Additionally, only approximately 10% of the streetsweeper's cost was supported by on-street dining fees. See id. ¶¶ 730-32 (alleging $300,000 in fees collected and $242,356 in total outdoor dining program expenses, excluding the streetsweeper; these figures leave $57,644 in on-street dining fees that went towards the purchase of the $552,000 streetsweeper). The imposition of these fees, which were used on a

number of services including street cleaning, was directly related to the City's need to mitigate the impacts of on-street outdoor dining.

The Court should affirm the district court's decision that the 2022 on-street dining fees were lawful user fees.

**V. THE DISTRICT COURT CORRECTLY HELD THAT THE RESTAURANTS' 202-PAGE AND 742-PARAGRAPH SECOND AMENDED COMPLAINT VIOLATED RULE 8 OF THE FEDERAL RULES OF CIVIL PROCEDURE.**

Rule 8 of the Federal Rules of Civil Procedure requires that a pleading "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 further states: "Each allegation must be simple, concise, and direct." Fed R. Civ. P. 8(d)(1). As the district court found, "[u]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1281, at 365 (1969)); see also Kuehl v. F.D.I.C., 8 F.3d 905, 908 (1st Cir. 1993) (citing Newman v. Commonwealth of Massachusetts, 115 F.R.D. 341, 344 (D. Mass. 1987), for the proposition that a court may consider "pragmatic matters, such as time and expense for defendants and court" when dismissing a complaint under Rule 8 (internal quotations omitted)). Where a complaint violates Rule 8,

46

dismissal is appropriate. See, e.g., Jackson v. Polaroid Corp., 181 F.3d 79 (1st Cir. 1999) (unpublished table decision).

As the district court concluded, the SAC "is one type of prolix pleading against which Rule 8 safeguards." Add. 8. The SAC contains 202 pages and 742 paragraphs, as well as 68 exhibits across an additional 170 pages. R.A. A9-384. Federal courts have consistently dismissed less voluminous complaints. See, e.g., Jackson, 181 F.3d at 79 (affirming dismissal of a 180-page, 350-paragraph complaint); Newman, 115 F.R.D. at 341 (striking a 21-page complaint with 70 pages of exhibits); Greg Beeche Logistics, 2014 WL 4656503, at *5 (D. Mass. Aug. 5, 2014) (dismissing a 122-page, 456-paragraph complaint); Youngworth v. Gentile, 2006 WL 516757, at *2 (D. Mass. Feb. 27, 2006) (dismissing a 100-page, 418-paragraph complaint).

The Restaurants' argument – for which they cite no authority – that Rule 8 merely requires that a pleading "***contain*** a short and plain statement," Br. 58 (emphasis in original), misunderstands the Rule. Following this logic, there would be no limit on the reasonable length or complexity of a complaint, so long as somewhere buried therein was a short and plain statement. This creative interpretation of Rule 8 is irrational on its face and ignores critical elements of the Rule's purpose.

The district court considered this argument directly. It did not, as the Restaurants state, "reject[] this argument, without addressing it, except to say that the 'SAC goes substantially too far.'" Id. The district court found the Restaurants' "view of the Rule is misguided," explained the purpose of Rule 8, detailed specific ways in which the SAC violates Rule 8, and concluded: "To require the City to answer the SAC as presently drafted imposes an unfair and unnecessary burden– one of the harms Rule 8 seeks to prevent. It also imposes a significant burden on the Court as it attempts to sift through the allegations of the pleading." Add. 8.

Finally, the Restaurants' assertion that the SAC complied with Rule 8 because "[t]here is no question" that the City and the district court understood the basis for the claims, Br. 59, is equally unavailing. Again, this argument ignores the additional purpose of Rule 8 of not imposing an undue burden on the court and adverse parties.

If, as the Restaurants suggest, their introduction section was meant to be the short and plain statement of the allegations, the SAC should have been limited to that 14-page, 51-paragraph section.

## CONCLUSION

For the reasons set forth above, the Restaurants failed to state claims against the City upon which relief could be granted. The City respectfully requests that this Court affirm the entry of judgment in their favor in all respects.

Date: May 23, 2025

Respectfully submitted,

**CITY OF BOSTON**

By its attorneys,

ADAM N. CEDERBAUM
Corporation Counsel

*/s/ Samantha H. Fuchs*
Samantha H. Fuchs
First Circuit Bar No. 1202037
Senior Assistant Corporation Counsel
Randall F. Maas
First Circuit Bar No. 1204232
Senior Assistant Corporation Counsel
Sam Dinning
First Circuit Bar No. 1215223
Senior Assistant Corporation Counsel
City of Boston Law Department
One City Hall Plaza, Room 615
Boston, MA 02201
(617) 635-4034
samantha.fuchs@boston.gov
randall.maas@boston.gov
samuel.dinning@boston.gov

# CERTIFICATE OF COMPLIANCE

I, Samantha Fuchs, certify pursuant to Fed. R. App. P. 32(g) that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because the entire document contains 12,115 words, as verified by the word count function of Microsoft Word, the word-processing system used to prepare this brief. I further certify that this document complies with the typeface requirements of Fed. R. App, P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word using 14-point Times New Roman font, a proportionally-spaced typeface.

Dated: May 23, 2025

*/s/ Samantha Fuchs*
Samantha H. Fuchs

# <u>CERTIFICATE OF SERVICE</u>

I, Samantha Fuchs, certify that on May 23, 2025, a true and accurate copy of the foregoing document was electronically filed with the United States Court of Appeals for the First Circuit by using the CM/ECF system and that all counsel of record will be served by the CM/ECF system.

/s/ *Samantha Fuchs*
Samantha H. Fuchs